**Peter M. ("Mac") Lacy (OSB # 013223)**
Oregon Natural Desert Association
2009 NE Alberta St., Ste. 207
Portland, OR 97211
(503) 525-0193
lacy@onda.org

**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC
24242 S. Engstrom Rd.
Colton, OR 97017
(503) 388-9160
davebeckerlaw@gmail.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

**OREGON NATURAL DESERT ASS'N,**

                         Plaintiff,

        v.

**JOHN RABY**, Acting Director, BLM,
**PRINCIPAL DEPUTY DIRECTOR**,
BLM, **BARRY BUSHUE**, State Director,
BLM Oregon/Washington, and **BUREAU
OF LAND MANAGEMENT**,

                         Defendants.

_____

No. 3:25-cv-363-_____

**COMPLAINT**

**(Environmental Matter)**

### NATURE OF ACTION

1.       Plaintiff Oregon Natural Desert Association ("ONDA") is compelled once again

to return to this Court and file suit challenging the Bureau of Land Management's ("BLM" or

"Bureau") latest attempt to spurn science-based management of the sagebrush habitat essential to the survival and recovery of the imperiled greater sage-grouse (*Centrocerus urophasianus*) (hereinafter "sage-grouse") in Oregon. A decade ago, in its 2015 sage-grouse conservation plan, the Bureau established thirteen reference areas on public lands in Oregon where it would remove domestic livestock grazing in order to undertake sorely needed scientific research. The Bureau said those thirteen "key" Research Natural Areas ("RNA"), covering about 22,000 acres of public land, were the "minimum number of sites and areas necessary" to provide statistically significant data and "support a coherent research plan." Yet, the agency dragged its feet and failed to actually implement the grazing closures. In 2022, this Court ruled that the Bureau's delay was unreasonable and ordered the agency to complete the closures "without further delay." *Or. Nat. Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813, 844 (D. Or. 2022). After three more years of delay, the Bureau issued a new decision on January 15, 2025, that, without reasoned explanation, would substantially roll back the size and number of study sites, and which still provides no deadlines or other certainty that the ungrazed reference areas will ever actually be implemented. This case seeks judicial reversal, partial vacatur, and other relief with regard to the Bureau's 2025 decision.

2.      As this Court understands, ungrazed areas serve as indispensable control sites to study the effects of grazing—and of not grazing—on unique sagebrush plant communities that are vital to sage-grouse. This iconic, but imperiled, bird relies exclusively on these unique high desert habitats for every part of its life cycle. The Bureau recognizes that undisturbed control sites are important to science-based management of public lands and resources. Yet, the agency has now decided, in its 2025 plan, to forsake its research needs identified in the 2015 plan by eliminating the 22,000 acres of closures provided by that plan, reducing the areas closed by the

2025 plan to only about 3,700 acres, and changing the definitions of a few terms—but never explaining its about-face with regard to the scientific importance and necessity of these ungrazed baseline areas. On top of this, the Bureau still never provides any deadline for completion of even the reduced set of closures, and it still refuses—after more than a decade of study now—to decide how the closures will be implemented, ignoring yet again that only the physical barrier of a fence will keep cattle from roaming into the study areas and effectively undercutting the research value of those areas every time that happens.

3.    The Bureau's 2015 conservation plan—the Oregon Greater Sage-Grouse Approved Resource Management Plan Amendment ("2015 ARMPA")—amended eight Resource Management Plans ("RMPs") in Oregon to conserve, enhance, and restore sage-grouse habitat. In a 2019 decision—the Oregon Greater Sage-Grouse Record of Decision and Approved Resource Management Plan Amendment ("2019 ARMPA")—the Bureau sought to further amend these RMPs to *eliminate* the key RNAs grazing closures. That 2019 ARMPA was immediately enjoined by a district court in Idaho, and it remains enjoined at this time. Now, in its latest Greater Sage-grouse Rangewide Planning Record of Decision and Approved Resource Management Plan Amendment for Oregon ("2025 ARMPA"), the Bureau is trying once again to largely abandon the science-based management provided by the key RNAs—reducing or eliminating the ungrazed areas for all but a single one of the key RNA research sites established in the 2015 plan.

4.    Adding insult to injury, the Bureau has collected no data from the areas made unavailable to grazing by the 2015 plan over the course of that past decade, having dragged its feet and resisted implementing the closures at every step of the way—including by so far refusing the construct the fencing necessary to keep grazing cattle out of the reference areas. This

Court held in 2022 that the Bureau had unreasonably delayed implementing closures of the 13 key RNAs, as was required under the 2015 ARMPA. *Or. Nat. Desert Ass'n v. Bushue*, No. 19-1550-SI (19-1550-SI ECF 148). The Court ordered the Bureau to "make unavailable to grazing the portions of the key RNAs specified in the 2015 ARMPA without further delay" and ordered that "BLM may not further authorize grazing on any portions of the 13 key RNAs designated unavailable to grazing" until the Court issued its Order on remedy.

5.      In 2023 and 2024, the Bureau agreed to keep cattle out of the key RNAs pursuant to a Stipulated Remedy, *see* Order Adopting Stipulated Remedy (19-1550-SI ECF 177) and Joint Report on Implementation of the Stipulated Remedy (19-1550-SI ECF 191), while the agency completed additional public processes needed to implement the grazing closures mandated by the 2015 ARMPA. But that requirement lapsed when the Bureau issued its January 15, 2025 Record of Decision approving the 2025 ARMPA. Now, absent relief from this Court, most portions of the key RNAs are available to livestock grazing for the first time in a decade, with no interim protection from grazing even in the smaller areas newly closed by the 2025 ARMPA. Grazing in these areas will erase the ungrazed scientific baseline once again leave the Bureau without vital information it plainly acknowledged it was lacking when it first established the ungrazed key RNAs in 2015.

6.      The conservation and scientific importance of the closure of RNAs to grazing was essentially undisputed during the public process leading to the 2015 ARMPA. These places represent important habitat areas for sage-grouse in Oregon. They are critical to the Bureau's ability to assess the impacts of livestock grazing and associated grazing management actions on sage-grouse, whether the removal of livestock will promote the recovery of degraded plant communities to the benefit of sage-grouse, and whether the agency's sage-grouse conservation

plan is actually working. In 2025, rather than explain whether or why these findings no longer are accurate, the Bureau instead just changed a few of the plan's definitions and contends that "lightly grazed" areas can provide essentially the same information as areas closed to livestock. This is not true.

7.      Adding further uncertainty to the situation, the newly installed Secretary of the Interior has ordered the Bureau to "review" and potentially further revise the 2025 ARMPA. *See* Joint Status Report ([19-1550-SI ECF 204](#)) at 3 ("Pursuant to Secretary's Order No. 3418, 'Unleashing American Energy' (February 3, 2025), the BLM is reviewing these [2025 ARMPA] decisions.").

8.      Plaintiff Oregon Natural Desert Association files this action to ensure that the Bureau is not permitted to repudiate the science-based conservation and research measures required by law and adopted for 13 identified RNAs in the 2015 plan. Accordingly, ONDA seeks relief from this Court, once again, to order the Bureau to immediately implement the 2015 ARMPA's key RNA closures and take immediate steps to preserve the status quo and ensure that no livestock enter the areas made unavailable to grazing by the 2015 ARMPA until the closures are implemented.

## JURISDICTION AND VENUE

9.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701–87, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370m-12, the Administrative Procedure Act ("APA"), and the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*. An actual, justiciable controversy exists between the

parties, and the requested relief is therefore proper under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 701–06.

10.     Venue is proper in this Court under 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, defendants reside in this district, and the public lands and resources and agency records in question are located in this district.

11.     The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## **PARTIES**

12.     Plaintiff OREGON NATURAL DESERT ASSOCIATION is an Oregon non-profit, public interest organization of about 25,000 members and supporters. It has offices in Portland, Oregon and Bend, Oregon. ONDA's mission is to protect, defend, and restore forever, the health of Oregon's native deserts. ONDA actively participates in Bureau and Department of the Interior proceedings and decisions concerning the management of public lands in eastern Oregon. ONDA brings this action on its own behalf and on behalf of its members and staff, many of whom regularly enjoy and will continue to enjoy the public lands and resources that are the subject of the final agency decision challenged in this action, for educational, recreational, spiritual, and scientific activities. ONDA has been active in monitoring ecological conditions for the sage-grouse on public lands managed by the Bureau throughout eastern Oregon, including within the agency's Prineville, Lakeview, Burns, and Vale Districts. ONDA participated throughout the public processes that led to the Bureau's adoption of the 2025 ARMPA.

13.     ONDA and its members use and enjoy the waters, public lands, and natural resources on and surrounding the thirteen key RNAs at issue in this case, for recreational,

scientific, spiritual, educational, aesthetic, and other purposes. They enjoy fishing, hiking, camping, hunting, bird watching, study, contemplation, photography and other activities in and around these public lands. The plaintiffs and their members also participate in information gathering and dissemination, education and public outreach, participating in agency land use and conservation planning processes, and other activities relating to the Bureau's management and administration of these public lands.

14.     Defendant JOHN RABY is sued solely in his official capacity as Acting Director of the Bureau of Land Management. The BLM Director has authority for the actions and inactions alleged herein. Plaintiff will amend this complaint or otherwise appropriately replace Acting Director Raby with his successor if/as one is appointed. *See* Fed. R. Civ. P. 25(d).

15.     Defendant PRINCIPAL DEPUTY DIRECTOR is sued solely in the official capacity as Principal Deputy Director of the Bureau of Land Management. The Principal Deputy Director is the Bureau official responsible for approving the 2025 ARMPA at issue in this case, and has authority for the actions and inactions alleged herein. At the time of this filing, this position is vacant, and Plaintiff will amend this complaint or otherwise appropriately replace the Principal Deputy Director with the acting or permanent appointee if/as one is appointed. *See* Fed. R. Civ. P. 25(d).

16.     Defendant BARRY BUSHUE is sued solely in his official capacity as State Director of the BLM Oregon/Washington, in Portland, Oregon. The State Director is the Bureau official responsible for implementing the 2025 ARMPA at issue in this case, and has authority for the actions and inactions alleged herein.

17.    Defendant BUREAU OF LAND MANAGEMENT is an agency of the United

States, and is charged with managing the public lands and resources governed by the 2025

ARMPA at issue in this case, in accordance and compliance with federal laws and regulations.


## STATEMENT OF FACTS

18.    Greater sage-grouse are symbolic of the vast, open lands between the Rocky

Mountains and the Sierra Nevada and Cascade ranges. But sage-grouse are in trouble. As many

as 16 million of these iconic birds once ranged across 297 million acres of sagebrush grasslands,

an area of western North America so vast it is sometimes called the Sagebrush Sea. Over the past

200 years, agriculture and development have reduced the bird's available habitat by nearly half.

The sage-grouse continues to struggle in Oregon and the West: the range-wide population has

declined 80% since 1965, and there are only about 25,000 birds remaining in Oregon today.

Scientists understand that the fate of the sage-grouse may be a harbinger for hundreds of other

species dependent upon the West's sagebrush habitats.

19.    The sagebrush ecosystem is among the most vulnerable in North America.

Scientists estimate that there has been a 45 percent loss in sagebrush area relative to its historical

distribution, which once likely covered more than 386,000 square miles of the Western United

States—an area five times the size of all of New England.

20.    The sage-grouse is in danger of extinction from fragmentation and loss of its

sagebrush habitat and increasing isolation of populations due to human activities. These include

livestock grazing, energy development and transmission, and ever-expanding motorized

transportation networks. Other factors, like Earth's changing climate, the establishment and

spread of weeds and invasive species that replace sagebrush plant communities, and changing

wildfire regimes in sagebrush landscapes, also have damaged sage-grouse habitat throughout the West including Oregon.

21.     Livestock grazing is one of the most ubiquitous threats to the sage-grouse. Grazing cattle consume native plants, trample and destroy soils and fragile spring and riparian areas, and increase the spread of sagebrush-replacing weeds. Cattle grazing in sage-grouse nesting areas during the April-May nesting season can cause sage-grouse hens to abandon their nests. The infrastructure of watering systems and barbed-wire fencing needed to manage herds of cattle in the desert also fragment and destroy sagebrush habitat, artificially concentrating cattle in important sage-grouse habitat areas, dewatering natural springs and water courses, and spreading weeds and invasive plant species that out-compete native plants.

22.     On December 29, 2003, ONDA, joined by 20 other conservation groups, petitioned the U.S. Fish and Wildlife Service ("FWS") to list the sage-grouse as threatened or endangered under the ESA. *See* 12-Month Findings on a Petition to List Greater Sage-Grouse (*Centrocerus urophasianus*) as an Endangered or Threatened Species, 80 Fed. Reg. 59,858, 59,859 (Oct. 2, 2015) (table summarizing previous federal actions for sage-grouse). The FWS denied that petition, concluding that the sage-grouse was "not warranted" for protection under the ESA. In 2007, a federal district court reversed that determination. *W. Watersheds Proj. v. U.S. Fish & Wildlife Serv.*, 535 F. Supp. 2d 1173 (D. Idaho 2007).

23.     After further study, the FWS published a new finding in 2010, determining that ESA protection was now "warranted" for the sage-grouse because of loss and fragmentation of sagebrush habitat and the inadequacy of the various state conservation plans then in place. 12-Month Findings for Petitions to List the Greater Sage-Grouse (*Centrocerus urophasianus*) as Threatened or Endangered, 75 Fed. Reg. 13,910 (Mar. 23, 2010). However, FWS also

determined that listing of the sage-grouse was precluded by higher priority listing actions. *Id*. at 13,910.

24.    The FWS based its "warranted" determination upon a 2009 monograph commissioned by the U.S. Geological Survey—*Ecology and Conservation of Greater Sage-grouse: A Landscape Species and its Habitats*—regarding the imperiled status of the sage-grouse and its habitat. The monograph collected unprecedented new research on the bird's life history, habitat needs, and threats to its survival and recovery. Much of the new research showed that sage-grouse are affected by habitat disturbance on far greater spatial scales than scientists had previously recognized.

25.    Citing that 2010 FWS finding, the Bureau, along with the U.S. Forest Service, launched its National Greater Sage-Grouse Planning Strategy in 2011. Under the Strategy, the agencies would amend federal land use plans across the West with sage-grouse conservation measures to avoid ESA listing. To guide that Strategy, a National Technical Team of sage-grouse experts was convened. The team released its Report on National Greater Sage-grouse Conservation Measures ("NTT Report") in 2011.

26.    The NTT Report emphasized the "overall objective" for saving the sage-grouse needed to focus on protecting highest-value, or priority, sage-grouse habitats from anthropogenic disturbances. The National Technical Team recognizes the importance of monitoring to provide an objective appraisal of both the positive and negative effects of various conservation actions and land management activities to sage-grouse populations and their habitats. So-called "adaptive management," based on monitoring, reveals gaps in knowledge about key processes and functional relationships. In turn, this helps to identify and prioritize research needs. The National Technical Team recommends that the Bureau study, among other things, the long-term

effects of grazing on sagebrush habitat, habitat changes due to herbivory, and altered sage-grouse behavior due to the presence of domestic livestock.

27.     In 2013, the FWS released its own expert Conservation Objectives Team Report ("COT Report"). That report identified Priority Areas for Conservation ("PACs"). These are key habitats necessary for sage-grouse conservation. The COT Report states that preserving the PACs "is the essential foundation for sage-grouse conservation." There are twenty PACs in Oregon.

28.     In 2015, the Bureau and the Forest Service unveiled a series of sweeping new plans to protect the sage-grouse and its sagebrush habitats on public lands across the West. The 2015 plans—known as Approved Resource Management Plan Amendments or "ARMPAs"— amended 98 existing land use plans across ten western states. This included eight BLM RMPs in Oregon, in the agency's Prineville, Lakeview, Burns, and Vale districts. The 2015 ARMPAs incorporated the NTT and COT Reports and were based on the "best available science."

29.     The 2015 federal plans represented an important step forward for sage-grouse conservation. Key features of the 2015 ARMPAs include protections for highest-priority habitats designated as Sagebrush Focal Areas, density and disturbance caps for energy and other industrial activity, buffers around sage-grouse breeding sites (called "leks"), triggers for increased protections if habitats or populations fall below specified levels, and a net conservation gain mitigation requirement for activities that affect grouse habitat.

30.     Monitoring habitat condition informs adaptive management and assessment of whether the plans are working. In Oregon, the 2015 ARMPA closed 13 "key" RNAs to livestock grazing, reserving these areas for scientific research and study. The 13 RNAs (or portions thereof) made unavailable to grazing by the 2015 ARMPA cover a total of about 22,000 acres of

public land. The Bureau had already closed two other key RNAs (Foster Flat and Guano Creek-Sink Lakes) to livestock grazing during previous land management planning processes. The map below shows the location of the key RNAs in eastern Oregon.



MAP 12: Key Research Natural Areas in Oregon

31.    The Bureau explained in the 2015 ARMPA and its accompanying Record of Decision and Final Environmental Impact Statement that the key RNAs were critical to the agency's ability to assess the impacts of livestock grazing and associated grazing management actions on sage-grouse and for gauging the effectiveness of ARMPA grazing measures. By removing grazing from these areas, the Bureau can study how a series of unique sagebrush plant communities respond in the absence of this otherwise ubiquitous, potentially destructive land use. In other words, these places were to serve as underlined baseline reference areas for the sagebrush plant communities they represent.

32.    There are almost no ungrazed areas on BLM-managed public lands within the range of the sage-grouse in Oregon, so the key RNAs grazing closure is crucial to the Bureau's ability to understand the effects of its grazing decisions and management throughout Oregon's high desert on the sage-grouse and to distinguish between areas that are properly and improperly managed. The Bureau authorizes and manages livestock grazing on more than 12 million acres of sagebrush habitat in eastern Oregon, so the information generated at the key RNAs is essential to understanding the effects of that management on these public lands.

33.    The Bureau also has explained that the 13 "key" RNAs closed to grazing in 2015 were the "minimum number of sites and areas necessary" to provide "sufficient replication and support a coherent research plan that would provide data with the statistical power" to extrapolate the results across all sage-grouse range in Oregon (and even into neighboring sagebrush habitat in Nevada and Idaho). In 2015, the Bureau also considered every other known ungrazed area in eastern Oregon, but found that *none* were sufficient to provide the information that the 13 identified key RNAs would provide.

34.     Although the Bureau's 2015 Record of Decision ("2015 ROD") indicated the key RNA grazing closures were "immediate decisions," the Bureau dragged its feet on implementing them. Then, in 2017, after Donald J. Trump took office, his new Secretary of the Interior, Ryan Zinke, issued an order directing the Department of the Interior to "review" the federal sage-grouse plans. A departmental review team in Washington, D.C. issued a report identifying ways to generally weaken or remove protections or processes established in the 2015 plans.

35.     In 2019, the Bureau decided to abandon the ungrazed key RNAs and resume livestock grazing in each of the 13 the areas. (The 2019 decision did not change the management of two other key RNAs, Foster Flat and Guano Creek-Sink Lakes, that had been closed to grazing during earlier, pre-ARMPA planning processes.) ONDA and other plaintiffs filed suit in this Court to challenge the 2019 decision. *Or. Nat. Desert Ass'n et al. v. Bushue*, No. 19-1550-SI (D. Or. filed Sept. 27, 2019).

36.     Later in 2019, the court in *Western Watersheds Project v. Schneider*, No. 1:16-cv-00083-BLW (D. Idaho filed Feb. 25, 2016), enjoined the Bureau from implementing the 2019 ARMPA for Oregon and other states. 417 F. Supp. 3d 1319, 1335 (D. Idaho 2019). The court ordered that "[t]he 2015 Plans remain in effect during this time." *Id*. The Idaho injunction remains in place today.

37.     After the Bureau continued to drag its feet on implementing the key RNA grazing closures, ONDA amended its complaint in *Bushue* and moved for partial summary judgment, arguing the Bureau had unlawfully withheld or unreasonably delayed implementation of the 2015 closures. In 2022, this Court agreed with ONDA and issued an Opinion and Order (19-1550 ECF 148) holding that the Bureau had unreasonably delayed implementing closures of 13 key RNAs. The Court directed the Bureau to "make unavailable to grazing the portions of the

key RNAs specified in the 2015 ARMPA without further delay" and ordered that "BLM may not further authorize grazing on any portions of the 13 key RNAs designated unavailable to grazing" until the Court issued a further order on remedy.

38.    In 2023, the Court adopted a Stipulated Remedy (19-1550 ECF 177) that described a series of steps the Bureau would take to finally effectuate the closures. In 2024, ONDA and BLM submitted a Joint Report (19-1550 ECF 191) updating the Court on the status of implementation of the Stipulated Remedy and stating that the Bureau would continue to implement the Stipulated Remedy and that BLM and ONDA each retained their rights described in the Stipulated Remedy.

39.    In 2023 and 2024, the Bureau made available for public comment, under NEPA, a number of site-specific environmental reviews considering alternatives for finally implementing the key RNA grazing closures required by the 2015 ARMPA, for the RNAs located on the agency's Vale District and Lakeview District. To date, the Bureau has not issued a final decision for any of those NEPA reviews—that is, for the Foley Lake, Fish Creek Rim, and Rahilly-Gravelly key RNAs on the Lakeview District, and the Spring Mountain, Black Canyon, Toppin Creek Butte, Mahogany Ridge, South Ridge Bully Creek, North Ridge Bully Creek, South Bull Canyon, Lake Ridge, and Dry Creek Bench key RNAs. All remain identified as "in progress" on the Bureau's ePlanning pages for each project, except for South Bull Canyon Key RNA, now shown as "cancelled" on ePlanning.

40.    In 2024, the Bureau issued both a Draft and then Final Environmental Impact Statement for its proposal to further amend its sage-grouse plans throughout the West including in Oregon. In the 2024 Final Environmental Impact Statement, the Bureau considered six alternatives. Alternative 1 would have preserved the 2015 ARMPA, including the key RNA

closure decisions, unamended. Alternative 2, which the Bureau called the "No Action" alternative, would have implemented the 2019 ARMPA. The Bureau explained that, although it is enjoined, the 2019 ARMPA is considered to be the "existing" plan amendment and, if Alternative 2 were selected, "the BLM would apply the management from the 2019 Approved RMP Amendments." Ultimately, the Bureau advanced as its Proposed RMP Amendment a version of Alternative 5, which would eliminate or reduce the size of the ungrazed reference areas in all but one of the 13 key RNAs, reducing the total area closed by the 2025 ARMPA to about 3,700 acres, compared with the roughly 22,000 acres closed by the 2015 ARMPA.

41.     Pursuant to Bureau land use planning regulations, ONDA administratively protested the proposed plan amendment on December 16, 2024. ONDA described concerns over the Bureau's proposal to reduce or eliminate ungrazed key RNAs, the fact that some of the Bureau's plant cover prescriptions for sage-grouse brood-rearing habitats are inconsistent with the best available science, and the Bureau's proposal to eliminate Sagebrush Focal Areas and failure to require a plan of operations for hardrock mining exploration activities in these core, highest-value habitat areas.

42.     On January 10, 2025, the Bureau published the BLM Director's Protest Resolution Report, summarizing the protest points received and the agency's responses to those points. The Bureau responded to some, but not all, of ONDA's protest points. For example, BLM regulations prohibit the agency from allowing livestock grazing in Wilderness Study Areas ("WSA") that are unallocated to grazing—as is the case for portions of the Fish Creek Rim, Dry Creek Bench, Lake Ridge, and Toppin Creek Butte Key RNAs that were made unavailable to grazing by the 2015 ARMPA—unless that grazing meets the FLPMA non-impairment standard or one of the exceptions enumerated in the Bureau's WSA management manual. In both its

comments and its administrative protest, ONDA described its concern that the Bureau was proposing to reallocate portions of these WSAs to grazing, but had failed to address the FLPMA non-impairment issue in the EIS. Absent any explanation from the Bureau, it would be unlawful for the agency to now allocate to grazing the approximately 6,695 acres of public lands that were made unavailable to livestock grazing under the 2015 ARMPA, in the Fish Creek Rim, Twelvemile, Camp Creek, and Oregon River Canyon Wilderness Study Areas. In the Protest Resolution Report, the Bureau simply never addressed this point.

43.　　On January 15, 2025, after rejecting ONDA's administrative protest, the Bureau issued a Record of Decision adopting the 2025 Approved Resource Management Plan Amendments for Oregon. The 2025 ARMPA further amends the 2015 and 2019 plan amendments. That is, anything the 2025 amendment did not change from those prior amendments remains in effect, albeit subject to the injunction that, for now, precludes implementation of the 2019 ARMPA.

44.　　In the 2025 ARMPA, including the Record of Decision, the Bureau once again reneged on its prior commitment to science-based management of livestock grazing in sage-grouse habitat. In the 2025 ARMPA, the Bureau decided to eliminate or dramatically reduce the ungrazed areas in all but a single one of the 13 key RNAs. The following table summarizes these changes:

//

//

//

//

//

| Key RNA | BLM District | Total RNA acres | Total 2015 ARMPA closure acres | Total 2025 ARMPA closure acres |
|---|---|---|---|---|
| East Fork Trout Creek RNA | Burns | 361 | 304 | 304 |
| Foster Flat | Burns | 2,687 | 2,687 | 2,687 |
| Fish Creek Rim RNA | Lakeview | 8,725 | 2,750 | 95 |
| Foley Lake RNA | Lakeview | 2,228 | 1,269 | 797 |
| Rahilly-Gravelly RNA | Lakeview | 18,678 | 8,282 | 2,025 |
| Guano Creek-Sink Lakes | Lakeview | 11,185 | 11,185 | 11,185 |
| Black Canyon RNA | Vale | 2,600 | 2,639 | 0 |
| Mahogany Ridge RNA | Vale | 444 | 155 | 69 |
| North Ridge Bully Creek RNA * | Vale | 1,569 | 164 | 0 |
| South Ridge Bully Creek RNA * | Vale | 621 | 397 | 0 |
| Spring Mountain RNA * | Vale | 996 | 996 | 0 |
| Dry Creek Bench RNA | Vale | 1,637 | 622 | 0 |
| Lake Ridge RNA | Vale | 3,857 | 769 | 13 |
| South Bull Canyon RNA | Vale | 770 | 747 | 257 |
| Toppin Creek Butte RNA | Vale | 3,998 | 2,685 | 203 |
| | | | | |
| | Total: | 60,356 | 35,651 | 17,635 |
| Total (excluding prior closures): | | 46,484 | 21,779 | 3,763 |

light green = closed under prior planning processes, unaffected by either ARMPA

**Notes:**
8 key RNAs still have some portions unavailable to grazing, with all remaining portions available to grazing.
3 key RNAs (*) are available to grazing, but with a 5-acres or less exclosure (location and size TBD).
2 key RNAs are available to grazing, no exclosure.

45. The Bureau has therefore cut the number of large, ungrazed references areas newly established in 2015 in half, from 13 down to just 8 (about a 47% reduction) and the number of ungrazed acres made unavailable to grazing by about 83%.

46. In its 2015 and 2019 reviews, the Bureau found that the 13 key RNAs (along with two other key RNAs, not at issue in this case, that had been closed to grazing in prior planning processes) represented the "minimum number of sites and areas necessary" to provide "sufficient

replication and support a coherent research plan that would provide data with the statistical power" to extrapolate the results across all sage-grouse range in Oregon (and beyond, into Nevada and Idaho). Nowhere in the 2025 ARMPA, including the Record of Decision, the accompanying Final Environmental Impact Statement, or the related BLM Director's Protest Resolution Report, does the Bureau explain its about-face with regard to that prior finding. This is a textbook instance of an unexplained reversal that renders an agency's decision arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

47.    Indeed, FLPMA, the federal law that provides the Bureau's authority to manage the public lands in eastern Oregon, specifically underscores the importance of science-based land management and decisionmaking. For example—

➢ Congress declared that it is the policy of the United States to, among other things, manage the public lands "in a manner that will protect the quality of scientific, . . . ecological, environmental" and other values and "that, where appropriate, will preserve and protect certain public lands in their natural condition" and "provide food and habitat for fish and wildlife and domestic animals." 43 U.S.C. § 1701(a)(8).

➢ The Bureau must manage the lands according to the principles of multiple use, which includes "scientific" values and management "without permanent impairment" of the "productivity of the land and the quality of the environment." 43 U.S.C. §§ 1702(c), 1732(a).

➢ In regulations adopted just last year, the Bureau emphasized that "to advance [its] multiple use and sustained yield mission by prioritizing the health and resilience of ecosystems across public lands" the agency "will protect intact landscapes, restore degraded habitat, and *make informed management decisions based on science and*

*data*." Conservation and Landscape Health, 89 Fed. Reg. 40,308, 40,308 (May 9, 2024) (rule codified at 43 C.F.R. Part 6100, and also emphasizing that "conservation is a use on par with other uses of the public lands" as part of the Bureau's multiple-use mission) (emphasis added).

48.     In its Final Environmental Impact Statement for the 2025 ARMPA, the Bureau deleted the word "undisturbed" from its description of what constitutes a key RNA "baseline reference area." The Bureau claims in the 2025 Record of Decision that "Key RNAs were identified to provide baseline vegetation information, but baseline reference areas were undefined in 2015." This is false: the 2015 ARMPA said the key RNAs would be "unavailable to grazing" and that the express purpose of the key RNAs is to (1) provide "baseline vegetation information to document successional changes," (2) serve as "areas for comparison" to grazed areas, and (3) "document vegetational shifts" in plant communities over time as they are affected by climate changes.

49.     The Bureau claims that an area that is "relatively unaltered" by grazing "levels of 20% or less of key indicator species" is a "more realistic standard under which to manage" and will provide the same information as an ungrazed area. In other words, the Bureau now claims that a "lightly grazed" area can provide the same baseline information as an ungrazed area. This is scientifically unsupportable. Among other problems, the reference the Bureau relies upon to support this notion is a decades-old "rangeland" textbook. The Bureau pulls the "lightly grazed" idea completely out of context.

50.     The Bureau also failed to undertake the required "conservation benefit" analysis to determine if fencing off the key RNA areas made unavailable to fencing would satisfy the lek buffer requirements and Required Design Features established in the 2015 ARMPA (and left

unchanged in the 2025 ARMPA). The Bureau failed to respond to this comment anywhere in the 2024 Final Environmental Impact Statement or 2025 Record of Decision and ARMPA.

51.     The Bureau also failed to explain how reducing and eliminating ungrazed areas deemed "key" to scientific research necessary to conservation of sage-grouse would be consistent with the purpose of the key RNAs. Consistent with FLPMA, Bureau regulations provide that, once established, an RNA shall not be managed in a manner inconsistent with the purpose of the research natural area. In its sage-grouse planning, the Bureau has explained that "activities that could impair scientific or education values" of the RNAs are "generally limited, restricted, or not allowed" so as to provide areas in the RNA that have "intact ecological conditions and processes."

52.     The Bureau claimed it needs to graze the key RNAs because "vulnerability to wildfire may increase as fine fuel loads build in the absence of livestock grazing." ONDA pointed out that the most recent wildfire hazard potential data show that the vast majority of all thirteen of the newly closed key RNAs are classified as Very Low, Low, or Moderate for wildfire hazard potential. Almost no areas are High or Very High potential. Removal of livestock from these areas has no appreciable effect on wildfire risk. The Bureau failed to respond to this comment.

53.     The Bureau stated that "making the key RNAs unavailable for livestock grazing would not address any threats to Greater Sage-grouse habitat identified in the COT report." That is false. The COT report lists "Grazing" as a threat, and it explicitly identifies livestock grazing as a threat in Oregon. The COT report also directs the Bureau to "[p]rioritize, fund, and implement research to address existing uncertainties," and the report explains that funding "key

research projects that will address uncertainties associated with sage-grouse and sagebrush

habitat management is essential."

54.    To date, the Bureau has failed to complete implementation of the key RNA

closures in Oregon.

55.    The Bureau may authorize livestock turnout on one or more of the allotments

and/or pastures (allotment units) containing key RNAs as early as April 1, 2025.

## FIRST CLAIM FOR RELIEF:
## VIOLATION OF THE FEDERAL LAND POLICY AND MANAGEMENT ACT
## AND ADMINISTRATIVE PROCEDURE ACT

56.    As alleged herein, through its January 15, 2025 Record of Decision, the Bureau

issued the 2025 ARMPA for Oregon, which amends the 2015 ARMPA and 2019 ARMPA.

While the 2015 ARMPA identified and made unavailable to livestock grazing portions or all of

13 key RNAs (in addition to two key RNAs already made unavailable to grazing through prior

planning processes), the 2025 ARMPA reduced the size of, or eliminated entirely, the ungrazed

research areas in 12 of the 13 key RNAs.

57.    To date, the Bureau has failed to implement the key RNA grazing closures, aside

from adopting a Range Line Agreement for the East Fork Trout Creek Key RNA and fencing off

half of the area made unavailable to grazing in the Foley Lake Key RNA.

58.    The APA forbids agency action that is "arbitrary, capricious, an abuse of

discretion or otherwise not in accordance with law" or is taken "without observance of procedure

required by law." 5 U.S.C. § 706(2)(A), (D).

59.    The 2025 Record of Decision and Approved Resource Management Plan

Amendment for Oregon violate FLPMA in one or more ways, including—

a. abandoning science-based land management required by FLPMA, implementing regulations, and Bureau policy;

b. failing to make a reasoned decision by failing to display awareness of, and failing to provide good reasons for changing, the Bureau's prior definitions related to grazing management and its finding that the number and acres of ungrazed key RNAs designated in the 2015 ARMPA represented the "minimum number of sites and areas necessary" to provide useful and statistically significant data;

c. reallocating livestock grazing within Wilderness Study Areas in violation of FLPMA's land use plan consistency and wilderness non-impairment requirements, 43 U.S.C. §§ 1732(a), 1782(c); and

d. unlawfully deciding to manage key RNAs "in a manner inconsistent with the purpose of the research natural area," 43 C.F.R. § 8223.1(b), and in violation of FLPMA's prohibitions against "unnecessary or undue degradation" of public lands and resources, 43 U.S.C. § 1732(b).

60. The Bureau's 2025 Approved Resource Management Plan Amendments, which weakened pre-existing protections for sage-grouse in Oregon, became final upon the BLM Director's resolution of the administrative protests to that amendment and the Bureau's issuance of the January 15, 2025 Record of Decision.

61. The 2025 ARMPA, including the Record of Decision, and the accompanying Final Environmental Impact Statement constitute final agency actions judicially reviewable by this Court pursuant to 5 U.S.C. § 706(2), and must be held unlawful and set aside for the reasons identified above.

**SECOND CLAIM FOR RELIEF:**
**VIOLATION OF THE NATIONAL ENVIRONMENTAL POLICY ACT**
**AND ADMINISTRATIVE PROCEDURE ACT**

62.     The 2024 Final Environmental Impact Statement, and the January 15, 2025 Record of Decision and 2025 ARMPA that rely upon the 2024 Final Environmental Impact Statement, violate NEPA in one or more ways, including—

a.   Failing to take a hard look at the effect on sage-grouse and the Bureau's ability to conduct scientific studies and manage livestock grazing due to the reduction and elimination of ungrazed reference areas and changes to key grazing management definitions;

b.   Failing to consider (1) replacement key RNAs for the five Key RNAs proposed to be completely re-allocated to livestock grazing and (2) failing to consider replacement acreages for the seven other RNAs proposed to be dramatically reduced in size, given the Bureau's prior findings that the 13 key RNAs established in 2015 represented the minimum number of areas and acres necessary to provide statistically significant, coherent and meaningful data;

c.   Failing to undertake a "conservation benefit" analysis to determine whether using fencing to close key RNA areas made unavailable to grazing meets the lek buffer requirements and Required Design Features established in the 2015 ARMPA and unchanged by the 2025 ARMPA; and

d.   Failing to respond to public comments raising substantial issues and concerns—for example, the fact that the best available science indicates removal of grazing from baseline study areas has no appreciable effect on

wildfire risk, the fact that federal and state agency expert scientists on the

Conservation Objectives Team identified livestock grazing as a threat in

Oregon and directed the Bureau to undertake research to study that threat, and

the fact that the 2015 ARMPA required the Bureau to undertake a

"conservation benefit" analysis to determine whether fencing was required to

physically establish ungrazed research areas in order to generate meaningful

baseline reference information.

63.     The 2025 ARMPA, including the Record of Decision, and the accompanying

Final Environmental Impact Statement constitute final agency actions judicially reviewable by

this Court pursuant to 5 U.S.C. § 706(2), and must be held unlawful and set aside for the reasons

identified above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

A.     Order, declare, and adjudge that defendants' January 15, 2025 Record of Decision

and Approved Resource Management Plan Amendment for Oregon and accompanying Final

Environmental Impact Statement are unlawful under, and in violation of, FLPMA, NEPA, and

the APA;

B.     Set aside and vacate the January 15, 2025 Record of Decision and Approved

Resource Management Plan Amendment for Oregon and accompanying Final Environmental

Impact Statement to the extent they alter the closures provided for by the 2015 ARMPA for the

13 key RNAs and any related changes to definitions of grazing management;

C.      Enter any injunctive or other relief necessary to mitigate for any resource-damaging or -threatening actions taken prior to this Court's issuance of a decision on plaintiff's claims;

D.      Issue an order directing defendants to immediately implement and impose the closures of the 13 key RNAs provided for in the 2015 ARMPA, and to take immediate measures to exclude livestock completely from the areas made unavailable to grazing in the 2015 ARMPA until implementation is completed;

E.      Award plaintiff its reasonable costs, litigation expenses, and attorney's fees associated with this litigation as provided by the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*., and all other applicable authorities; and

E.       Grant such other further relief as plaintiff may request or the Court deems just and proper.

DATED this 28th day of February, 2025.          Respectfully submitted,

s/ Peter M. Lacy

_____

Peter M. ("Mac") Lacy
Oregon Natural Desert Association

Of Attorneys for Plaintiff