# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **OREGON NATURAL DESERT ASSOCIATION**, <br><br> Plaintiff, <br><br> v. <br><br> **JOHN RABY**, Acting Director, BLM; **PRINCIPAL DEPUTY DIRECTOR**, BLM; **BARRY BUSHUE,** State Director, BLM Oregon/Washington, and **BUREAU OF LAND MANAGEMENT**, <br><br> Defendants. | Case No. 3:25-cv-363-SI <br><br> **OPINION AND ORDER** |

Peter M. ("Mac") Lacy, OREGON NATURAL DESERT ASSOCIATION, 2009 NE Alberta Street, Suite 207, Portland, OR 97211; and David H. Becker, LAW OFFICE OF DAVID H. BECKER, LLC, 24242 S Engstrom Road., Colton, OR 97017. Of Attorneys for Plaintiff.

Emma L. Hamilton, U.S. DEPARTMENT OF JUSTICE, ENVIRONMENT & NATURAL RESOURCES DIVISION, 201 Third Street, N.W. Suite 900, Albuquerque, NM 87102; and Luther L. Hajek, U.S. DEPARTMENT OF JUSTICE, ENVIRONMENT & NATURAL RESOURCES DIVISION, 999 18th Street, South Terrace, Suite 370, Denver, CO 80202. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

The Oregon Natural Desert Association ("ONDA") sued the Bureau of Land

Management ("BLM"), John Raby (acting director of BLM), Barry Bushue (state director of

BLM Oregon and Washington), and the Principal Deputy Director of BLM.[1] ONDA brings this lawsuit in response to BLM's January 15, 2025, decision that allegedly would substantially reduce the number of research sites in Oregon for scientists to better understand sagebrush habitat essential to the survival of greater sage-grouse. *See* First Amended Complaint ("FAC") (ECF 15) ¶ 1. In the pending motion for preliminary injunction, ONDA asks the Court to enjoin BLM from authorizing or allowing livestock grazing in approximately 22,000 acres of land located in "key" Research Natural Areas ("key RNAs") that were closed to grazing for scientific research in BLM's 2015 conservation plan for greater sage-grouse in Oregon.[2] The Court held a hearing on April 28, 2025. For the reasons described below, the Court grants ONDA's motion.

## STANDARDS

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in favor of the plaintiff; and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).[3] "Due to the urgency

---

[1] The Court refers to all Defendants collectively as "BLM."

[2] In the FAC, ONDA alleges that BLM may authorize livestock grazing on pastures within the key RNAs as early as April 1, 2025. FAC ¶ 66. After ONDA filed its motion for a preliminary injunction, however, the parties conferred, and BLM agreed to prevent livestock from entering those areas before May 1, 2025. *See* ECF 17 at 2.

[3] The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *See All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127,

of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013); *see also Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

## BACKGROUND[4]

Greater sage-grouse populations have rapidly declined in recent years. Declaration of Mark N. Salvo ("Salvo Decl.") (ECF 10) ¶ 14. The survival of the greater sage-grouse residing in the western United States depends upon the health of the sagebrush habitats upon which they depend. *Id.* Livestock grazing is one of the most significant threats to this vulnerable ecosystem. *Id.* ¶¶ 15-16; *see also* Declaration of J. Boone Kauffman, Ph.D. ("Kauffman Decl.") (ECF 11) ¶ 14; Second Declaration of J. Boone Kauffman, Ph.D. ("Second Kauffman Decl.") (ECF 27) ¶ 4. Cattle consume native plants, trample and destroy soils, and increase the spread of weeds that replace sagebrush. Second Kauffman Decl. ¶¶ 4-7. Cattle also disrupt sage-grouse shelter, breeding, nesting, and other phases of the birds' annual life cycles and migration patterns. Salvo Decl. ¶ 18.

In 2003, ONDA and other conservation organizations petitioned U.S. Fish and Wildlife Service ("FWS") to list the sage-grouse as threatened or endangered. *See* 12-Month Finding on a Petition to List Greater Sage-Grouse (*Centrocerus urophasianus*) as an Endangered or Threatened Species, 80 Fed. Reg. 59858, 59859 (Oct. 2, 2015). After seven years and intervening litigation, FWS published a finding in 2010, determining that Endangered Species

---

1131-32 (9th Cir. 2011). The Court does not apply this test in this case, and accordingly does not discuss it further.

[4] For a more extensive discussion of the history of sage-grouse conservation in Oregon, see *Oregon Natural Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813, 823-827 (D. Or. 2022).

Act ("ESA") protection was "warranted but precluded" for the sage-grouse. *See W. Watersheds Project v. Fish & Wildlife Serv.*, 535 F. Supp. 2d 1173, 1189 (D. Idaho 2007); 12-Month Findings for Petitions to List the Greater Sage-Grouse (*Centrocerus urophasianus*) as Threatened or Endangered, 75 Fed. Reg. 13910 (Mar. 23, 2010). FWS explained that the inadequacy of existing regulatory mechanisms was the key factor in this determination. 75 Fed. Reg. at 13973-82. BLM and the U.S. Forest Service ("USFS") launched the National Greater Sage-Grouse Planning Strategy to amend federal land use plans across the west and implement sage-grouse conservation measures. After years of strategizing with experts, BLM and USFS unveiled a series of plans to protect sage-grouse in the western United States. *See* Salvo Decl. ¶ 25. These 2015 plans—the 2015 Oregon Greater Sage-Grouse Approved Resource Management Plan Amendment ("the 2015 ARMPA")—amended 98 existing land use plans across ten states, including Oregon. *See id.* ¶ 2; *see generally* 2015 Record of Decision ("ROD") (ECF 20-3). The 2015 ARMPA sought to "avoid the continued decline of populations across the species' range." 2015 ROD at 1-7.

The 2015 ARMPA created 15 key RNAs that were to become unavailable for livestock grazing and instead used for scientific research and study. 2015 ROD at 2-18. The purpose of making these key RNAs unavailable to grazing was to create "baseline"—or control—sites for researching the effects of livestock grazing on sagebrush communities. *See* Kauffman Decl. ¶ 17; 2015 ROD at 2-33. The 2015 ARMPA made 21,957 acres of land on these RNAs "unavailable" by providing that BLM would not issue any new grazing permits for the RNAs. 2015 ROD 2-18. By 2015, grazing ceased on only two of the 15 key RNAs. 2025 ROD 1-16 (ECF 20-4). For that reason, the parties often refer to 13, as opposed to 15, key RNAs. Important to this case, and discussed in greater detail below, BLM stated in a 2018 Final Environmental Impact Statement

("FEIS") that the key RNAs were the "minimum number of sites and areas necessary" to provide reliable and coherent data on sage-grouse and sagebrush health. 2018 FEIS (ECF 12-5) at 4-8.

Eventually, BLM issued its proposed amendments to the 2015 ARMPA ("2019 ARMPA") which it adopted through a series of RODs implemented in 2019. In 2019, ONDA and other plaintiffs filed a different lawsuit in this Court. *Or. Nat. Desert Ass'n v. Bushue*, No. 19-1550-SI (D. Or. filed Sept. 27, 2019). Also that year, the District Court of Idaho enjoined BLM from implementing the 2019 ARMPA in Oregon and other states. *See W. Watersheds Project v. Schneider*, 417 F. Supp. 3d 1319, 1335 (D. Idaho 2019). Accordingly, the governing ARMPA became the 2015—not the 2019—ARMPA. *Id.*[5]

In 2022, the Court issued an Opinion and Order in the 2019 action, holding that BLM had unreasonably delayed in implementing closures of the 13 key RNAs. *See Or. Nat. Desert Ass'n v. Bushue,* 644 F. Supp. 3d 813, 844 (D. Or. 2022). The Court directed BLM to "make unavailable to grazing the portions of the key RNAs specified in the 2015 ARMPA without further delay." *Id.* In 2023, the Court adopted a Stipulated Remedy that described the steps that BLM would be permitted to take to achieve the RNA closures. *Or. Nat. Desert Ass'n v. Bushue*, 672 F. Supp. 3d 1101, 1107-08 (D. Or. 2023), *appeal dismissed sub nom. Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 2023 WL 7548185 (9th Cir. Oct. 20, 2023). The 13 key RNAs closed to grazing in 2022, 2023, and 2024. *See* Salvo Decl. ¶ 29; Kauffman Decl. ¶ 38.

In 2024, BLM issued a Draft EIS ("2024 EIS") and FEIS ("2024 FEIS") for its proposal to further amend the 2015 ARMPA. ONDA issued public comments to the 2024 EIS and a subsequent protest letter to the 2024 FEIS. *See generally* Oregon Natural Desert Association

---

[5] ONDA included claims against the 2019 ARMPA in its 2019 lawsuit—and, as discussed below, in the present action—in the event that the Idaho court lifted its injunction. *See* FAC ¶ 45.

May 24, 2024 Comments on March 14, 2024 Bureau of Land Management Greater Sage-Grouse Land Use Plan Draft Environmental Impact Statement (ECF 10-2); ONDA Protest Letter (ECF 10-3). On January 10, 2025, BLM published the BLM Director's Protest Resolution Report, which summarized ONDA's protest and BLM's responses. On January 15, 2025, BLM issued an ROD adopting the 2025 amendments ("2025 ARMPA") for Oregon. *See* 2025 ROD.[6] As relevant to the pending lawsuit, the 2025 ARMPA reduces the total ungrazed area of sagebrush landscape from about 22,000 acres (2015 ARMPA) to about 3,700 acres (2025 ARMPA). *See* Salvo Decl. ¶ 2; Kauffman Decl. ¶ 10. At the core of the present lawsuit is ONDA's allegation that BLM reneged on its commitment to sage-grouse protection in the 2015 ARMPA. FAC ¶ 55.

Specifically, ONDA alleges that BLM: (1) reduced the number of ungrazed RNAs from 13 to 8; and (2) cut the number of ungrazed acres within these RNAs by 83%. *Id.* ¶ 56. ONDA argues that this reduction is a dramatic departure from BLM's 2015 ARMPA and BLM's previous policy statement that the 13 RNAs were the "minimum number of site and areas necessary" to support the sage-grouse research. *Id.* ¶ 57. ONDA further alleges that BLM inexplicably removed the word "undisturbed" from its description of what constitutes a key RNA baseline area such that key RNAs may be exposed to "light grazing." *Id.* ¶¶ 59-60. Finally, ONDA alleges several procedural failures in the creation of the 2025 ARMPA. For example, BLM allegedly failed to explain how reducing ungrazed areas would be consistent with the purpose of the key RNAs. *Id.* ¶ 62. BLM also allegedly failed to respond to several of ONDA's

---

[6] The 2025 ARMPA does not assume a blank slate. Rather, anything that it does not change from the prior ARMPAs remains in effect (subject, of course, to the injunction of the 2019 ARMPA).

public comments, including about conducting a conservation benefit analysis and about grazing and wildlife risk.

ONDA alleges five claims against BLM. Of these claims, only the first two concern the 2025 ARMPA; the others concern the 2019 ARMPA, and as such, will not be addressed further in this Opinion and Order. ONDA's first claim is that the 2025 ARMPA violates the Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq*. ("FLPMA"). ONDA's second claim is that the 2025 ARMPA violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*. Both claims, however, assert violations of "general principles" of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* In the pending motion, ONDA asks the Court to preliminarily enjoin BLM from authorizing livestock grazing in the key RNAs that the 2025 ARMPA has opened to grazing.

## DISCUSSION

### A. Mandatory Versus Prohibitive Injunctions

BLM argues in a footnote that ONDA's requested relief is more akin to a mandatory injunction than a prohibitive injunction. As explained by the Ninth Circuit:

> A preliminary injunction can take two forms. A prohibitory injunction prohibits a party from taking action and "preserve[s] the status quo pending a determination of the action on the merits." *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988); *see also Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983) (a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits"). A mandatory injunction orders a responsible party to take action. A mandatory injunction goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored. In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages.
>
> The *status quo ante litem* referenced in *Chalk* means the last, uncontested status which preceded the pending controversy.

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009) (alterations in original) (cleaned up).

BLM states that as of January 2025, the 2025 ARMPA became the status quo. Thus, "[r]eversing course" back to the Stipulated Remedy or a version of the 2015 ARMPA would require BLM to take additional affirmative steps, such as revisiting established plans with grazing permittees and building fencing. The Court disagrees with BLM. Although BLM began discussions with permittees in January 2025, the key RNAs will not *open for grazing* until May 1, 2025. The *status quo ante litem* thus is the current status quo: a world where the key RNAs are ungrazed. ONDA seeks an injunction to prevent that future grazing from happening. Therefore, the injunctive relief sought in this motion is more appropriately characterized as prohibitive, not mandatory. *Cf. W. Watersheds Project v. Bernhardt*, 392 F. Supp. 3d 1225, 1262 n.18 (D. Or. 2019) (rejecting argument that injunction was mandatory because the requested relief would "*preclude* grazing from *commencing*" as opposed to requiring the "round up and removal of cattle from any allotment" (emphasis in original)). The Court, therefore, will not apply the heightened standard applicable to requests for a mandatory injunction.

**B.  Likelihood of Success on the Merits**

As discussed above, ONDA brings against BLM one claim under FLPMA and one claim under NEPA. Both claims, however, assert violations of "general principles" of the APA. The Court will address these "general principles" first and then turn to the FLPMA and NEPA claims, respectively.

**1.  APA**

At the heart of both ONDA's FLPMA and NEPA claims is that BLM's decision in the 2025 ARMPA to reduce the size and number of ungrazed reference areas was arbitrary and

capricious. BLM asserts that its decision was within its discretion as an agency and that the Court should afford BLM deference.[7]

The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is "arbitrary and capricious" if the agency has offered "an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Unexplained inconsistency" between agency actions is "a reason for holding an interpretation to be an arbitrary and capricious change." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). In other words, agencies have a duty to explain any "departure from prior norms." *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973); *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. NLRB*, 802 F.2d 969, 974 (7th Cir. 1986) ("[A]n administrative agency is not allowed to change direction without some explanation of what it is doing and why."). Thus, agencies may change existing policies as long as they provide a reasoned explanation for the change. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). A policy change satisfies APA requirements if: (1) the agency displays "awareness" that it is changing positions; (2) the new policy is "permissible" under the statute; (3) "there are good reasons for" the new policy; and (4) the agency "believes" the new policy to be "better." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

---

[7] The 2025 ROD is subject to judicial review under the APA. *See, e.g.*, *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1087-91 (9th Cir. 2003).

ONDA argues that BLM itself articulated that the key RNAs as defined in 2015 represent the minimum amount of land necessary to conduct valuable scientific research. ONDA derives its position on this issue from a paragraph in BLM's 2018 FEIS:

> The remaining 15 key RNAs and acres in the 2015 ROD/ARMPA were considered the minimum size and placement needed to provide a sufficient land base and mix of vegetation types to meet the research need and retain the statistical power and scope of inference that could be extrapolated over the planning area as a whole and into adjoining states.

2018 FEIS at 2-4. BLM's response is that "there is no agreed minimum size for purposes of comparing areas that are undisturbed with those that are utilized for some purpose." *See* 2025 ROD at 1-16. BLM argues that "[n]owhere in the 2015 FEIS, 2015 [ROD], or 2015 ARMPA did BLM determine (or even discuss) a minimum number of study areas, minimum acreage, or specific configuration of the areas that would be necessary to facilitate research in the key RNAs."

Although BLM's position that it did not assert a "minimum" in 2015 may be accurate, BLM ignores what it wrote in the 2018 FEIS. BLM argues only that the 2018 FEIS does not explain *where* in the 2015 ARMPA or 2015 FEIS that BLM determined that the key RNAs constituted the minimum number of acres. But BLM's statement in the 2018 FEIS clearly reflects the agency's view in 2015, and in 2018, that the 15 key RNAs "were considered the minimum." Indeed, BLM repeated this sentiment in its 2020 Final Supplemental Environmental Impact Statement ("2020 FSEIS"), where BLM justified its decision in June 2016 not to reduce the size of the key RNAs. *See* ECF 30-1 at 2 ("The BLM considered the remaining 15 key RNAs and acres identified in the 2015 ROD/ARMPA the minimum size and placement needed . . . ."). Thus, from 2015 through 2020, BLM's position remained consistent. It was only in 2025 that BLM changed course, reducing the size of the RNAs and allowing for light grazing.

The parties agree that BLM has met the first, second, and fourth *Fox* requirements.[8] The parties dispute whether BLM provided "good reasons" for the change in policy. In support of their positions, ONDA analogizes to, and BLM distinguishes, *Organized Villages of Kake v. U.S. Department of Agriculture*, 795 F.3d 956 (9th Cir. 2015). In that case, the Ninth Circuit assessed the validity of a rule that limited road construction and timber harvesting in national forests. *Id.* at 959. At the time, the Department of Agriculture had expressly found that exempting the Tongass National Forest from the rule would "risk the loss of important roadless area [ecological] values," but reversed course two years later when it found the application of the roadless rule "unnecessary to maintain the roadless values." *See id.* (quotation marks omitted). The court explained that the ROD in which the Department articulated its new position did not "explain why an action that it found posed a prohibitive risk to the Tongass environment only two years before now poses merely a 'minor' one." *Id.* at 969. Accordingly, the court held that the Department's change in policy violated the APA. *Id.*[9]

BLM distinguishes *Kake* on the ground that in *Kake*, the Department's change in policy was based on the same factual record as its original decision. *See id.* at 959. By contrast, BLM argues, the decision to reduce the key RNAs in 2025 was based on extensive scientific research that occurred between 2015 and 2025. The Court agrees with BLM that an agency may change

---

[8] BLM also argues that the *Fox* analysis may not apply because its "changes to management direction for key RNAs" was not a *policy change*. The Court disagrees; BLM's previous position, as articulated in the 2015 ARMPA and effectuated by the Stipulated Remedy, was that the key RNAs would remain ungrazed; under the 2025 ARMPA, BLM has allowed some of that land to open to grazing.

[9] Similarly, in *Humane Society v. Locke*, 626 F.3d 1040, 1045-46 (9th Cir. 2010), the Ninth Circuit held that a determination by the National Marine Fisheries Services that sea lions posed a "significant negative impact" on fish populations constituted an unexplained—and therefore impermissible—departure from previous findings that comparable dangers to similar fish populations would not have a significant adverse impact.

its position on a policy when confronted with new scientific revelations. And, BLM did provide

extensive discussions in Appendix 17 to its 2024 FEIS ("Appendix 17") (ECF 20-1) of why it

was reducing the size of the key RNAs.[10] Nevertheless, deference to BLM's determination that

the 2025 ARMPA satisfies *research needs* is likely not appropriate because BLM failed to

provide an explanation, supported by expertise, for reversing course on its earlier factual finding

about minimum amounts of land necessary *to do research*.[11]

BLM also attempts to distinguish *Kake* on the grounds that the Department of Agriculture

"fully reversed" a prior policy, whereas the 2025 ARMPA's key RNA provisions largely remain

in line with the goals of the 2015 ARMPA. The Court agrees with BLM that the change in policy

here may not be as dramatic as the one in *Kake*, but finds that *Kake* is still persuasive. After all,

BLM explicitly states that it is "changing" and "updating" the definition of the key RNAs. 2025

ROD at 1-15-16. Although the 2025 ARMPA may share some of the goals of the 2015 ARMPA,

it alters without sufficient explanation the method by which the 2015 ARMPA purported to

achieve those goals.

In conclusion, the 2025 ROD rests on factual findings contradicting those in

the 2018 FEIS describing the position of the 2015 ARMPA. Namely, the 2015 ARMPA,

---

[10] BLM also in the 2025 ROD examples of scientific studies that were conducted on smaller plots of land. *See* 2025 ROD at 1-17. But BLM does not explain why these studies are sufficiently analogous to the ones contemplated in this case.

[11] The closest that BLM gets to an explanation is its statement in the 2025 ROD that "there is no scientific consensus on the minimum size of an area allocated as unavailable to grazing that is necessary to study plant succession." 2025 ROD at 1-16. Nothing in this statement indicates a change in facts or scientific understanding after the 2015 ARMPA was issued. In fact, the three studies conducted on smaller plots of land, *see* footnote 10, were all published before 2015. Thus, BLM would have been aware—or should have been aware—in 2015 of the absence of scientific consensus on the minimum size required for meaningful baseline areas. It nevertheless committed to the idea that the key RNAs *were* the minimum, and nothing in the quoted statement indicates an explanation for that departure.

the 2018 FEIS, and the 2020 FSEIS all indicate that BLM held, as a matter of fact, that the key RNAs as defined in 2015 represented the "minimum" number of acres necessary to provide baselines for meaningful scientific research. In the 2025 ROD, BLM departed from that finding and is now opening up some of that land to grazing. BLM does not explain why this reduced amount of land will still provide statistically valuable baselines *for the type of large-scale research that BLM sought to do with the key RNAs*. Therefore, ONDA is likely to succeed on its FLPMA and NEPA claims to the extent that they are based on the general prohibition against arbitrary and capricious agency action under the APA.

## 2. FLPMA

ONDA alleges that four of the key RNAs—Fish Creek Rim, Dry Creek Bench, Lake Ridge, and Toppin Creek Butte—overlap with land designated as Wilderness Study Areas ("WSAs"). ONDA argues that FLPMA requires BLM to manage WSAs "so as not to impair the suitability of such areas for preservation as wilderness." *See* 43 U.S.C. § 1782(c).

FLPMA provides direction to BLM for the management of public lands. "In enacting FLPMA, Congress declared that it is the policy of the United States to manage the public lands in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air, and atmospheric, water resource, and archeological values." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 498-99 (9th Cir. 2011) (quotation marks omitted). FLPMA requires the government to manage the public lands "in accordance with the land use plans . . . when they are available." 43 U.S.C. § 1732(a). When the government adopts a plan, all future resource management authorizations and actions must conform with that plan. *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 42 (9th Cir. 2025) (citing 43 C.F.R. § 1610.5-3(a)). "The statutory directive that BLM manage 'in accordance with' land use plans, and the regulatory requirement that authorizations and actions 'conform to' those plans, prevent BLM from taking

actions inconsistent with the provisions of a land use plan." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69 (2004). Thus, any BLM land use decision contrary to the plan "can be set aside as contrary to law pursuant to 5 U.S.C. § 706(2)." *Id.*

BLM first argues that its WSA management manual explains that proposals for new uses and facilities must meet the non-impairment standard "unless excepted." BLM asserts that the "legacied uses" exception applies in this case. *See* Manual 6330 (ECF 12-10) at 1-12. Under this exception, "[g]razing . . . that [was] allowed on the date of approval of FLPMA (October 21, 1976)—or the designation date for Section 202 WSAs not reported to Congress—[is] allowed as a preexisting use and exempt from the non-impairment standard." *Id.* As ONDA argues, however, the text in Manual 6330 suggests that the exemption applies only to uses that *already exist*, not to *new* land use allocations. *See id.* (explaining that "these uses and facilities may *continue* in the same manner and degree as on [the relevant date]" and that "[t]he benchmark for the 'manner and degree' of an *existing* use is the physical and visual impact that use was having on the area on [the relevant date]" (emphases added)). In this case, the 2015 ARMPA closed the key RNAs to grazing. Thus, when the 2025 RNAs reopened some of these key RNAs to grazing, it created new allotments that came into existence in 2025. Therefore, the "legacied uses" exception to FLPMA compliance likely does not apply to the 2025 ARMPA.

BLM further argues that its management of the key RNAs is consistent with its power under the BLM and FLPMA implementing regulations. BLM emphasizes that only the "original" purpose of the RNAs matters, and that neither the 2015 nor the 2025 ARMPA amended the underlying values for which those RNAs had originally been designated. Thus, the Court turns to BLM's statements about the purpose of the RNAs. BLM stated in its 2018 FEIS that "[t]he primary research purpose for BLM's closure [of the key RNAs] would be to study whether

livestock grazing has adverse, beneficial, or no impact on the availability of forbs and insects

important to prelaying hens and Greater Sage-Grouse chicks." 2018 FEIS at 4-8. "BLM intended

the closed areas to serve as controls for studying grazing impacts on the same plant communities

outside of the closed areas." *Id.* Opening the key RNAs to grazing appears to contravene the

RNAs' intended purpose of providing an ungrazed baseline *against which* to measure grazed

lands. Without sufficient explanation for this inconsistent course of action, BLM likely runs

afoul of FLPMA and the arbitrary and capricious standards outlined in the APA. Thus, ONDA

has shown likelihood of success on the merits with respect to its claim under FLPMA.

### 3. **NEPA**

ONDA further claims that BLM violated its obligations under NEPA to take a "hard

look" at the environmental consequences of the 2025 ARMPA. NEPA "is the basic national

charter for protection of the environment." 40 C.F.R. § 1500.1(a) (2024).[12] The purpose

of NEPA is twofold: (1) to ensure that agencies carefully consider information about significant

environmental impacts; and (2) to guarantee relevant information is available to the public and

decisionmakers at a time when decisionmakers retain a maximum range of options. *See N. Plains*

*Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011); *Pit River Tribe v.*

*U.S. Forest Serv.*, 469 F.3d 768, 785 (9th Cir. 2006). "In order to accomplish

this, NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at

environmental consequences." *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th

Cir. 2005) (quotation marks omitted). "NEPA requires that 'to the fullest extent possible . . . all

---

[12] The Council on Environmental Quality issued new regulations that went into effect
after the FEIS and ARMPA that are before the Court were issued, and thus the Court evaluates
the sufficiency of the challenged agency action under the version of the regulation that existed
when BLM promulgated these documents.

agencies of the Federal Government shall' complete an environmental impact statement (EIS) in connection with 'every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment.'" *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 640-41 (9th Cir. 2014) (alteration in original) (quoting 42 U.S.C. § 4332(2)(C)). Indeed, "[u]nder BLM regulations, the agency must prepare an EIS when adopting a Resource Management Plan." *Mont. Wildlife Fed'n*, 127 F.4th at 20 (citing 43 C.F.R. § 1601.0-6 (1983)). "In addition to the proposed agency action, every EIS must '[r]igorously explore and objectively evaluate all reasonable alternatives' to that action. The analysis of alternatives to the proposed action is 'the heart of the environmental impact statement.'" *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir. 2010) (citing 40 C.F.R. § 1502.14(a).[13] ). "In reviewing the adequacy of an EIS, this circuit employs a 'rule of reason' that asks whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016) (cleaned up). NEPA claims are reviewed under the standards of the APA. *Jewell*, 747 F.3d at 601.

ONDA has shown, among other things, that BLM failed to (a) create key RNAs to replace the key RNAs that would be re-allocated to livestock grazing and (b) consider replacement acreages for the key RNAs that would be dramatically reduced in size. ONDA argues that these alleged failures violate NEPA because BLM provided in its 2018 FEIS that the 13 key RNAs were the "minimum" number of areas and acres to do meaningful research. ONDA emphasizes that BLM failed to provide the public with a meaningful opportunity to

---

[13] The version of this regulation that existed in 2024, when the FEIS in this case was issued, is identical to this phrasing.

address the notion that there is "no scientific consensus" on the minimum number of ungrazed baseline sites and that "lightly grazed" areas are sufficient to provide a baseline. The Court finds that ONDA has shown a likelihood of success on the merits that BLM did not meet NEPA's hard look requirement.

First, BLM's decision to define "relatively unaltered" in the ROD likely deprived the public of a meaningful opportunity to participate in the comment process. The 2024 DEIS contains the phrase "relatively unaltered" once. The 2024 FEIS contains the phrase "relatively unaltered" 33 times. BLM, however, does not define that phrase in either document. It is only in the 2025 ROD that BLM states that it is "defining 'relatively unaltered' as exhibiting utilization levels of 20% or less of key indicator species, which is considered negligible to very light grazing." 2025 ROD at 1-15. In other words, as ONDA argues, the ROD would have been the first time that the public would have learned that "relatively unaltered" meant "lightly grazed."

BLM responds that the 2025 ROD merely "crystallized" a proposed path forward that BLM had already provided in its EIS and FEIS. In support, BLM distinguishes *Oregon Natural Desert Ass'n v. Rose*, 921 F.3d 1185 (9th Cir. 2019), arguing that in *Rose*, the agency failed to include critical baseline resource condition information in its NEPA analysis and provided it only after public comment had closed. BLM asserts that ONDA provided no authority "for the proposition that an agency cannot advance or crystallize its rational for the first time in its ROD." But BLM's discussion of "relatively unaltered" does not appear merely to *support* an *existing* rationale in its EIS and FEIS, but rather to state *what* BLM *meant* by "relatively unaltered." Without defining an important phrase and receiving feedback on the definition from the public, BLM may have failed to "analyze[] the environmental impacts of the [2025 ARMPA]

PAGE 17 – OPINION AND ORDER

properly," *Rose*, 921 F.3d at 1192, and thus deprived ONDA and others of meaningful public

participation.

Second, BLM likely failed to explain its change of direction regarding the minimum

number of sites and areas needed to generate meaningful scientific data. BLM explains that in

Appendix 17, BLM provided a detailed analysis of the baseline conditions of each key RNA and

its rationale for reallocating each key RNA for livestock grazing. Indeed, BLM's analysis is

extensive. *See, e.g.*, Appendix 17 at 17-12 (explaining that the Black Canyon key RNA will be

opened to livestock grazing because "[p]rior to the removal of livestock grazing from this key

RNA, there was no indication of negative impacts from livestock grazing to these vegetative

communities or the relevant and important values for which the RNA was designated"); *id.* at 17-

18 (explaining that the Dry Creek Bench key RNA will be opened to grazing because there is

"limited adequate available water and the remote, rugged nature of the area naturally limits

livestock use in this key RNA").

The problem with BLM's analysis is that although it makes statements about the limited

effects of grazing on the land, BLM does not explain how opening the key RNAs is consistent

with its previous position that it *needed* the 2015 key RNAs to conduct meaningful science. To

the extent that BLM addresses this issue in Appendix 17, it does so in conclusory fashion. *See,*

*e.g.*, Appendix 17 at 17-18 ("The key RNA would continue to provide research opportunities to

study relatively unaltered plant community types important to sage-grouse without additional

fencing as it is largely undisturbed."). As discussed above, however, BLM does not explain why

grazed land is an adequate substitute for ungrazed land to provide baselines *for research*. Indeed,

ONDA raised concerns in both comments to the 2024 EIS and protest letters to the 2024 FEIS

that reducing the size of baseline areas would diminish from those areas' scientific value. *See,*

*e.g.*, Oregon Natural Desert Association May 24, 2024 Comments on March 14, 2024 Bureau of

Land Management Greater Sage-Grouse Land Use Plan Draft Environmental Impact Statement

at 77-78 (comments regarding Black Canyon key RNA); ONDA Protest Letter at 4-5 (protest

letter explaining that the purpose of the key RNAs is to create ungrazed baseline sites). But BLM

did not address those concerns in the 2025 ROD, and for that reason, likely violated NEPA's

mandate to "guarantee relevant information [concerning the implementation of the 2025

ARMPA] is available to the public." *See N. Plains Res. Council, Inc.*, 668 F.3d at 1072.

## C. Irreparable Harm

ONDA alleges two interests at risk of irreparable harm: (1) its interest in land use and

(2) its interest in science-based land management practices.

### 1. ONDA's interest in the conservation of scientific reference areas in ungrazed sagebrush plant communities in a natural condition

ONDA alleges that its members have visited and intend to continue visiting the ungrazed

lands to "enjoy them in their undisturbed state and document these examples of how ONDA's

efforts to conserve sage-grouse and scientific management of public lands have come to

fruition." At the outset, the Court notes that the loss of the ability to view, experience, and use

natural areas in their undisturbed state is a cognizable, irreparable injury. *See All. for the Wild

Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *League of Wilderness Defs./Blue

Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014); *High Sierra

Hikers Ass'n v. Blackwell*, 390 F.3d 630, 642-43 (9th Cir. 2004).

BLM does not dispute this proposition. Rather, BLM's position is that ONDA has not

sufficiently shown *irreparable harm* to this cognizable interest. Both parties rely primarily on

*Alliance for the Wild Rockies v. Cottrell* in support of their positions on this issue. *Cottrell* held

that a logging project would irreparably harm Alliance for the Wild Rockies members' abilities to "'view, experience, and utilize' the areas in their undisturbed state." 632 F.3d at 1135.

The Court finds that ONDA sufficiently has shown irreparable harm to this interest. First, there is an important factual difference between when the Court rejected similar arguments in 2022[14] and now, in 2025: the key RNAs have been *ungrazed* in the time after the close of grazing in 2022. *See* Salvo Decl. ¶ 39. Unlike in 2022, these key RNAs have had up to three years to recover from decades of rotational grazing. ONDA members have been able to view them within the last three years and observe that recovery. Because—unlike in 2022—ONDA members can view the undisturbed land *right now*, the Ninth Circuit's concerns about the ability to "'view, experience, and utilize' the areas in their undisturbed state" applies.

Second—contrary to BLM's position—although grazing may not have effects as long-spanning as the logging in *Cottrell*, grazing *does* have long-term effects on sagebrush communities. Livestock grazing has "long been recognized . . . as negatively impacting native vegetation, soils and the ecological integrity of sagebrush steppe. Direct impacts include consumption of native grasses, trampling of shrubs and understory, and soil disturbance and erosion." Salvo Decl. ¶ 15. Invasive plants dry out quicker than native plants, exacerbating wildfires (that in turn destroy native seeds more than invasive grasses). *Id.* ¶ 17. This "downward ecological spiral," combined with livestock methane emissions that contribute to climate change, "escalat[es] stress on native vegetation and ecosystems . . . [and] are devastating to sage-grouse and other species that rely upon healthy, intact, resilient and connected sagebrush plant communities for food, shelter, breeding, nesting and other phases of their annual life cycles." *Id.*

---

[14] In the 2019 litigation, the Court denied ONDA's motion for a temporary restraining order. *See* 594 F. Supp. 3d 1259 (D. Or. 2022).

¶ 18; *see also* Second Kauffman Decl. ¶¶ 4-7, 17-18 (describing the devastating long-term effects of grazing on soil and native plant life).

BLM's response is that its pastures are grazed on a cyclical basis, and each pasture is rested every few years to facilitate regrowth. But the fact that land may recover for short periods of time does not mean that it would have healed from decades of cyclical grazing or that there is no irreparable harm. As ONDA explains in its reply, BLM's view of the effects of grazing is "too simplistic." *See Bernhardt*, 392 F. Supp. 3d at 1254 ("Although sagebrush may recover within 50 to 100 years . . . that does not mean that harm to this habitat is not irreparable."). The Court finds persuasive ONDA's argument that "[w]hile grasses consumed by livestock may grow back the next season, other environmental damage from grazing takes far longer to recover." These effects include soil erosion, streambank damage, and "profound" changes to plant species composition. *See generally* Second Kauffman Decl.

Third, BLM argues that there will be alternative areas for ONDA members to experience ungrazed sagebrush plant communities. But, as ONDA responds, *Cottrell* indicates that the existence of alternative lands is not relevant. In *Cottrell*, USFS argued that the plaintiffs could still "view, experience, and utilize" areas of the forest that were not being logged. *See* 632 F.3d at 1135. The Ninth Circuit rejected USFS's argument, explaining that "[i]ts logical extension is that a plaintiff can never suffer irreparable injury resulting from environmental harm in a forest area as long as there are other areas of the forest that are not harmed." *Id.* The Court applies *Cottrell*'s holding to this case. Even if BLM is correct that there are thousands of acres of other sagebrush communities available to ONDA members, that is not relevant to the question of accessing the specific undisturbed acres in the key RNAs.

Finally, ONDA's injury is not de minimus; the interest is in tens of thousands of acres of land. *Cf. id.*  (USFS activity affecting 1,652 acres was "hardly a de minimus injury); *Bernhardt*, 392 F. Supp. 3d at 1258 (BLM activity affecting 15,800 acres was not de minimus). For these reasons, ONDA sufficiently has shown irreparable harm in the absence of injunction.

### 2.  ONDA's interest in science-based land management

ONDA also states that to adequately protect the sage-grouse, BLM needs to understand grazing and its effects on the habitat. ONDA has shown that BLM currently lacks the data to facilitate that understanding. To conduct research properly, BLM scientists need baseline reference areas—controls—against which those scientists can measure the effects of grazing. The key RNAs provide critical baseline areas and restoring them to grazing will diminish those RNAs' usefulness as controls. If the status quo is preserved, however, then the RNAs can serve as baseline reference areas for future studies.

BLM provides a series of responses. First, BLM argues that the 2025 ARMPA will continue to provide valuable research opportunities for scientists. In the 2025 ROD, BLM states that RNAs subject to "light grazing" "maintain research opportunities while better reflecting the reality of natural disturbances that may affect the landscape as well as minor disturbances that may result from BLM continuing to carry out its multiple-use mission on surrounding lands." 2025 ROD at 1-15. As discussed, BLM's position is that "light grazing"—in turn defined as exhibiting utilization levels of 20% or less of key indicator species—will leave key RNA sites "relatively unaltered." BLM supports its position with five scientific studies. *Id.* at 1-15-16.

As detailed in the analysis of the merits, BLM conflates two related concepts. Even if "light grazing" has limited impacts on sagebrush communities, that does not mean that a "lightly grazed" area can still function as an *adequate baseline research area* for scientific research. As ONDA notes in its reply, the "*scientific point* of key RNAs is to assess sagebrush plant

community response in the absence of domestic livestock." (emphasis in original). Indeed, "BLM has the entire spectrum of grazed areas on the other 12 million acres it manages—so it can look at literally thousands of locations across eastern Oregon to collect data on what 20% grazing looks like, what 30% looks like, [etc.]. What is missing is locations with 0%." Second Kauffman Decl. ¶ 8. BLM fails to explain why reclassifying the key RNAs to allow grazing, however light that grazing may be, would continue to allow for the meaningful scientific research that BLM described in the 2015 ARMPA and reiterated in the 2018 FEIS. Thus, the Court finds unpersuasive BLM's first response to this allegation of irreparable harm.

Second, BLM argues that ONDA fails to show harm to *ONDA's own research interests*, as opposed to the consequences that the 2025 ARMPA may have on research conducted by BLM or third parties. ONDA provides several responses to this argument. Among them is that "it would be difficult for a scientist to justify research funding in proposals until there is a definitive resolution of the uncertainty" regarding the future of the key RNAs. Kauffman Decl. ¶ 35; *see also id.* ("[N]o scientist would be certain that establishing long term experiments comparing grazed vs ungrazed plant communities would not be destroyed by resumption of grazing or extensive trespass in the absence of fully-implemented ungrazed exclosures."). The Court finds this argument persuasive. Without certainty that their baseline research areas would remain intact, it easy to see why scientists would refrain from starting large scale research projects in reliance on those baselines. And, in the absence of a preliminary injunction, these scientists would lose the about three years of restoration, which would in turn delay research until baseline sites can again be established.

Third, BLM asserts that 18,265 acres across the 13 key RNAs will remain "unavailable" to grazing, with an additional 9,724 acres rested for this season. But land that merely is *rested*

in 2025 does not address ONDA's concerns; land that oscillates from grazed to rested cannot

serve as a baseline for research. As for the 18,265 acres that will allegedly remain ungrazed

going forward, it is still unclear whether that amount of land will suffice for scientific research.

After all, as will be discussed in greater detail below, the 2018 FEIS asserts that the "key RNAs

and acres in the 2015 ROD/ARMPA were considered the *minimum* size and placement needed to

provide a sufficient land base and mix of vegetation types to meet the research need." 2018 FEIS

at 2-4 (emphasis added). Taking BLM at its word, the acres protected by the 2015 ARMPA

represent the minimum amount of land necessary to conduct meaningful scientific research.

Therefore:

> without the same number and areal scope of reference areas the
> BLM itself deemed the "minimum number of sites and areas
> necessary," any research confined to the roughly 3,763 acres in
> eight key RNAs (plus three small exclosures at undisclosed
> locations on three others, and two others closed in previous
> planning processes) is likely to fail to provide biologically
> meaningful, and statistically significant controls needed to support
> science-based management of grazing.

Kauffman Decl. ¶ 23. In the absence of a preliminary injunction, any research that scientists

could conduct using ungrazed land would be statistically insignificant and therefore of little to no

probative value in the sage-grouse conservation efforts for which the RNAs were created in the

first place.[15]

---

[15] BLM observes that Dr. Kauffman has used small plot sizes in some of his own research. BLM attempts to use this observation to undermine ONDA's argument that more than 18,250 acres are necessary to do meaningful research. But the fact that Dr. Kauffman may have conducted research on smaller plots of land does not mean that smaller plots of land will suffice for *any* research on the effects of grazing. Dr. Kauffman's study had the narrow goal of examining livestock impacts on riparian communities. *See* Second Kauffman Decl. ¶ 11. By contrast, BLM's research purpose was to inform agency management of grazing at a *landscape scale* over the millions of acres of land under its authority.

**D.  Balance of the Equities and Public Interest**

The final two elements of the preliminary injunction analysis are the balance of the hardships and the public interest. When the government is a party, these two factors merge. *Connaughton*, 752 F.3d at 766. Accordingly, the Court considers these factors together.

ONDA first argues that it—and the broader public—share an interest in science-based, informed land management. BLM counters that the Court ought to give BLM discretion to manage its priorities and resources. BLM responds that there is a strong public interest in allowing it to carry out its "statutorily granted land management and planning authority." But as discussed above, ONDA has demonstrated a likelihood of success on the merits with respect to its two claims alleging that BLM overstepped the bounds of its authority. When the alleged action by the government violates federal law, the public interest factor generally weighs in favor of the plaintiff. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013); *see also Inland Empire-Immigrant Youth Collective v. Nielsen*, 2018 WL 1061408, at *21 (C.D. Cal. Feb. 26, 2018) ("In addition, the Court again notes the public interest that exists in ensuring that the government complies with its obligations under the law and follows its own procedures." (quotation marks omitted)); *Coyotl v. Kelly*, 261 F. Supp. 3d 1328, 1344 (N.D. Ga. 2017) ("[T]he public has an interest in government agencies being required to comply with their own written guidelines instead of engaging in arbitrary decision making . . . .").

Second, BLM argues that an injunction would divert limited BLM resources from other important work. As clarified at oral argument, BLM asserts that it would have to take additional "affirmative" steps to revert to the 2015 ARMPA, such as communicating with ranchers to restructure permits (and in some cases, conducting those communications in person). BLM argues that the public interest favors allowing BLM to use its limited resources on other projects. In support, BLM provides a "Damages Calculation" chart (ECF 20-2 at 10) outlining potential

costs. Some of these costs support BLM's argument (*e.g.*, about 26 staff hours will be needed to confer with permittees about keeping livestock out of the 2015 closure areas). But others do not. For example, it is unclear why BLM would need to spend at least 55 hours "drafting permittee agreements" when agreements complying with the 2015 ARMPA have existed and been implemented for at least the last two years. Moreover, it is unclear why BLM's hours allocated towards vehicle costs and compliance checks would be different under either ARMPA; the Court's understanding is that BLM has compliance and monitoring obligations under even the 2025 ARMPA. For example, BLM would need to verify that lands opened to "light grazing" are, in fact, only being lightly grazed. Thus, a preliminary injunction would not require BLM to draft all of its permitting agreements from a blank slate. And although BLM may have to invest some money and staff hours to reworking some permits, the Court does not find this investment to be so burdensome as to tip the balance of equities in BLM's favor.

The parties next dispute how an injunction or lack thereof may affect the land. ONDA argues that there is no compelling interest for BLM to start grazing in areas that have been unavailable to grazing as of 2015 and *actually* ungrazed for at least two years. In support, ONDA cites *Schneider*, where the court explained that "the sage grouse will suffer more hardships from the 2019 [ARMPA] than the defendants will suffer from reverting to the provisions of the 2015 plans." 417 F. Supp. 3d at 1334. BLM's response is that the 2025 ARMPA will promote range health and reduce fire risk. BLM presents declarations from Matthew Haskins, a fuel specialist with BLM (ECF 20-8), and David LaChappelle, an assistant fire manager with BLM (ECF 20-9), that explain why wildfires could accelerate ONDA's fear about the spread of invasive grass species. ONDA argues that these declarations are unsupported by science and do not cite a single scientific authority.

The Court finds persuasive ONDA's observation that these declarations appear to be based solely on their authors' personal experience and opinions. Moreover, as the Court explained in *Bernhardt*, a claim of increased fire danger is given great weight only when the claimed danger is "imminent or the danger has begun." 392 F. Supp. 3d at 1260 (quoting *Connaughton*, 752 F.3d at 766). "Without evidence of an imminent threat . . . the inability to mitigate such risks for a temporary period" generally does not outweigh other public interests. *Connaughton*, 752 F.3d at 766; *cf. Bark v. U.S. Forest Serv.*, 2019 WL 2344771, at *3 (D. Or. June 3, 2019) (distinguishing *Connaughton* because the parcels at issue "are assigned a high wildfire risk rating, and have a moderate to high risk of . . . wildfire" (quotation marks omitted)). As ONDA alleges and BLM does not contest, most of the land that BLM seeks to open to grazing is designated as "Very Low, Low, or Moderate" for wildfire hazard potential. *See* FAC ¶ 63. To the extent that BLM's concerns about wildfires in the key RNA areas are supported by science, the parties' concerns about soil health do not appear to be mutually exclusive. ONDA's submissions indicate that grazing *also* damages soil health and that the effects of livestock on wildfire mitigation is contested. *See, e.g.*, Second Kauffman Decl. ¶¶ 2, 14-19.

Finally, the parties dispute the magnitude of impact that a preliminary injunction would have on cattle ranchers. ONDA argues that an injunction would have "little to no impact on private ranching operations." ONDA's position is a clear understatement; ranchers who have been preparing to use land within the key RNAs will now have to make last-minute alternative plans for the 2025 grazing season. One rancher, Joe Cahill, asserts that returning to the 2015 ARMPA could require him either to sell cattle or purchase additional feed. *See* Declaration of Joe Cahill (ECF 20-10) ¶ 7. He further asserts that the injunction could cost him upwards of 30% of his ranch's annual income. *Id.* ¶ 9. This assertion, however, is undercut by submissions from

ONDA that Cahill Ranches used only about half of its permitted allotment for grazing in recent years. *See* Second Declaration of Mark N. Salvo ("Second Salvo Decl.") (ECF 26) ¶¶ 6(c)-8. The Court of course understands that a preliminary injunction will negatively impact ranchers like Mr. Cahill. But the parties' submissions indicate that there are alternatives open to these ranchers that have been in place for at least the last two years. Moreover, Mr. Cahill does not assert that he or any of his colleagues will lose their business altogether or that an injunction extending the duration of this litigation would affect his livelihood for years to come. *Cf. Bernhardt*, 392 F. Supp. 3d at 1263 (finding that economic harm in the form of "finding alternative grazing during the time period of the injunction" and "no lost jobs or other community economic harms" did not tip the balance of the equities in favor of ranchers).

The Ninth Circuit has emphasized that although weighing economic considerations with environmental harms "is not easy, it is not unprecedented. [The Ninth Circuit has] held time and again that the public interest in preserving nature and avoiding irreparable environmental injury outweighs economic concerns." *Lands Council v. McNair*, 494 F.3d 771, 780 (9th Cir. 2007), *vacated on rehearing en banc on other grounds sub nom. The Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) (finding that the balance of equities supports the plaintiffs, even when the economic harm included laying off personnel). This case may resolve as quickly as one year, meaning that these ranchers may be affected for as little as one season of grazing. By contrast, one season of grazing has the potential to irreparably harm years of progress in restoring sagebrush communities for scientific purposes. Thus, taking into consideration the economic impacts a preliminary injunction may have on ranchers and on BLM, the Court finds that the balance of equities and the public interest both weigh in favor of a preliminary injunction. *Cf. Schneider*, 417 F. Supp. 3d at 1334.

**E.  Bond**

Rule 65(c) of the Federal Rules of Civil Procedure generally requires that the party moving for a preliminary injunction "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." BLM demands a bond in the amount of $104,926.00. ONDA asks that it not be ordered to post a bond in this case. ONDA explains that it is "a small 501(c)(3) non-profit, tax-exempt organization." Second Salvo Decl. ¶ 9. "The court has discretion to dispense with the security requirement . . . where requiring security would effectively deny access to judicial review." *People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir.), *amended*, 775 F.2d 998 (9th Cir. 1985); *see also Friends of the Earth, Inc. v. Brinegar*, 518 F.2d 322, 324 (9th Cir. 1975) (reducing district court's grant of a $4,500,000 bond to a $1,000 bond where movant was an environmental interest group with limited resources); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 2005 WL 8177174, at *1-2 (D. Or. June 17, 2005) (declining to impose a $50 million bond on an environmental organization). The Court has considered the relative hardships and the likelihood of success on the merits and concludes that to require any security in this case would be unjust. *Cf. Van De Kamp*, 766 F.2d at 1325-26 (imposing no bond); *W. Watersheds Project v. Bernhardt*, 391 F. Supp. 3d 1002, 1026 (D. Or. 2019) (imposing no bond); *Schneider*, 417 F. Supp. 3d at 1335 (imposing no bond).[16]

---

[16] The Court acknowledges that other courts, including courts in this circuit, have chosen to impose *nominal* bonds instead of no bond at all. *See, e.g.*, *Earth Island Inst. v. U.S. Forest Serv.*, 2006 WL 3359192, at *1, 4 (E.D. Cal. Nov. 20, 2006) (declining to increase a $1,000 bond to a $200,000 bond because the plaintiffs showed that the imposition of a bond "would pose a hardship chilling their ability to mount environmental challenges akin to the present case"); *Ctr. for Biological Diversity v. Stahn*, 2008 WL 1701374, at *1 (D. Ariz. Apr. 10, 2008) (declining to increase a $5,000 bond to a $100,000 bond); *Env't Def. Fund v. Corps of Eng'rs of U.S.*

**CONCLUSION**

The Court GRANTS Plaintiff's motion for preliminary injunction, ECF 9. BLM is enjoined from authorizing livestock grazing in any of the portions of the 13 key RNAs that were made unavailable to grazing in the 2015 ARMPA. The 2015 ARMPA and the measures outlined in the Stipulated Remedy, *see* 672 F. Supp. 3d 1101, shall remain in effect until such time as the Court can adjudicate on the merits the claims presented in the pending action.

**IT IS SO ORDERED**.

DATED this 30th day of April, 2025.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

---

*Army*, 331 F. Supp. 925, 927 (D.D.C. 1971) (ordering bond of $1). Here, BLM did not request, nor does the Court see the value in imposing, a nominal or symbolic bond.