**Peter M. ("Mac") Lacy (OSB # 013223)**
Oregon Natural Desert Association
2009 NE Alberta St., Ste. 207
Portland, OR  97211
(503) 525-0193
lacy@onda.org

**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC
24242 S. Engstrom Rd.
Colton, OR 97017
(503) 388-9160
davebeckerlaw@gmail.com

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **OREGON NATURAL DESERT ASS'N,** | No. 3:25-cv-363-SI |
| Plaintiff, | |
| v. | **MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| **JOHN RABY**, Acting Director, BLM, **PRINCIPAL DEPUTY DIRECTOR**, BLM, **BARRY BUSHUE**, State Director, BLM Oregon/Washington, and **BUREAU OF LAND MANAGEMENT**, | |
| Defendants. | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ *iv*

GLOSSARY OF ACRONYMS .........................................................................................*viii*

MOTION ............................................................................................................................. *ix*

INTRODUCTION................................................................................................................. 1

LEGAL FRAMEWORK AND STANDARD OF REVIEW....................................................... 2

    I.      FEDERAL LAND POLICY AND MANAGEMENT ACT...................................... 2

    II.    NATIONAL ENVIRONMENTAL POLICY ACT .................................................. 3

    III.   MOTION FOR SUMMARY JUDGMENT IN APA CASES.................................... 4

BACKGROUND .................................................................................................................. 5

ARGUMENT........................................................................................................................ 9

    I.     THE BLM FAILED TO PROVIDE A REASONED EXPLANATION FOR
        ITS ABOUT-FACE, VIOLATING CORE TENETS OF ADMINISTRATIVE
        LAW. ................................................................................................................ 10

    II.    THE BLM VIOLATED NEPA BY FAILING TO TAKE A "HARD LOOK"
        AT THE ENVIRONMENTAL CONSEQUENCES OF ITS ACTION. .................. 16

        A.    The BLM Failed to Consider How Reducing and Eliminating Ungrazed
            Key RNAs Would Affect Science-Based Sage-Grouse Conservation................ 16

        B.    The BLM Failed to Explain how Altering Objective SD 4 from Managing
            Undisturbed Baseline Reference Areas to Instead Allowing Active
            Restoration Actions Would Affect Science-Based Conservation....................... 20

        C.    The BLM Failed to Provide for Meaningful Public Input or Offer
            Rationales for the Brand-New Notion that "Lightly Grazed" is the Same
            as Ungrazed and its New Definitions of Key Natural Areas and What is a
            Scientific Baseline........................................................................................... 21

        D.    The BLM Failed to Study Alternatives for Replacement Sites and Acres
            for Eliminated or Reduced Key RNAs................................................................ 23

**III.   THE BLM'S DECISION TO ALLOW GRAZING IN WSAs AND RNAs ALLOCATED AS UNAVAILABLE TO GRAZING VIOLATED FLPMA'S NON-IMPAIRMENT AND LAND USE PLAN CONSISTENCY MANDATES.** ................................................................................ 25

**IV.   THE COURT SHOULD PARTIALLY VACATE THE BLM's 2025 ROD, 2025 ARMPA, AND 2024 FEIS, AND ORDER BLM TO COMPLETE THE 2015 GRAZING CLOSURES BEFORE LIVESTOCK TURNOUT IN 2027** ...... 27

**A.   Partial Vacatur is Appropriate to Excise the 2025 ARMPA's Unlawful Key RNAs Provisions** ........................................................................ 27

**B.   A Permanent Injunction is Necessary to Set a Date-Certain Deadline for Finally Completing the Long-Delayed Key RNA Grazing Closures.** ................. 31

**CONCLUSION** ........................................................................................................... 35

# TABLE OF AUTHORITIES

**CASES**

*Abramowitz v. EPA*, 832 F.2d 1071 (9th Cir. 1987) ..................................................... 33

*All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105 (9th Cir. 2018) .......................... 5, 28

*Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017) .............................. 15

*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531 (1987) ............................................. 32

*Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800 (1973) ................. 10

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281 (1974) ............................... 19

*Cahill Ranches, Inc. v. Bureau of Land Mgmt.*, 766 F. Supp. 3d 1079 (D. Or. 2025) ....... 6, 26, 27

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ................................. 5

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004) ................................................. 4, 23

*eBay Inc. v. MercExch., L.L.C.*, 547 U.S. 388 (2006) .................................................... 31

*In re Am. Rivers*, 372 F.3d 413 (D.C. Cir. 2004) ........................................................ 33

*In re Pesticide Action Network N. Am.*, 798 F.3d 809 (9th Cir. 2015) .................................. 33

*Klamath Siskiyou Wildlands Ctr. v. Boody,* 468 F.3d 549 (9th Cir. 2006) ............................... 30

*Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1 (9th Cir. 2025) ........................................... 2

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................. 5, 10, 18, 19

*Nat. Res. Def. Council v. EPA*, 38 F.4th 34 (9th Cir. 2022) ........................................... 27, 29

*Nat. Res. Def. Council v. EPA*, 489 F.3d 1250 (D.C. Cir. 2007) ....................................... 34

*Nat'l Cable & Telecoms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ...................... 10

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ................................................... 2

*Nw. Env't Advocs. v. EPA*, No. 3:12-cv-1751-AC,
    2018 WL 6524161 (D. Or. Dec. 12, 2018) ....................................................... 28

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468 (9th Cir. 1994) ................................. 4

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092 (9th Cir. 2010) .... 2, 4, 19, 23, 25

*Or. Nat. Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813, 844 (D. Or. 2022) ................ 1, 6, 8, 33, 34

*Or. Nat. Desert Ass'n v. Bushue*, 672 F. Supp. 3d 1101 (D. Or. 2023) .................................. 6, 8, 9

*Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562 (9th Cir. 2016)....................................................... 22

*Or. Nat. Desert Ass'n v. Raby*, 780 F. Supp. 3d 1085 (D. Or. 2025)................................... *passim*

*Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185 (9th Cir. 2019) ............................................... 22, 23

*Or. Nat. Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982 (D. Or. 2010)........................................... 34

*Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956 (9th Cir. 2015)................ 11, 12, 16

*Paulsen v. Daniels*, 413 F.3d 999 (9th Cir. 2005) .......................................................................... 30

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015)...................................................................... 12

*Pollinator Stewardship Council v. EPA*, 806 F.3d 520 (9th Cir. 2015) ................................. 27, 29

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Air Force*, 128 F.4th 1089 (9th Cir. 2025) ...... 23

*Pub. Lands Council v. Babbitt*, 529 U.S. 728 (2000) ..................................................................... 26

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)........................................ 4, 24

*Seattle Audubon Soc'y v. Moseley*, 798 F. Supp. 1494 (W.D. Wash. 1992) ................................. 33

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497 (2025) .................................... 30

*Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725 (9th Cir. 2017).............. 5

*W. Watersheds Proj. v. Bernhardt*, 392 F. Supp. 3d 1225 (D. Or. 2019)..................................... 26

*W. Watersheds Proj. v. Bernhardt*, 519 F. Supp. 3d 763 (D. Idaho 2021) ....................... 13, 15, 23

*W. Watersheds Proj. v. Rosenkrance*, 736 F. Supp. 2d 1276 (D. Idaho 2010)............................. 27

*W. Watersheds Proj. v. Schneider*, 417 F. Supp. 3d 1319 (D. Idaho 2019).................................. *ix*

**STATUTES**

42 U.S.C. § 4321 .................................................................................................... 4

42 U.S.C. § 4331 .................................................................................................... 4

42 U.S.C. § 4331(a) ............................................................................................... 4

42 U.S.C. § 4332(2)(C) .......................................................................................... 4

42 U.S.C. § 4332(2)(D) .......................................................................................... 4

42 U.S.C. § 4332(2)(E) ........................................................................................... 4

42 U.S.C. § 4332(2)(H) ...................................................................................... 4, 24

43 U.S.C. § 1702(a) ............................................................................................... 3

43 U.S.C. § 1712(a) ............................................................................................... 2

43 U.S.C. § 1712(c)(3) ........................................................................................... 3

5 U.S.C. § 706(1) ................................................................................................. 33

5 U.S.C. § 706(2) ................................................................................ *ix*, 3, 5, 16

Administrative Procedure Act, 5 U.S.C. §§ 701–706 ............................................ 4

**OTHER AUTHORITIES**

12-Month Findings for Petitions to List the Greater Sage-Grouse (*Centrocerus urophasianus*) as Threatened or Endangered, 75 Fed. Reg. 13,910 (Mar. 23, 2010) ..................................... 17

BLM, *Historic Conservation Campaign Protects Greater Sage-Grouse* (Sept. 22, 2015), www.blm.gov/press-release/historic-conservation-campaign-protects-greater-sage-grouse-0 .................................................................................................. 1

**RULES**

Fed. R. Civ. P. 56 ................................................................................................. *ix*

Local Rule 56-1 ................................................................................................... *ix*

Local Rule 7-1(a)(1) ............................................................................................. *x*

**REGULATIONS**

43 C.F.R. § 1601.0-1 ........................................................................................................... 2

43 C.F.R. § 1610.4-3 ........................................................................................................... 3

43 C.F.R. § 1610.5-3(a) ...................................................................................................... 2

43 C.F.R. § 8223.0-5(a) ...................................................................................................... 3

43 C.F.R. § 8223.1(b) .......................................................................................................... 3

43 C.F.R. § 8223.1(c) ........................................................................................................... 3

## GLOSSARY OF ACRONYMS

| | |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| APA | Administrative Procedure Act |
| ARMPA | Approved Resource Management Plan Amendment |
| BLM | U.S. Bureau of Land Management |
| COT | U.S. Fish and Wildlife Service Conservation Objectives Team |
| DEIS | Draft Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| FSEIS | Final Supplemental Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| FWS | U.S. Fish and Wildlife Service |
| NEPA | National Environmental Policy Act of 1969 |
| ONDA | Oregon Natural Desert Association |
| RMP | Resource Management Plan |
| RNA | Research Natural Area |
| ROD | Record of Decision |
| WSA | Wilderness Study Area |

## MOTION

Pursuant to Fed. R. Civ. P. 56, Local Rule 56-1, and 5 U.S.C. § 706(2), plaintiff, Oregon Natural Desert Association ("ONDA"), respectfully moves the Court to grant partial summary judgment and relief in favor of ONDA as to its First and Second Claims for Relief in its First Amended Complaint ([ECF 15]).[a] Specifically, the Court should: (1) declare that defendants John Raby *et al.* ("BLM") have violated the Federal Land Policy and Management Act ("FLPMA"), National Environmental Policy Act ("NEPA"), and Administrative Procedure Act ("APA") by reducing and eliminating the agency's 2015 key Research Natural Area ("RNA") grazing research closures, without providing a reasoned explanation and in violation of procedural and substantive requirements of law; (2) partially vacate the 2025 Approved Resource Management Plan Amendment ("ARMPA"), 2025 Record of Decision ("ROD"), and 2024 Final Environmental Impact Statement ("FEIS")[b] as to the 2025 key RNA closures;[c] and (3) enter a

---

[a] ONDA does not at this time seek summary judgment on its Third, Fourth, and Fifth claims, because the 2019 ARMPA remains enjoined. *W. Watersheds Proj. v. Schneider*, 417 F. Supp. 3d 1319, 1335 (D. Idaho 2019).

[b] Citations to these and other agency planning documents (including FEISs, ARMPAs, and RODs from previous years) use the format "2025 ROD 1-1 (AR_000029)" to clearly identify them.

[c] The partial vacatur requested in this motion would specifically encompass, in addition to any other language in the ROD, ARMPA, and FEIS referencing changes to the 2015 key RNA provisions: **2025 ROD** 1-13 to -19 (AR_000041–47) (section titled "Key Research Natural Areas"), and 1-23 to -24 (AR_000051–52) (section titled "Key Research Natural Areas (RNAs) Objective, Allocations, and Management Direction (ARMPA Table 3)"); **2025 ARMPA** 2-31 to -32 (AR_000091–92) (Table 3 describing changes under the 2025 ARMPA, including the re-written Objective SD 4), 6-1, 6-5 (AR_000251, 000255) (definitions of "baseline reference area," "key research natural area," and "relatively unaltered"), and Appx. 1 Maps 12–27 (AR_000112–127); and **2024 FEIS** 2-98 (AR_013017) (changes to Objective SD 4 and MD LG 1, which defines which key RNAs will be unavailable for livestock grazing), 4-89 (AR_013216) (section titled "Research Natural Areas (Oregon Only)"), 4-90 (paragraph beginning "For the detailed analysis of key RNAs . . ."), and Appx. 17 (AR_015177–268).

permanent injunction ordering BLM to implement the 2015 key RNA closures no later than the turnout of grazing in 2027 and directing that, until then, the 2023 Stipulated Remedy remains in effect, with appropriate adjustments to the dates therein for providing information about grazing turnout, conferral on forthcoming grazing, compliance checks, and disclosures of agreements and compliance check documentation. Pursuant to Local Rule 7-1(a)(1), the parties conferred but were unable to resolve the dispute.[d]

---

[d] This motion is supported by the legal memorandum below, the administrative record lodged by BLM, the Salvo and Kauffman declarations previously submitted with ONDA's motion for preliminary injunction (ECF 10, 11, 26, 27), and the additional declarations of Anne White and Jim Davis submitted herewith. The declarations also demonstrate that ONDA has standing.

MOTION FOR PARTIAL SUMMARY JUDGMENT

x

## **INTRODUCTION**

In 2015, the Bureau of Land Management adopted a series of historic plans to protect greater sage-grouse in the West after decades of decline. According to the agency, this "science-based greater sage-grouse strategy is the largest land conservation effort in U.S. history."[1] In turn, the U.S. Fish and Wildlife Service relied on this "unprecedented" plan in deciding to not yet place the sage-grouse on the endangered species list. AR_044768 (Federal Register notice). A crucial feature of BLM's plan for Oregon was to close 21,779 acres in 13 "key" Research Natural Areas to livestock grazing and make them "undisturbed baseline reference areas" for scientific research. These ungrazed areas were designed to serve as control sites to study the effects of grazing—and of not grazing—on unique sagebrush plant communities essential to the sage-grouse. The BLM explained that the lack of such areas hindered its ability—in fact, made it "nearly impossible"—to effectively manage grazing on the 12 million acres of sage-grouse habitat in eastern Oregon where the agency otherwise permits livestock grazing year after year.

Now, eliding this Court's order, three years ago, to complete the 2015 key RNA grazing closures "without further delay," *Or. Nat. Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813, 844 (D. Or. 2022), the BLM's 2025 decision dismantles the research network the agency itself previously determined to be the scientific "minimum" needed to produce data with "statistical power" to support "coherent research." BLM violated the law in several ways, but its principal error was simply to never grapple with its own prior factual findings. This in turn tainted its environmental analysis under NEPA and stymied compliance with substantive requirements under FLPMA. The BLM's unexplained, dramatic reduction in ungrazed reference areas in 2025 contradicts the agency's own, science-based method, chosen in the 2015 ARMPA, for a comprehensive program

---

[1] BLM, *Historic Conservation Campaign Protects Greater Sage-Grouse* (Sept. 22, 2015), www.blm.gov/press-release/historic-conservation-campaign-protects-greater-sage-grouse-0.

of large-scale, replicated grazing studies that would meet a "scientific need" the BLM had

identified as essential for evaluating effects of grazing on sage-grouse habitat. The Court should

hold unlawful and set aside the BLM's unexplained about-face, vacate the portions of the 2025

decisions that amended the key RNA closures established in the 2015 ARMPA, and convert the

existing preliminary injunction into a permanent injunction.

<u>**LEGAL FRAMEWORK AND STANDARD OF REVIEW**</u>

## I.  FEDERAL LAND POLICY AND MANAGEMENT ACT

BLM's land management authority is defined by FLPMA. Under FLPMA, land use plans

developed by the agency "provide by tracts or areas for the use of the public lands." 43 U.S.C. §

1712(a). They are essentially landscape-scale zoning decisions for public lands. *See Or. Nat.*

*Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1096–99 (9th Cir. 2010) (describing land

use planning under FLPMA).[2] Once issued, or—as here—amended, the BLM "shall manage"

the lands "in accordance with" these plans. 43 U.S.C. § 1732(a). That is, "[o]nce a plan is

adopted, '[a]ll future resource management authorizations and actions . . . and subsequent more

detailed or specific planning, [must] conform to the approved plan.'" *Mont. Wildlife Fed'n v.*

*Haaland*, 127 F.4th 1, 42 (9th Cir. 2025) (quoting 43 C.F.R. § 1610.5-3(a)). "The statutory

directive that BLM manage 'in accordance with' land use plans, and the regulatory requirement

that authorizations and actions 'conform to' those plans, prevent BLM from taking actions

inconsistent with the provisions of a land use plan." *SUWA*, 542 U.S. at 69. Those "provisions"

include plan "allocations" of "lands available or not available for livestock grazing" and other

uses. AR_059256, 059321–22 (BLM Land Use Planning Handbook providing, "Land use plans

---

[2] BLM also refers to these as "resource management plans" or RMPs. 43 C.F.R. § 1601.0-1.
ONDA uses the terms "land use plan" and "resource management plan" interchangeably. *See*
*also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 59 (2004) ("*SUWA*") (noting same).

must identify uses, or allocations, that are allowable, restricted, or prohibited on the public lands."). Any BLM land use decision contrary to the plan "can be set aside as contrary to law pursuant to 5 U.S.C. § 706(2)." *SUWA*, 542 U.S. at 69.

To ensure that BLM has adequate information to manage public lands, the agency must "prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values . . . . This inventory shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values." 43 U.S.C. § 1711(a). BLM's land use planning regulations require "environmental" and other "data and information to be collected, or assembled if already available." 43 C.F.R. § 1610.4-3. Germane to this case, the BLM must—both in gathering information and planning—give "priority" to ACECs, in which "special management attention is required" to "protect and prevent irreparable damage to important . . . fish and wildlife resources or other natural systems or processes." 43 U.S.C. §§ 1702(a), 1711(a), 1712(c)(3). RNAs are a "special kind" of ACEC "where certain elements or values are protected or managed for scientific purposes, and natural processes are allowed to dominate." 2020 FSEIS 1-7 (AR_037972). The "primary purpose" of RNAs is "research and education." 43 C.F.R. § 8223.0–5(a). Activities "inconsistent with [an RNA's] purpose" are prohibited, and "[s]cientists and educators shall use the area in a manner that is nondestructive." *Id*. § 8223.1(b)(c). And BLM must manage Wilderness Study Areas ("WSA") "so as not to impair the suitability of such areas for preservation as wilderness." 43 U.S.C. § 1782(c); *see also Or. Nat. Desert*, 625 F.3d at 1097–98 (discussing BLM wilderness management).

## II. NATIONAL ENVIRONMENTAL POLICY ACT

NEPA is our basic national charter for protection of the environment. It is intended "to promote efforts which will prevent or eliminate damage to the environment and biosphere" and

"enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321. It "declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). NEPA directs federal agencies "to use all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony." 42 U.S.C. § 4331(a). Its "action-forcing" procedures have two goals: meaningful public participation and informed agency decisionmaking. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004). The obligation to disclose information about environmental impacts underpins NEPA's core principle of "democratic decisionmaking." *Or. Nat. Desert*, 625 F.3d at 1121 n.24.

NEPA requires federal agencies to prepare a "detailed" study of the "environmental effects" of proposed actions and the reasonable alternatives that would avoid or minimize "any negative environmental impacts." 42 U.S.C. § 4332(2)(C)(i)–(iii). The study must assess the "relationship between local short-term uses of [the] environment and the maintenance and enhancement of long-term productivity." *Id*. § 4332(2)(C)(iv). Agencies must "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document" and to "make use of reliable data and resources." *Id*. § 4332(2)(D), (E). And agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *Id*. § 4332(2)(H).

### III. MOTION FOR SUMMARY JUDGMENT IN APA CASES

Judicial review of ONDA's claims is governed by the APA. 5 U.S.C. §§ 701–706; *see Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994) (endorsing use of Rule 56 motions for summary judgment in reviews of agency administrative decisions

under the APA). The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts" and "requires agencies to engage in 'reasoned decisionmaking[.]'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (citations omitted). Under the APA, courts "shall . . . hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Nevertheless, the agency must 'examine the relevant data and articulate a satisfactory explanation for its action.'" *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1112 (9th Cir. 2018) (quoting *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 732 (9th Cir. 2017)). An agency's decision is arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*State Farm*, 463 U.S. at 43. Agencies must articulate a "rational connection between the facts found and the choice made." *Id*. at 43, 52 (internal quotation marks and citation omitted).

## BACKGROUND

This Court is familiar with the greater sage-grouse, federal efforts to protect and conserve this imperiled species and its sagebrush habitat, the BLM's 2015 decision to remove grazing from key RNAs in Oregon to conduct scientific research, the litigation over BLM's 2015 and 2019 ARMPAs, and the BLM's belated commitment, since 2023, to keep cattle out of key RNAs and complete the decision-making processes the agency deemed necessary to finally implement

the grazing closures. *Bushue*, 644 F. Supp. 3d at 823–26, 844–45 (detailed description of these issues and holding that BLM unreasonably delayed implementing the 2015 grazing closures); *see Or. Nat. Desert Ass'n v. Bushue*, 672 F. Supp. 3d 1101, 1108 (D. Or. 2023) (adopting Stipulated Remedy including actions to prevent livestock from grazing in key RNAs and a commitment by BLM to timely complete implementation of long-term closures for the key RNAs); *see also Or. Nat. Desert Ass'n v. Raby*, 780 F. Supp. 3d 1085, 1093–97 (D. Or. 2025) (additional background in opinion granting preliminary injunction).[3] ONDA will not repeat that background here but will summarize the salient facts that led to the 2025 ARMPA decision challenged in this case.

In 2015, the BLM identified 15 key RNAs, covering a unique assemblage of sagebrush plant communities important to sage-grouse across eastern Oregon, and made them unavailable to livestock grazing. 2015 ARMPA 2-18, 2-33 (AR_045906, 045921); 2025 ARMPA Map 12 (AR_000112).[4] The purpose of this land use plan decision "was to create 'baseline'—or control—sites for researching the effects of livestock grazing on sagebrush communities." *Raby*, 780 F. Supp. 3d at 1095; *see* 2015 FEIS 4-275 (AR_047487) (removing grazing from key RNA areas "that contain plant communities important to" sage-grouse will "provide the BLM with areas for baseline vegetation monitoring without the influence of BLM-permitted activities"); 2015 ARMPA 2-33 (AR_045921) (Objective SD 4 directing BLM to "[m]anage key RNAs . . . as undisturbed baseline reference areas"), 5-11 to- 12 (AR_045941–42) (defining "Key research natural area" by "the absence of BLM actions and human disturbance").

---

[3] In a separate case, this Court also rejected a grazing permittee's challenge to the 2015 ARMPA and its key RNAs provisions. *Cahill Ranches, Inc. v. Bureau of Land Mgmt.*, 766 F. Supp. 3d 1079 (D. Or. 2025).

[4] Two of the key RNAs had been closed to grazing in prior planning processes. For that reason, the parties generally refer to 13, not 15, key RNAs, and reference the 21,779 acres of public land newly closed to grazing in 2015 in those 13 key RNAs. *See Raby*, 780 F. Supp. 3d at 1095.

In 2018, the BLM explained that the closed key RNAs were the "minimum number of sites and areas necessary" to provide reliable and "coherent" data on sage-grouse and sagebrush health. 2018 FEIS 4-8 (AR_040175). The key RNAs were "considered the minimum size and placement needed to provide a sufficient land base and mix of vegetation types to meet the research need and retain the statistical power and scope of inference that could be extrapolated over the planning area as a whole and into adjoining states." *Id.* at 2-4 (AR_040137). The BLM reiterated that the "primary research purpose" for the "closure[s] would be to study whether livestock grazing has adverse, beneficial, or no impact" on plant communities important to sage-grouse and that "BLM intended the closed areas to serve as controls for studying grazing impacts on the same plant communities outside of the closed areas." *Id.* at 4-8 (AR_040175).

The BLM further explained that the ungrazed key RNAs would support "Sagebrush and Sage-Grouse Science Need #2" from the agency's "Actionable Science Plan"—namely, to "[c]onduct a series of large-scale, replicated grazing studies that address how different livestock species, grazing systems, disturbance histories, and other environmental conditions affect Greater Sage-Grouse habitat." *Id.*[5] "'Comparisons to areas without livestock grazing are important so that grazing treatments . . . can be compared to baseline conditions.'" *Id*. Moreover, BLM said that resuming grazing in key RNAs would undermine that indispensable science:

> Based on determinations in the 2015 ARMPA that the 13 RNAs identified for closure along with the 2 RNAs already closed to livestock grazing were likely the minimum number of sites need[ed], the BLM assumes that [resuming] livestock grazing in the 13 key RNAs would not provide sufficient variability of sites needed to meet the research purposes identified in the 2015 ARMPA or provide the same level of support to Sagebrush and Sage-Grouse Science Need #2.

---

[5] The 2015 Actionable Science Plan "outlined the need for coordinated, science-based adaptive management to achieve long-term protection, conservation, and restoration of the sagebrush (*Artemisia spp.*) ecosystem. A key component of this management approach is the identification of knowledge gaps that limit implementation of effective strategies to meet current management challenges." AR_044013.

*Id*. (underlining added). BLM stated that any set of sites smaller than the 15 total key RNAs would be "potentially of less statistical value" and "diminish the utility of study results." *Id*. Likewise, in a Supplemental EIS in 2020, the BLM rejected an alternative that would keep the 13 newly closed key RNAs but reduce them in size—precisely what the agency later did in the 2025 ARMPA challenged here—stating that the "BLM did not analyze this alternative in detail, because the reduced number and size of RNAs would be less than the minimum needed to meet research needs." 2020 FSEIS 2-5 (AR_037984).

In 2022, the Court held that the BLM had unreasonably delayed implementing the 13 key RNA grazing closures, directing BLM to make the areas unavailable to grazing "without further delay." *Bushue*, 644 F. Supp. 3d at 844. The 2023 Stipulated Remedy set out a series of steps the BLM would take to finally effectuate the closures. *Bushue*, 672 F. Supp. 3d at 1107–08. Despite BLM's promise to make "best efforts" to complete the closures "before the start of the 2024 [grazing] season," it failed to do so. To date, none of the closures has been fully implemented.

Then, in 2025, the agency issued a Record of Decision further amending the ARMPA, forsaking its research goals identified in the 2015 plan by eliminating five of the ungrazed key RNAs (albeit with "5 acre or less" exclosures in three of them) and reducing the area closed to grazing from 21,779 acres to only about 3,763 acres. 2024 FEIS Appx. 17-3 to -5 (AR_015183–85); *see also* ECF 12-1 (summary table of areas made unavailable to grazing under the 2015 and 2025 ARMPAs).[6] BLM indicated in its 2025 decision that, while it "retained" all of the key RNAs, it was changing or offering new definitions for the terms "baseline reference areas," "key research natural areas," and "relatively unaltered." *See* 2025 ROD 1-15, 6-1, 6-5 (AR_000043,

---

[6] Slightly different acreage figures shown in the text and tables of BLM's various NEPA documents are generally attributable to minor discrepancies in GIS datasets.

000251, 000255). The 2025 ROD defined "baseline reference area" for the first time as "functioning within a normal range of variability" instead of "undisturbed" as it had been in the 2015 ARMPA. *Id*. at 1-15, 6-1 (AR_000043, 000251). Also for the first time in the 2025 ROD, the BLM claims that grazing levels of *6% up to 20%*, which it calls "very light grazing," leave an area "practically undisturbed" and allegedly offer the same research opportunities as actually undisturbed areas. *Id*. at 1-15, 6-5 (AR_000043, 000255). So, "key RNAs" still exist on BLM maps, but the 2025 lexicon largely emasculates their scientific value.

In April 2025, this Court enjoined the BLM from authorizing grazing in any of the portions of the 13 key RNAs made unavailable to grazing in the 2015 ARMPA, ordering that the "2015 ARMPA and the measures outlined in the Stipulated Remedy, *see* 672 F. Supp. 3d 1101, shall remain in effect until such time as the Court can adjudicate on the merits the claims presented in [this] action." *Raby*, 780 F. Supp. 3d at 1110.

## ARGUMENT

The BLM's decision to reverse itself and abandon most of the science-based research closures it decided in 2015 were the bare minimum needed is unlawful in three ways. **First,** contrary to core tenets of administrative law, the BLM failed to provide good reasons for its abrupt about-face—particularly by never addressing the complete disappearance of its prior determination that the number, acres, sites, mix of vegetation, and placement of areas closed to grazing were statistically calculated to be the "minimum" needed to support "coherent" management. **Second,** contrary to NEPA, the BLM failed to take a "hard look" at the environmental consequences of its drastic reduction, particularly with regard to conservation of sage-grouse through scientific management and by failing to provide for meaningful public review of several brand-new notions fundamentally at odds with the agency's prior factual

findings about the sites and acres necessary to generate reliable scientific data. **Third,** BLM's decision to resume grazing in portions of RNAs and WSAs that the 2015 ARMPA had allocated as unavailable to grazing runs contrary to FLPMA's wilderness non-impairment and land use plan consistency requirements. **Finally,** if the Court agrees that the BLM violated the law in one or more of these ways, the appropriate relief is to vacate those portions of the 2025 ARMPA, 2025 ROD, and 2024 FEIS that amended the key RNA closures established in the 2015 ARMPA, and convert the existing preliminary injunction into a permanent injunction with an implementation deadline of 2027.

## I.     THE BLM FAILED TO PROVIDE A REASONED EXPLANATION FOR ITS ABOUT-FACE, VIOLATING CORE TENETS OF ADMINISTRATIVE LAW.

Agency action is "arbitrary and capricious" if an agency "offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463.S. at 43. "Unexplained inconsistency" between agency actions is "a reason for holding an interpretation to be an arbitrary and capricious change." *Nat'l Cable & Telecoms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). "In other words, agencies have a duty to explain any 'departure from prior norms.'" *Raby*, 780 F. Supp. 3d at 1098 (quoting *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973)).

A policy change satisfies APA requirements if (1) the agency displays "awareness" that it is changing position, (2) the new policy is "permissible" under the statute, (3) the agency "believes" the new policy is "better," and (4) "there are good reasons" for the new policy, which, if the "new policy rests upon factual findings that contradict those which underlay its prior policy," must include "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S.

502, 515–16 (2009). The *Fox* analysis—that is, the core rule that an agency's change of direction violates the APA if the agency ignores or countermands its earlier factual findings without a reasoned explanation for doing so—applies to BLM's decision to amend its land use plan provisions for sage-grouse. *Raby*, 780 F. Supp. 3d at 1099 n.8.

Here, BLM failed to show there were good reasons for the decision to drastically reduce the number and acres of ungrazed baseline reference areas, wholly failing to address its prior "minimum number" findings. The BLM claims "there is no scientific consensus on the minimum size of an area allocated as unavailable to grazing that is necessary to study plant succession." 2025 ROD 1-16 (AR_000044). This ignores what BLM wrote in the 2018 FEIS, which "clearly reflects the agency's view in 2015, and in 2018, that the 15 key RNAs 'were considered the minimum.'" *Raby*, 780 F. Supp. 3d at 1099. And it ignores that BLM "repeated this statement in its 2020 [FSEIS], where BLM justified its decision in June 2016 not to reduce the size of the key RNAs." *Id*. (citing 2020 FSEIS 2-4 (AR_037983)). "Thus, from 2015 through 2020, BLM's position remained consistent. It was only in 2025 that BLM changed course, reducing the size of the RNAs and allowing for light grazing." *Id*. In the 2025 ROD and ARMPA, however, "BLM does not explain why this reduced amount of land will still provide statistically valuable baselines *for the type of large-scale research that BLM sought to do with the key RNAs*." *Id*. at 1100. This is the fatal flaw with the BLM's 2025 decision, a classic "unexplained inconsistency" rendering its decision arbitrary and capricious. *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015).

In *Kake*, the Ninth Circuit assessed the validity of a rule that limited road construction and logging in national forests. *Id*. at 959. Initially, the Department of Agriculture found that exempting the forest from the rule would "risk the loss of important roadless area values." *Id*. at

960. But two years later the Department reversed course and determined the application of the rule "unnecessary to maintain the roadless values." *Id*. at 962. This unexplained change of direction was unlawful where the agency had previously found that "long-term ecological benefits . . . of conserving . . . roadless areas outweigh the potential economic loss" to local communities, yet on "precisely the same record" found in the subsequent decision that "social and economic hardships . . . outweigh the potential long-term ecological benefits." *Id*. at 967.

As was true in *Kake*, the BLM's reversal here runs afoul of the rule that an agency must give "good reasons" for changing course. *Id*. ONDA does not dispute that BLM was entitled to change its policy. *See id*. at 968. However, "*State Farm* teaches that . . . an agency may not simply discard prior factual findings without a reasoned explanation." *Id*. Moreover, although an agency's reasons do not need to be more detailed than what would be needed to support a newly enacted policy or decision "created on a blank slate," *Fox*, 556 U.S. at 515, the "APA requires an agency to provide *more substantial justification* when its new policy rests upon factual findings that contradict those which underlay its prior policy." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015) (internal quotation marks omitted) (emphasis added). "In such cases it is not that further justification is demanded by the mere fact of policy change; but that a *reasoned explanation* is needed *for disregarding facts and circumstances that underlay or were engendered by the prior policy*." *Fox*, 556 U.S. at 515–16 (emphasis added).

And that is exactly what is missing here, where BLM—in thousands of pages of NEPA documents and its Director's Protest Resolution Report—is utterly mum on its prior "minimum number" and "statistical power" findings. In *Kake*, the Ninth Circuit explained that it was not an instance where the agency "merely decided that it valued [other] concerns more highly than environmental protection." *Kake*, 795 F.3d at 968. Rather, the new decision rested on an

"express finding" that the forest plan posed only "minor" risks to roadless values; this was "a direct, and entirely unexplained, contradiction of the [prior] finding." *Id*. "An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate." *Fox*, 556 U.S. at 537.

An Idaho case, also involving the BLM's sage-grouse plans, is similarly instructive. There, the court considered the BLM's decision, in the 2019 ARMPA, to reverse its 2015 recommendation to withdraw core sage-grouse habitat areas from mineral development. *W. Watersheds Proj. v. Berhardt*, 519 F. Supp. 3d 763, 789–96 (D. Idaho 2021). Like the purpose of the key RNA grazing closures here, "the policy at issue is whether the withdrawal was needed for sage grouse conservation." *Id*. at 790. In 2015, BLM said it was and submitted the application for withdrawal. *Id*. In 2017, the agency merely said it was "no longer needed" and withdrew the application. *Id*. Applying *Fox* and related cases, the court concluded that BLM failed to "provide the reasoned explanation needed to support the BLM's change in position regarding the need for the withdrawal, rendering the cancellation decision arbitrary and capricious." *Id*. at 795.

The BLM has argued this case is different because the decision to reduce the key RNAs "was based on extensive scientific research that occurred between 2015 and 2025" and "extensive discussions in Appendix 17" to its 2024 FEIS. *Raby*, 780 F. Supp. 3d at 1099. The problem, as this Court observed, is that *none* of those studies and discussions addressed—that is, provided a "reasoned explanation" or "good reasons" for discarding—the BLM's "earlier factual finding about minimum amounts of land necessary *to do research*." *Id*. at 1099–1100; *see also id*. at 1099 n.10 ("BLM does not explain why these [small plot] studies are sufficiently analogous to the ones contemplated in this case."). Indeed, the "closest that BLM gets to an explanation is its statement in the 2025 ROD that 'there is no scientific consensus on the

minimum size of an area allocated as unavailable to grazing that is necessary to study plant succession.'" *Id*. at 1100 n.11 (quoting 2025 ROD 1-16 (AR_000044)). But "[n]othing in this statement indicates a change in facts or scientific understanding after the 2015 ARMPA was issued. In fact, the three studies conducted on smaller plots of land . . . were all published before 2015." *Id*. The BLM "nevertheless committed to the idea that the key RNAs *were* the minimum, and nothing in the quoted statement indicates an explanation for that departure." *Id*. And the minimum number of areas and acres closed in 2015 were based on the fact that "the lack of large representative tracts of ungrazed habitat *makes it nearly impossible* to determine and monitor the *actual consequences* of livestock grazing." 2018 FEIS 4-7 (AR_040174) (emphasis added).

Likewise, all of the conflicts BLM listed in Appendix 17 of the 2024 FEIS had already been identified and considered in 2015. *See* 2024 FEIS Appx. 17 (AR_015181–265) (scattered sections on "Rationale for Reallocating the Area as Available for Livestock Grazing" identifying fencing near sage-grouse leks, impacts to wilderness values, and big game species movement as "conflicts" with closing key RNAs to grazing); *compare, e.g.*, 2015 FEIS 2-45 (AR_046857) (describing that BLM dropped seven potential key RNAs from consideration "because they . . . were areas where fencing the area was extremely difficult or because of wild horses or other factors") and 4-24 (AR_047236) (recognizing that although fences pose some risk to sage-grouse, "[f]encing in 13 [key RNAs] will provide areas where natural successional processes will proceed for long-term monitoring and research of the plant communities important for [sage-grouse]" and that the key RNA configurations shown on the 2015 maps were designed "in order to minimize fencing miles, to avoid disturbing leks, and to use existing pasture fences"). Indeed, "[a]n important consideration in determining the size of the closures in the 2015 ROD/ARMPA was to minimize the amount of additional fencing needing to be constructed." 2018 FEIS 2-4

(AR_040137). So despite those recognized conflicts, the BLM decided in 2015 to close 21,779 acres on the 13 key RNAs, explaining that this was necessary because the agency had determined those closures represented the "minimum number" required to generate meaningful information. *See W. Watersheds*, 519 F. Supp. 3d at 794 (information that was available at the time the first decision was made, and determined by the agency at that time to "support[]" the sage grouse conservation measure "do[es] not, therefore, support the BLM's [subsequent] change of position regarding the need for the [measure]"—absent a "reasoned explanation").

The BLM also argues its 2025 decision "largely remain[s] in line with the goals of the 2015 ARMPA." *Raby*, 780 F. Supp. 3d at 1100. Although the 2025 ARMPA "may share some of the goals of the 2015 ARMPA, it alters without sufficient explanation the method by which the 2015 ARMPA purported to achieve those goals." *Id*. Offering undefined "research opportunities" is far different than the detailed program in the 2015 ARMPA that met a "science need" with a specific minimum number, acreage, size, mix of vegetation types, and placement of ungrazed research areas to provide statistical replicability and extrapolation of results across the landscape.

In short: moving from a biologically selected network of research areas determined to have a calculated, statistically powerful value, to one that falls far beneath the BLM-determined "minimum" threshold of significance, is a change that requires a "reasoned explanation" for "disregarding [the] facts and circumstances" that undergirded the first decision. *Fox*, 556 U.S. at 516; *see also Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 928 (D.C. Cir. 2017) ("If instead an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.") (internal quotation marks omitted). Here, BLM "does not explain why this reduced amount of land will still provide statistically valuable baselines *for the type of large-scale research that BLM sought to do with*

*the key RNAs*." *Raby*, 780 F. Supp. 3d at 1100. Under *Fox*, an agency must give "good reasons" when reversing course like this. 556 U.S. at 515. Under *Kake*, an agency must provide a "reasoned explanation" before "discard[ing] prior factual findings." 795 F.3d at 968. Here, the BLM provided no good reasons for abandoning its "minimum number" findings. Thus abusing its discretion, BLM's decision is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

## II.    THE BLM VIOLATED NEPA BY FAILING TO TAKE A "HARD LOOK" AT THE ENVIRONMENTAL CONSEQUENCES OF ITS ACTION.

The BLM failed to take a "hard look" at the environmental consequences of its drastic reduction in ungrazed key RNAs by **(A)** failing to explain its change of direction on the minimum number of sites and areas needed to generate reliable data, and whether sage-grouse conservation will be harmed in the absence of statistically significant information; **(B)** failing to explain how altering Objective SD 4 to now allow "active restoration" in previously undisturbed baseline reference areas would affect science-based conservation; **(C)** failing to provide for meaningful public review of new terms and notions that fundamentally alter the definition and purpose of a scientific "baseline"; and **(D)** failing to develop and study an alternative that identified substitute RNAs for dropped or shrunken ones in order to maintain the minimum number of sites and acres necessary to generate reliable scientific information.

### A.    The BLM Failed to Consider How Reducing and Eliminating Ungrazed Key RNAs Would Affect Science-Based Sage-Grouse Conservation.

The BLM failed to explain or analyze the effect its decision to reduce or eliminate grazing research closures established in 2015 would have on the agency's ability to conduct science-based, statistically powerful, "coherent" research and management, or how sage-grouse habitat and the bird's conservation in Oregon would be harmed by the weakened research network. The 2015 designation of the 13 key RNAs for closure and management as "undisturbed

baseline reference areas" responded to the U.S. Fish & Wildlife Service's concern, in its 2010 listing decision, that researching the impacts of livestock grazing on sage-grouse "is confounded by the fact that almost all sage-grouse habitat has at one time been grazed and thus no non-grazed, baseline areas currently exist with which to compare." 12-Month Findings for Petitions to List the Greater Sage-Grouse (*Centrocerus urophasianus*) as Threatened or Endangered, 75 Fed. Reg. 13,910, 13,942 (Mar. 23, 2010). The 2015 closures established "the minimum size and placement" and "the minimum number of sites and areas" of ungrazed land "needed to meet the research purposes identified in the 2015 ARMPA" and support "Sagebrush and Sage-Grouse Science Need #2." 2018 FEIS 2-4, 4-8 (AR_040137, 040175). The 2025 FEIS nowhere explains or analyzes how reducing the closed sites and acres below the "minimum" needed to generate reliable scientific information would still provide statistically valuable, ungrazed baselines for the research the agency deemed essential to manage livestock grazing for sage-grouse conservation—or what effect abandonment of these minimum parameters would have on the agency's ability to engage in the "[s]cience-based" management it deemed "fundamental" to the strategy for conserving and recovering sage-grouse. 2015 FEIS ES-2 (AR_046760).

The BLM says Appendix 17 of the 2024 FEIS contains the agency's explanation of "why it was reducing the size of the key RNAs." *Raby*, 780 F. Supp. 3d at 1099. While Appendix 17 looked at a number of things, it does not address the effects to sage-grouse conservation of the drastic reduction in sites and areas closed to grazing. In fact, not once in Appendix 17 does BLM mention its prior findings about the "minimum" number of "sites and areas" necessary to produce data with the "statistical power" needed to address its prior-articulated science need. The public brought this issue to the agency's attention repeatedly. *See* AR_020301–65 and 001156–72 (ONDA comment and protest letters); AR_021103–05 (American Bird Conservancy

comment letter); AR_003534 (Western Watersheds Project protest letter).

The reasons given in Appendix 17 for the weakened research network focus instead on management considerations or unfounded assumptions. For example—

➢ BLM suggests that it re-opened some areas because they only receive "little to no use" by livestock. *See, e.g.*, 2024 FEIS Appx. 17-11 (AR_015191) (Black Canyon key RNA). It makes no sense to allocate a closed, ungrazed research area to grazing that is not actually occurring. This illogic fails to articulate a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 52.

➢ BLM suggests that reducing the amount of fencing needed will reduce impacts to aesthetic and wilderness values. *See, e.g.*, 2024 FEIS Appx. 17-18 (AR_015198) (Dry Creek Bench key RNA). The agency mostly fails, however, to disclose how many miles of fence *already exist* in each area (let alone where they are located). *See* AR_001164–65 (ONDA comment describing same). BLM elsewhere contradicts itself when it describes that 23.2 miles of existing fence within "lands with wilderness characteristics" units in one key RNA are "substantially unnoticeable to the average visitor"—an amount many times more than the mere two or three miles needed to physically close off that research area. 2024 FEIS Appx. 17-69 (AR_015249) (South Bull Canyon key RNA).

➢ BLM claims closing key RNAs to grazing "would not address any threats" identified by experts on the U.S. Fish and Wildlife Service Conservation Objectives Team. *Id*. at 17-6 (AR_015186). In fact, the Team clearly identified grazing as a threat to sage-grouse in Oregon and its Report stresses that research to "address uncertainties associated with sage-grouse and sagebrush habitat management is essential." 2015 ARMPA 1-8 to -9 (AR_045882–83), COT Report 35, 44–46 (AR_049685, 049694–96).

➢ BLM also claims that "vulnerability to wildfire may increase" if livestock are not allowed to consume the grasses. 2024 FEIS Appx. 17-2, -14, -33 to -35 (AR_015182, 015194, 015213–15). But it failed to apply the most recent wildfire data. Federal experts at the Missoula Fire Sciences Laboratory produced powerful new datasets on fire probability and intensity in 2023. The data show that almost no areas in the key RNAs are at high or very high risk for wildfire. *See* AR_001162–63, 001303–17 (wildfire hazard potential maps). Removal of grazing has no appreciable effect on wildfire risk in these areas; in fact, it *increases the risk of fire* as cheatgrass and highly flammable weeds proliferate. *See* AR_001163 (ONDA protest citing published science).

➢ Plus, BLM had already identified all of these management considerations in 2015 and again in 2018, not to mention in the eight RNA-specific NEPA analyses (covering 12 key RNAs) the agency prepared over the past three years. *See* AR_019891, 068318, 069566, 069707, 069776, 069806, 069918, 069928.

The BLM may argue that the Court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). Again, the problem here is that there is, in fact, nothing for the Court to "reasonably discern." Despite ONDA and others raising the concern during the NEPA process, BLM simply remained mute on the "minimum number" issue in the DEIS, the FEIS, the ROD, and even the Director's Protest Report. This was not a "decision of less than ideal clarity." It was a decision of *no* clarity. The Court "cannot defer to a void." *Or. Nat. Desert*, 625 F.3d at 1121; *see State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious if agency "entirely failed to consider an important aspect of the problem").

The BLM may also again argue that ONDA is merely "debating" the agency's "policy"

choice. That mischaracterizes the situation. It was *BLM* that chose to close 21,779 acres in 13 key RNAs to livestock grazing in 2015, and it was *BLM* that made the factual determination that this was the "minimum number" of sites and acres needed for the large-scale research and science-based management the agency deemed essential to conserve sage-grouse. What ONDA objects to is the BLM's unexplained abandonment of its own prior land use plan Management Direction and science-based findings and explanation for that decision.

**B.     The BLM Failed to Explain how Altering Objective SD 4 from Managing Undisturbed Baseline Reference Areas to Instead Allowing Active Restoration Actions Would Affect Science-Based Conservation.**

The BLM offers no rationale for its sea change in Objective SD 4—its management direction for key RNAs—away from a directive to manage them "as undisturbed baseline reference areas" and "for minimum human disturbance allowing natural succession to proceed" in "the absence of BLM actions and human disturbance." 2015 ARMPA 2-33, 5-12 (AR_045921, 045942) (definition of "Key research natural area"). Instead, the 2025 ARMPA deletes the essential word "undisturbed," and amends Objective SD 4 to merely manage key RNAs "as baseline reference areas," also now adding that "[a]ctive or passive restoration actions are allowed within key RNAs to support maintenance or improvement of identified vegetation communities and to meet [sage-grouse] habitat objectives." 2025 ARMPA 2-31 (AR_000091). But the agency never offers a rationale for changing the objective from managing for "undisturbed" areas that will allow "natural succession to proceed" to one where human disturbance, in the form of "active restoration" is allowed, without concern for whether they remain undisturbed and while eliminating the goal of allowing "natural succession." *See* 2024 FEIS Appx. 17-5 (AR_015185) (setting out changed language in SD 4 without explaining changes, particularly why human disturbance is now being authorized in key RNAs previously

managed as "undisturbed"); 2025 ROD 1-15 (AR_000043) (same).

The premise of the 2015 closures, responding to the absence of ungrazed baseline reference areas in sage-grouse habitat, was to conduct large-scale science comparing undisturbed areas "where natural successional processes would proceed for long-term monitoring of the plant communities important for [sage-grouse] and research" with areas where grazing continued. 2015 FEIS 2-46 (AR_046858). The 2015 FEIS repeatedly stressed that fencing and managing key RNAs *undisturbed* will "provide areas where natural successional processes [will] proceed for long-term monitoring and research." *Id.* at 2-46, 2-66, 4-24 (AR_046858, 046878, 047236). Precluding BLM actions and human disturbance (including grazing) was thus intended "to provide areas in the RNA that have intact ecological conditions and processes" to serve as undisturbed baseline reference areas. *Id*. at 2-66 (AR_046878). The 2025 FEIS states that active and passive restoration will now be allowed, but it provides no rationale for this change to the scientific premise of the 2015 closures (indeed, no definition of what "active restoration" even entails) and no analysis of how allowing "active restoration" that will disrupt natural succession within key RNAs will alter their value as "baseline reference areas" where "natural successional processes will proceed" for long-term, large-scale scientific research. The agency thus failed to take a hard look at the implications of this unexplained change on its scientific project.

## C. The BLM Failed to Provide for Meaningful Public Input or Offer Rationales for the Brand-New Notion that "Lightly Grazed" is the Same as Ungrazed and its New Definitions of Key Natural Areas and What is a Scientific Baseline.

In addition to altering the management objective for key RNAs without offering a rationale for doing so, or analysis of the implications for long-term research, the BLM inserted definitions for the terms "key research natural areas," "relatively unaltered," and "baseline reference area"—integral to Objective SD 4—for the first time in the 2025 ROD, without

offering any rationales for the dramatic changes or analyzing the consequences for sage-grouse conservation. BLM's "light grazing" notion and its re-definition ("relatively unaltered") of what is a scientific baseline within key RNAs were brand-new bases for the agency's decision, defined for the very first time in the 2025 ROD, after the public NEPA process was closed. BLM contends that it merely "crystallized" its rationale in the ROD. *See Raby*, 780 F. Supp. 3d at 1103. But adding a brand-new definition that utterly changes the scientific basis of a "key" land use plan component is not "crystallizing" (much less "explaining") a decision; rather, BLM's obfuscation "materially affected the outcome of environmental review." *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 570 (9th Cir. 2016). As this Court observed, "BLM's discussion of 'relatively unaltered' does not appear merely to *support* an *existing* rationale in its EIS and FEIS, but rather to state *what* BLM *meant* by 'relatively unaltered.'" *Raby*, 780 F. Supp. 3d at 1103. And the source cited at 2025 ROD 1-15 (AR_000043) (BLM 1996, p. 86) distinguishes between "no evidence of grazing use or negligible use" (0–5% utilization) and "very light grazing" (6–20% utilization)—demonstrating that "no grazing" and "very light grazing" are in fact *not* the same thing. AR_064260 (BLM Technical Reference manual on measuring grazing use).

Here, had BLM been forthright during the NEPA process about the new "relatively unaltered" definition, ONDA would have had an opportunity to submit scientific evidence, like that in Dr. Kauffman's declarations (ECF 11, 27), explaining why this was inconsistent with the scientific goals the BLM itself had set for the ungrazed key RNAs. But lacking such input, this "caused the agency not to be fully aware of the environmental consequences of the proposed action, thereby precluding informed decisionmaking and public participation." *Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1189 (9th Cir. 2019) (internal quotation marks omitted). Absent any explanation from the BLM prior to issuance of the ROD, the public had no opportunity to

play a "role in both the decisionmaking process and the implementation of that decision." *Pub. Citizen*, 541 U.S. at 768. "It is fairly debatable issues of this kind that NEPA was designed to bring out in the open, for analysis and discussion in the service of sound decisionmaking." *Or. Nat. Desert*, 625 F.3d at 1122.

"Without defining an important phrase and receiving feedback on the definition from the public," the BLM failed to analyze the environmental impacts of the 2025 ARMPA, thus depriving ONDA and others "of meaningful public participation." *Raby*, 780 F. Supp. 3d at 1103 (quoting *Rose*, 921 F.3d at 1192). For example, in *Rose*, a BLM travel plan decision violated NEPA's public review requirement when the agency relied on evidence (route survey photographs) inserted into the decision record "[a]t some point *after* the public comment period closed." 921 F.3d at 1192. Similarly, in the ARMPA mineral withdrawal case, BLM's reversal of an earlier decision to withdraw key sage-grouse habitat areas from mining, where the agency "used a changed definition of what is deemed to be a minor impact and did not provide a reasoned explanation for this change, render[ed] the cancellation decision arbitrary and capricious." *W. Watersheds*, 519 F. Supp. 3d at 793. Here, BLM's failure to offer any rationales for the changes to fundamental definitions in the 2024 FEIS, 2025 ARMPA, or 2025 ROD—offering *descriptions* of the changes rather than an *explanation for* or *analysis of the environmental consequences of* them—likewise violates NEPA and the APA.

### D. The BLM Failed to Study Alternatives for Replacement Sites and Acres for Eliminated or Reduced Key RNAs.

An "integral part" of NEPA's statutory scheme" is "[i]nformed and meaningful consideration of alternatives," *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Air Force*, 128 F.4th 1089, 1116 (9th Cir. 2025) (internal quotation marks omitted), and NEPA commands

agencies to "study, develop, and describe appropriate alternatives to recommended courses of action." 42 U.S.C. § 4332(2)(H). If the BLM actually thought all the *management considerations* described in Appendix 17 for individual key RNAs counseled in favor of reducing or eliminating some of them, then the agency violated NEPA by not developing an alternative that identified *other* RNAs to substitute for the dropped or shrunken ones in order to maintain the minimum number of sites and acres necessary to generate statistically significant scientific data. *See* AR_020343 (ONDA letter requesting BLM to "replace each such eliminated or reduced RNA with a comparable ungrazed closure area on a different ACEC or RNA" *and* identifying an "already-vetted network" of 17 ACECs from which BLM could select replacement sites). In the 2013 Draft EIS, BLM identified 76 ACECs and RNAs, spanning more than 450,000 acres, that could have been used for this scientific research. 2013 DEIS 3-123 to -126 & Table 3-50.[7] Between the 2013 DEIS and the 2015 FEIS, BLM dropped two ACECs and seven RNAs because of conflicts, reducing the total area to be closed by 95,751 acres compared to the 2013 DEIS. 2015 FEIS 2-45 (AR_046857); 2020 FSEIS 2-4 (AR_038428). The 2015 FEIS, of course, was the point at which, as BLM later described, the agency determined its final 13-RNA/22,000-acre network was the "minimum" needed to generate reliable data and support "coherent" land management. 2018 FEIS 4-8 (AR_041559); 2020 FSEIS 2-4 (AR_038428).

In sum, whether new evidence, new assumption, or a new definition, the rule under NEPA is clear: the statute's "action-forcing" procedure "guarantees that the relevant information will be made available" to the public so that they may "play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. at 349. BLM was aware

---

[7] The 2013 DEIS is not in the administrative record, but is available at https://eplanning.blm. gov/eplanning-ui/project/60100/570. After conferral, BLM agreed not to challenge ONDA's citation to it. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (published government documents generally subject to judicial notice).

of the public's keen interest in key RNAs. The agency must "do more than simply assert" that its prior factual determinations no longer hold true. *Or. Nat. Desert*, 625 F.3d at 1122. BLM's decision to not grapple with its prior factual findings and take a hard look at potential alternatives to dropped or shrunken key RNAs is a fatal error under NEPA.

**III.    THE BLM'S DECISION TO ALLOW GRAZING IN WSAs AND RNAs ALLOCATED AS UNAVAILABLE TO GRAZING VIOLATED FLPMA'S NON-IMPAIRMENT AND LAND USE PLAN CONSISTENCY MANDATES.**

The BLM's unexplained decision to allocate lands within four WSAs[8] as available to livestock grazing—when the existing land use plan allocation, rendered in the 2015 ARMPA, allocated these lands as unavailable to grazing—violated FLPMA's wilderness non-impairment requirement. 43 U.S.C. § 1782(c). This is because—applying BLM's binding interpretation of that requirement in its WSA management manual—grazing is more than "temporary" and creates "surface disturbance," and no exception applies. BLM 6330 Manual 1-10 (AR_051122). BLM argues the Manual's "legacied use" exception applies. *Raby*, 780 F. Supp. 3d at 1101 (referring to 6330 Manual 1-12 (AR_051124)). The "legacied use" exception applies only to ongoing grazing. Once livestock grazing is discontinued through a land use plan allocation, as was done for specified portions of 13 key RNAs made unavailable for grazing in the 2015 ARMPA, the exemption no longer applies. This is clear for three reasons.

First, the "legacied use" exemption refers only to *existing* uses that "continue"—not to *new* land use allocations. 6330 Manual 1-12 (AR_051124); *see* 43 U.S.C. § 1782(c) (non-impairment subject to "continuation of existing mining and grazing uses"). In the 2015 ARMPA, BLM allocated these areas as "unavailable" to grazing. 2015 ARMPA 2-18 (AR_045906). After

---

[8] The Fish Creek Rim, Dry Creek Bench, Lake Ridge, and Toppin Creek Butte key RNAs overlap with the Fish Creek Rim, Twelvemile, Camp Creek, and Oregon River Canyon WSAs, respectively. *See* 2025 ROD Maps 14, 16, 20, 27 (AR_000114, 000116, 000120, 000127).

that, the existing land use allocation was "not available for livestock grazing." BLM Handbook H-1601-1 Appx. C p.14 (AR_059321); *see W. Watersheds Proj. v. Bernhardt*, 392 F. Supp. 3d 1225, 1249–50 (D. Or. 2019) (describing, in the context of whether BLM could issue a grazing permit using a NEPA exception applicable to any permit that "continues the *current* grazing management," that "the 'current' grazing management was no grazing and the 'existing' grazing was none."). The 2025 ROD makes *new* allocations of some of these lands as available for livestock grazing. 2025 ROD 1-17 to -19 (AR_000045–47).

Second, the Manual expresses "BLM's policy not to establish new discretionary uses in WSAs that would impair" wilderness values. 6330 Manual 1-9 (AR_051121). Grazing is a "discretionary" use on the public lands. *Cahill Ranches*, 766 F. Supp. 3d at 1091 ("privileges [grazing permits] do not create any right, title, or interest in the land, and the Secretary retains broad discretionary authority to add or remove lands from grazing use, including 'pursuant to a land use plan.'") (quoting *Pub. Lands Council v. Babbitt*, 529 U.S. 728, 738 (2000)). Here, BLM never considered whether grazing would impair these ungrazed areas' wilderness values.

And third, where "wilderness characteristics have improved since 1976 for a particular WSA . . . BLM [will] not allow actions that would cause the regression of the WSA" to its prior condition. 6330 Manual 1-9 to -10 (AR_051121–22). Again, BLM never considered whether, after ten years of being unavailable for grazing and at least two years actually ungrazed, conditions in the four WSAs had improved. *See* ECF 19 at 21 n.6 (conceding in injunction brief that BLM did not "explicitly address[] this issue, which ONDA raised in its comments, in planning documents"—also a NEPA violation, *see* First Am. Compl. (ECF 15) ¶ 74.d). Where BLM changes a land use plan allocation to allow a new use that "*might*" impair wilderness values in a WSA, it violates FLPMA's non-impairment requirement where the agency fails to

"compare this project's impacts with the 1980 [WSA] Inventory baseline." *W. Watersheds Proj. v. Rosenkrance*, 736 F. Supp. 2d 1276, 1282 (D. Idaho 2010) (where BLM failed to analyze how newly authorized grazing and livestock facilities would impact wilderness values in a WSA).

Finally, BLM also violated FLPMA's land use plan consistency requirement, 43 U.S.C. § 1732(a), by changing management of key RNAs in a manner inconsistent with the purpose of those areas—to serve as *ungrazed* reference areas. BLM contends only the "original" purpose of the RNAs matters because neither the 2015 nor the 2025 ARMPA "amended the underlying values for which those RNAs had originally been designated." *Raby*, 780 F. Supp. 3d at 1101. However, as this Court explained in *Cahill Ranches*, the original purpose of the RNAs was "research and education" (of identified plant communities), and the 2015 ARMPA "focus[ed]" BLM's management "on the research and education of *undisturbed* [by grazing] sage-grouse habitat." 766 F. Supp. 3d at 1089 (emphasis added). Hence, "[o]pening the key RNAs to grazing appears to contravene the RNAs' intended purpose of providing an ungrazed baseline *against which* to measure grazed lands." *Raby*, 780 F. Supp. 3d at 1101. Accordingly, BLM's 2025 decision to allocate, as available to grazing, key RNAs that were unavailable to grazing under the prior-governing land use allocation in 2015, violated FLPMA. 43 U.S.C. §§ 1732(a), 1782(c).

IV.    **THE COURT SHOULD PARTIALLY VACATE THE BLM's 2025 ROD, 2025 ARMPA, AND 2024 FEIS, AND ORDER BLM TO COMPLETE THE 2015 GRAZING CLOSURES BEFORE LIVESTOCK TURNOUT IN 2027.**

A.    **Partial Vacatur is Appropriate to Excise the 2025 ARMPA's Unlawful Key RNAs Provisions.**

"Vacatur is the traditional remedy for erroneous administrative decisions." *Nat. Res. Def. Council v. EPA*, 38 F.4th 34, 51 (9th Cir. 2022) (citing *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015)). In considering whether to vacate, a court must (1) weigh the

"seriousness of the agency's errors" against the "disruptive consequences" of a vacatur, (2) consider the "extent to which either vacating or leaving the decision in place would risk environmental harm," and (3) examine whether the "flaws in the agency's decision" are so "fundamental" that it is "unlikely that the same rule would be adopted on remand." *Id.* at 51–52 (internal quotation marks omitted). "Because vacatur . . . is the ordinary remedy," the BLM, if it opposes vacatur, "bears the burden of demonstrating vacatur is inappropriate." *Nw. Env't Advocs. v. EPA*, No. 3:12-cv-1751-AC, 2018 WL 6524161, at *3 (D. Or. Dec. 12, 2018); *see Wild Rockies*, 907 F.3d at 1121–22 ("presumption of vacatur" must be overcome by a party seeking remand without vacatur).

Here, the Court should partially vacate the 2025 ARMPA and related documents. Specifically, the Court should vacate and excise the provisions from the 2025 ROD, 2025 ARMPA, and 2024 FEIS that reduce or eliminate the 2015 ARMPA key RNAs and that introduced new management objectives and re-definitions of key terms. *See supra* at *vi* n.c (identifying sections, pages, and provisions that should be excised through a partial vacatur order). The BLM's errors were "serious"—unexplained changes of direction, failing to take a hard look at the environmental consequences of those changes, hindering meaningful public input, and reversing land use allocations without considering required factors, all in violation of core principles of administrative law and procedural and substantive requirements of NEPA and FLPMA. Those errors undermined the main purpose of the 2015 ARMPA "to avoid the continued decline of [sage-grouse] populations across the species' range," as well as the specific "purpose of making these key RNAs unavailable to grazing . . . to create 'baseline'—or control—sites for researching the effects of livestock grazing on sagebrush communities." *Raby*, 780 F. Supp. 3d at 1095. And there will be no "disruptive consequences" from an order narrowly

excising the 2025 key RNAs provisions. As the Court noted in granting the preliminary injunction, the "13 key RNAs [were] closed to grazing in 2022, 2023, and 2024" (and now 2025), and so the "*status quo ante litem*" is "a world where the key RNAs are ungrazed." *Id*. at 1095–97; *see* ECF 37 (status report describing continuation of measures to avoid grazing in key RNAs in 2025). Partial vacatur therefore will maintain, not disrupt, the management status quo.

Likewise, partial vacatur will preserve the ungrazed, scientifically valuable, condition of the key RNAs, without human activity that would eviscerate their scientific value as undisturbed baseline reference areas. *See* White Decl. ¶¶ 9–12; Davis Decl. ¶¶ 6–10; Salvo Decl. ¶¶ 26, 38–41 (members all describing same). This will preserve the environment, not "risk environmental harm." *Nat. Res. Def. Council*, 38 F.4th at 52. And the "flaws in the [BLM's] decision" are so "fundamental" that it is "unlikely that the same rule would be adopted on remand." *Id*. Even if BLM wanted to reconsider its key RNA grazing closures, the agency would have to actually address its prior "minimum number" factual findings and scientific assumptions including the 2015 ARMPA findings that undisturbed areas allowing for natural succession of vegetation are indispensable for comparison to grazed areas. As part of that exercise, BLM would also need to consider replacement sites for any reduced or eliminated key RNAs. Under FLPMA, any proposal to resume grazing in the portions of four key RNAs within WSAs would require BLM to undertake a non-impairment analysis. For all of this, the agency would need to undertake a new NEPA process to allow meaningful public review. In other words, any future adjustments to the key RNAs would require much more than simply "'offer[ing] better reasoning [and] . . . adopt[ing] the same rule on remand.'" *Id*. (quoting *Pollinator Stewardship*, 806 F.3d at 532) (second alteration in original).

Partial vacatur is also suitably tailored to the violations at issue. The key RNA provisions

are a discrete, excisable part of the much larger 2025 ARMPA which, in turn, itself only amends portions of the underlying 2015 ARMPA. *See* 2025 ARMPA 1-3 (AR_000031) ("Management actions in the 2015 and 2019 RMP Amendments that are not amended will remain in place"); *see also Raby*, 780 F. Supp. 3d at 1096 n.6 ("anything that [the 2025 ARMPA] does not change from the prior ARMPAs remains in effect (subject, of course, to the injunction of the 2019 ARMPA)"). A narrow partial vacatur of the 2025 ROD, 2025 ARMPA, and 2024 FEIS, would leave the unchallenged bulk of the 2025 ARMPA unaffected, but allow the 2015 ARMPA closure decisions and associated terms to also remain in effect. *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005) ("The effect of invalidating an agency rule is to reinstate the rule previously in force."); *see Klamath Siskiyou Wildlands Ctr. v. Boody,* 468 F.3d 549, 562 (9th Cir. 2006) (applying *Paulsen* to the amendment of a land use plan); *see also Or. Nat. Desert*, 625 F.3d at 1094–95 (leaving undisputed portions of land use plan in place while imposing stipulated limitations on wilderness management, finding such "relief accorded in a NEPA case . . . would be appropriate relief if requested by the plaintiff independently").

Having spent more than three years in a fundamentally flawed effort to eviscerate the key RNA closures after thrice explaining that the 2015 closures represented the minimum number of sites and acres for sound science, adopting definitions diametrically opposed to that purpose, ignoring requests from commenters to explain its proposal and consider reasonable alternatives, and now more than ten years of delay since the 2015 closures were meant to begin scientific research and management of grazing in eastern Oregon, no deference is due to the agency for its violations of NEPA, FLPMA, and the APA, and partial vacatur is appropriate. *Cf. Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1514 (2025) (vacatur is appropriate if there is "reason to believe that the agency might disapprove the project" after further analysis).

**B.    A Permanent Injunction is Necessary to Set a Date-Certain Deadline for Finally Completing the Long-Delayed Key RNA Grazing Closures.**

The Court should also convert the existing preliminary injunction into a permanent injunction and order the BLM to implement the 2015 closures no later than the turnout of grazing in 2027 on each pasture containing a key RNA. To obtain a permanent injunction, a plaintiff must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExch., L.L.C.*, 547 U.S. 388, 391 (2006). Here, such relief is appropriate to avoid irreparable harm (from grazing in the currently ungrazed scientific baseline areas and from further delaying implementation of the closures to allow scientific research to begin) and in recognition of the Court's prior finding, in 2022, that the BLM had already unreasonably delayed the key RNA closures.

 ONDA has established that its interests in conservation of ungrazed sagebrush plant communities in a natural condition and science-based land management would be irreparably harmed if BLM were allowed to reintroduce grazing in key RNAs—and continue to be irreparably harmed with each passing day of further delay in BLM's implementation of the 2015 closures and the beginning of science-based, replicable research and land management. *Raby*, 780 F. Supp. 3d at 1104–07; *see* Davis Decl. ¶¶ 5–9 (member describing injury); White Decl. ¶¶ 10–12, 15 (same); Salvo Decl. ¶¶ 3–4, 8–12, 14, 19–25, 29, 38–43 (describing ONDA's long-time involvement in sage-grouse conservation and BLM sage-grouse planning and irreparable harm to ONDA's mission and its members' interests in science-based conservation of the bird

and its habitat from delays in closing key RNAs to grazing). Monetary damages would not compensate for the harm to ONDA because "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

Because "the government is a party, the [balance of the hardships and public interest] factors merge." *Raby*, 780 F. Supp. 3d at 1107. There is a broad public interest in science-based land management—particularly with regard to livestock grazing, the most widespread land use activity affecting sage-grouse habitat in Oregon. *See* 2015 FEIS 3-88 (AR_047092) (BLM allows grazing on 98.6% of 12 million+ acres of sagebrush habitat in Oregon); *see also Raby*, 780 F. Supp. 3d at 1104–05 (describing impacts of grazing on vegetation, soils, and ecological integrity, and how even the "cyclical" nature of grazing rotations results in long-term environmental effects including "soil erosion, streambank damage, and 'profound' changes to plant species composition") (quoting Second Kauffman Decl., ECF 27). After ten years of delay since the 2015 ARMPA established the key RNAs as undisturbed baseline reference areas, including years of foot-dragging and time spent in multiple, futile, unlawful efforts to abandon the research closures, it would be inequitable to allow the BLM yet another bite at the apple—particularly when the 2015 closures were part of a comprehensive plan to "avoid the continued decline of populations across the species' range." 2015 ROD 1-7 (AR_045881). Where "[irreparable environmental] injury is sufficiently likely . . . the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco*, 480 U.S. at 545. And "[w]hen the alleged action by the government violates federal law, the public interest factor generally weighs in favor of the plaintiff." *Raby*, 780 F. Supp. 3d at 1107.

The order should include that the 2023 Stipulated Remedy remains in effect, with

appropriate adjustments to the dates therein for providing information about grazing authorizations and turnout schedules, permittee agreements, and compliance check documentation. *See* Stipulated Remedy (19-1550 ECF 177) ¶¶ 2, 3, 4, 6. The order should also strike ¶ 1 (related to BLM's "best efforts" to effectuate closures before 2024 grazing) from the Stipulated Remedy and instead order that BLM has until the date(s) of the earliest turnout in 2027 for each pasture containing a key RNA to complete any fencing and other measures needed to finally and permanently effectuate the 2015 key RNA closures.

A concrete deadline is imperative because BLM's delay here has now continued for a decade, including more than three years since this Court's 2022 order to complete the closures "without further delay." *Bushue*, 644 F. Supp. 3d at 844 ("The key RNA closures have been unreasonably delayed. Thus, Plaintiffs are entitled to relief under § 706(1)."). The APA vests the Court with broad equitable authority to compel unreasonably delayed agency action. 5 U.S.C. § 706(1). "Federal courts have often found it necessary to order administrative agencies to take particular steps . . . and to do so by specified times." *Seattle Audubon Soc'y v. Moseley*, 798 F. Supp. 1494, 1497 (W.D. Wash. 1992) (citing *Abramowitz v. EPA*, 832 F.2d 1071, 1078–79 (9th Cir. 1987) and other cases); *see also In re Pesticide Action Network N. Am.*, 798 F.3d 809, 814–15 (9th Cir. 2015) (ordering EPA to issue respond to a rulemaking petition in less than three months, where an eight-year delay with no concrete timeline to reach a final decision was a "roadmap for further delay" that "stretched the rule of reason beyond its limits"); *In re Am. Rivers*, 372 F.3d 413, 420 (D.C. Cir. 2004) (ordering action within 45 days to end "marathon round of administrative keep-away").

Without a deadline, and with no incentive to act in a reasonable time, BLM has consistently failed to do so. The agency's instinct is to forever delay actually implementing *any*

closures. This is reflected yet again in the 2025 ROD's statement that "[s]ite-specific actions to exclude permitted grazing from all or portions of key RNAs allocated as unavailable to livestock grazing will be balanced with other management priorities and this decision does not set forth a required timeline for implementation." 2025 ROD 1-14 (AR_000042). But, as this Court once observed, "[t]he buck must stop somewhere." *Or. Nat. Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982, 1003–04 (D. Or. 2010) (enjoining habitat-damaging grazing Forest Service had repeatedly authorized but which was based on continual "empty promises . . . absent the monitoring and enforcement promised"). A relief order "with time limits . . . will give the agency an incentive to act in a reasonable time . . . . A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such." *Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1264 (D.C. Cir. 2007) (Randolph, J., concurring).

Finally, any burden on BLM is mitigated by the fact that, over the past three years, it has already undertaken NEPA analyses for implementation of the 2015 key RNA closures for 12 of the 13 key RNAs, and administratively closed one other. *See* AR_019891, 068318, 069566, 069707, 069776, 069806, 069918, 069928. BLM provided the two-year notices of the 2015 closures to grazing permittees more than five years ago, and the interim management has now been in place since 2023, mitigating any harm on the agency or affected permittees from *finally* enforcing implementation of the closures by 2027 and continuing interim management for another year before that. *Bushue*, 644 F. Supp. 3d at 826; *Raby*, 780 F Supp. 3d at 1096, 1110. Also, ONDA has been "building, retrofitting, and removing fence" in cooperation with BLM and others in eastern Oregon for decades, and is willing and able to offer experienced staff and volunteers to work with BLM on constructing necessary fencing before grazing turnout in 2027. White Decl. ¶¶ 13–14 (ONDA has successfully contributed to "more than 130 fence-related

projects across southeastern Oregon in the past decade alone to support wildlife and ecosystem health"). BLM estimated that implementation of the 2015 closures would require "39 miles of fence in 13 key RNAs and an additional 800 acres fenced next to 9 key RNAs," a relatively modest amount of work that could have been completed years ago had BLM begun implementation sooner. 2015 FEIS 4-203 (AR_047415).

## CONCLUSION

For these reasons, the Court should grant ONDA's motion for partial summary judgment, holding unlawful and vacating the BLM's 2025 ARMPA decision reducing the key RNAs and related decisions and definitions in the 2025 ROD and 2024 FEIS, and order that BLM shall not authorize livestock grazing in any of the portions of the 13 key RNAs that were made unavailable to grazing in the 2015 ARMPA, shall implement (with appropriate adjustments) the measures to keep livestock out of the enjoined areas described in the Stipulated Remedy ordered by this Court in *Bushue*, and shall complete permanent solutions to effectuate the key RNA grazing closures no later than the turnout date in 2027 for each allotment containing a key RNA.

Respectfully submitted this 25th day of September, 2025.

s/ Peter M. Lacy

_____

Peter M. Lacy
Oregon Natural Desert Association

Of Attorneys for Plaintiff