**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**OREGON NATURAL DESERT ASSOCIATION**,

Plaintiff,

v.

**BILL GROFFY**, Acting Director, BLM; **PRINCIPAL DEPUTY DIRECTOR**, BLM; **BARRY BUSHUE,** State Director, BLM Oregon/Washington, and **BUREAU OF LAND MANAGEMENT**,

Defendants.

Case No. 3:25-cv-363-SI

**OPINION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Peter M. ("Mac") Lacy, OREGON NATURAL DESERT ASSOCIATION, 2009 NE Alberta Street, Suite 207, Portland, OR 97211; and David H. Becker, LAW OFFICE OF DAVID H. BECKER LLC, 24242 South Engstrom Road, Colton, OR 97017. Of Attorneys for Plaintiff.

Adam R.F. Gustafson, Principal Deputy Assistant Attorney General, ENVIRONMENTAL & NATURAL RESOURCES DIVISION, UNITED STATES DEPARTMENT OF JUSTICE; Emma L. Hamilton, NATURAL RESOURCES SECTION, ENVIRONMENTAL & NATURAL RESOURCES DIVISION, UNITED STATES DEPARTMENT OF JUSTICE, 201 Third Street, N.W., Suite 900, Albuquerque, NM 87102; and Luther L. Hajek, NATURAL RESOURCES SECTION, ENVIRONMENTAL & NATURAL RESOURCES DIVISION, UNITED STATES DEPARTMENT OF JUSTICE, 999 18th Street, South Terrace, Suite 370, Denver, CO 80202. Of Attorneys for Defendants.

Elizabeth Howard, Lawson E. Fite, and David M. Hori, SCHWABE, WILLIAMSON & WYATT, 1211 SW Fifth Avenue, Suite 1800, Portland, OR 97204. Of Attorneys for *Amicus Curiae* Cahill Ranches.

**Michael H. Simon, District Judge.**

In this lawsuit, the Oregon Natural Desert Association ("ONDA") asserts claims against the Bureau of Land Management ("BLM"), Bill Groffy (Acting Director of BLM), Barry Bushue (State Director of BLM Oregon and Washington), and the Principal Deputy Director of BLM. ONDA alleges that the BLM's decision dated January 15, 2025, will substantially and unlawfully reduce the number of research sites in Oregon for scientists to understand better sagebrush habitat, which is essential to the survival of greater sage-grouse.[1] On April 30, 2025, the Court preliminarily enjoined BLM from authorizing livestock grazing in accordance with that decision. *See Or. Nat. Desert Ass'n v. Raby*, 780 F. Supp. 3d 1085, 1110 (D. Or. 2025).

Now pending before the Court is Plaintiff's Motion for Partial Summary Judgment (ECF 41) and Defendants' Cross-Motion for Summary Judgment (ECF 51). To resolve these motions, the Court must decide whether BLM's 2025 land management plan and 2024 environmental study were enacted and performed in violation of the Federal Land Policy and Management Act ("FLPMA"), the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA"). The matter has been fully briefed, and the Court held a hearing on April 9, 2026. For the reasons explained below, the Court grants ONDA's motion in part, remands all applicable agency actions to BLM, and enjoins BLM from taking any action inconsistent with the status quo or this Opinion and Order.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine

[1] *See* First Amended Complaint (ECF 15) ¶ 1.

dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting *Celotex*, 477 U.S. at 325)). "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson*, 477 U.S. at 252, 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"When cross-motions for summary judgment are at issue, [courts] evaluate 'each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences.'" *Zabriskie v. Fed. Nat. Mortg. Ass'n*, 940 F.3d 1022, 1026 (9th Cir. 2019) (quoting *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006)); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

## BACKGROUND

In 2003, ONDA and other conservation organizations petitioned the U.S. Fish and Wildlife Service ("FWS") to list the sage-grouse as threatened or endangered. FWS published a finding in 2010 determining that Endangered Species Act ("ESA") protection was "warranted but precluded" for the sage-grouse.[2] The agency explained that the inadequacy of existing regulatory mechanisms was the key factor in this determination.[3] To implement sage-grouse

[2] *See W. Watersheds Project v. Fish & Wildlife Serv.*, 535 F. Supp. 2d 1173, 1189 (D. Idaho 2007); 12-Month Findings for Petitions to List the Greater Sage-Grouse (Centrocerus urophasianus) as Threatened or Endangered, 75 Fed. Reg. 13910 (Mar. 23, 2010).

[3] 75 Fed. Reg. at 13973-82.

conservation measures, BLM and the U.S. Forest Service ("USFS") launched the National Greater Sage-Grouse Planning Strategy, whereby the agencies would amend federal land use plans across the west.

**A. Statutory Background**

FLPMA requires BLM to "manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans," also called Resource Management Plans ("RMPs"). *See* 43 U.S.C. § 1732(a). FLPMA requires all RMPs to be adopted through notice and comment procedures. 43 U.S.C. § 1712(f). At the same time, NEPA requires all federal agencies to prepare an Environmental Impact Statement ("EIS") "if there are 'substantial questions' regarding whether the agency's proposed action may have significant impacts" on the environment. *See Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 878 (9th Cir. 2022).[4] After completing its EIS, the agency must promulgate a public record of decision ("ROD") explaining the findings in the EIS and the decision the agency ultimately reached. The "EIS and [ROD] . . . culminate the agencies' environmental review process" under NEPA. *Env't Def. Ctr.*, 36 F.4th at 868.

An RMP significantly affects the environment; thus, BLM must follow NEPA when it creates and promulgates one. *See* 43 C.F.R. § 1601.0-6. To satisfy its statutory requirements under both FLPMA and NEPA, BLM generally creates an EIS regarding its proposed RMP,

[4] To determine whether an EIS is required, an agency may first prepare an environmental assessment ("EA"). *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 483 (9th Cir. 2023). "If, after preparing the Assessment, an agency determines that the action will not have a significant effect on the human environment, then the agency makes a 'Finding of No Significant Impact,'" also called a FONSI, "and need not prepare an EIS." *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 20 (9th Cir. 2025) (cleaned up).

solicits public comment, and then promulgates the resulting RMP with an accompanying ROD. Three such land planning cycles are relevant to this litigation.

**B. 2015 ARMPA**

Through the 2015 Oregon Greater Sage-Grouse Approved Resource Management Plan Amendment ("2015 ARMPA"), BLM amended 98 existing land use plans across ten states, including Oregon. The 2015 ARMPA generally sought to conserve, enhance, and support sage-grouse habitat (namely, sagebrush) by eliminating or minimizing habitat threats.[5] To do so, BLM identified 15 Research Natural Areas ("RNAs") and designated them as "key." The RNAs were selected as key because they either contained sage-grouse leks[6] or were within 0.1 to 4 miles of leks and were, or likely were, used by sage-grouse for nesting, brood-rearing, foraging, breeding or wintering.[7]

The 2015 ARMPA had four main objectives, called Objective Special Designations ("Objective SDs"). Objective SD 4 is relevant to this litigation. That objective directed BLM to "[m]anage key RNAs, or large areas within the RNAs, as *undisturbed baseline reference areas* for the sagebrush plant communities they represent that are important for Greater sage-grouse" and "[m]anage key RNAs for minimum human disturbance allowing natural succession to

[5] 2015 ROD and ARMPA at 1-20 (AR_046216).

[6] A lek is "[a]n area where male sage-grouse display during the breeding season to attract females (also referred to as strutting-ground)." *See* AR_047860. For more information about sage-grouse lekking, see U.S. BUREAU OF LAND MGMT., *Sage-grouse in Springtime: Lands for a thousand dances* (Mar. 31, 2022), available at: https://perma.cc/TL8Q-QGRZ, and U.S. BUREAU OF LAND MGMT., *Rites of Spring* (Apr. 2, 2024), available at: https://perma.cc/K25Y-B6MJ.

[7] 2015 FEIS at 8-21 (AR_047857) (key RNA definition); *see also id.* at 2-44-46 (AR_046856-58) (explaining key RNA selection process).

proceed."[8] Key RNAs are defined as areas that "will be utilized for long-term vegetation monitoring for native plant communities important for [sage-grouse] in the absence of BLM actions and disturbance by man," that "will provide baseline vegetation information to document successional changes, serve as areas for comparison to treated areas, and to document vegetational shifts in the plant communities in the future caused by changes in precipitation and temperature (climate change)."[9] In relevant part, "baseline" is defined as "[t]he pre-existing condition of a defined area and/or resource that can be quantified by an appropriate metric(s)."[10] The 2015 ARMPA does not further define "undisturbed."

Permitted livestock grazing had previously been removed from two of the RNAs identified as key. The 2015 ARMPA, however, would newly remove permitted livestock grazing from all or portions of the other 13 key RNAs within five years.[11] (For this reason, the parties and the Court refer often to 13, rather than 15, key RNAs). As a result, the 2015 ARMPA proposed closing 21,957 acres to grazing by installing approximately 39 miles of fence. This plan, according to BLM, "would provide areas where natural successional processes would proceed for long-term monitoring of the plant communities important for [sage-grouse] and research."[12] Grazing, however, "would continue to be authorized in the remaining pastures

---

[8] *Id.* at 2-18 (AR_046830) (emphasis added).

[9] *Id.* at 8-21 (AR_047857).

[10] *See id.* at 8-8 (AR_047844). The definition additionally states that, "[d]uring environmental reviews, the baseline is considered the affected environment that exists at the time of the review's initiation, and is used to compare predictions of the effects of the proposed action or a reasonable range of alternatives." *Id.*

[11] *Id.* at 2-46 (AR_046858).

[12] *Id.*

within the allotments and in the remaining open areas in the RNA."[13] BLM also planned to develop "[s]ite specific RNA activity plans identifying actions to conserve and manage the RNA values and to utilize these areas for baseline research for plant communities important for [sage-grouse] . . . for the 15 key RNAs within 5 years following BLM Manual 1613 and Oregon State Office BLM Manual Supplement 1623."[14] The agency adopted the plan as described above. *See generally* 2015 ROD and ARPMA.[15]

**C. 2019 ARMPA**

BLM then issued an EIS ("2018 FEIS") seeking to amend the 2015 ARMPA by reopening all or portions of the key RNAs to grazing.[16] At that point, BLM had begun work to meet the 5-year implementation time frame identified in the 2015 ARMPA for closing the key RNAs to livestock grazing, but grazing was ongoing in the 13 key RNAs.[17]

In the 2018 FEIS, BLM compared the environmental impacts of its proposed plan amendment and a "No-Action Alternative"—leaving the 2015 ARMPA in place[18]—on sage-grouse.[19] As compared to the No-Action Alternative, the "Proposed Plan Amendment would result in 21,959 fewer undisturbed acres within Oregon available for additional research in plant communities important to Greater Sage-Grouse to further determine the impact of livestock

---

[13] *Id.*

[14] *Id.*

[15] 2015 ROD and ARMPA (AR_046187-275).

[16] *See* 2018 FEIS 2-6 (AR_040139).

[17] *Id.* at 3-21 (AR_040166).

[18] *Id.* at 4-3 (AR_040170).

[19] *Id.* at 4-6-9 (AR_ 040173-76).

grazing on Greater Sage-Grouse and their habitats."[20] BLM reasoned that, although closing the areas to grazing "would not address any threats" to sage-grouse habitat, it "would enhance research opportunities relating to the effects of grazing . . ., including the threat posed by 'improper grazing.'"[21]

The agency proceeded to summarize its findings in the 2015 ARMPA related to those research opportunities as follows:

> The BLM determined in the 2015 ARMPA that the 13 RNAs identified for closure along with the 2 RNAs already closed to livestock grazing were *likely the minimum number of sites and areas necessary to provide sufficient replication and support a coherent research plan* that would provide data with the statistical power and sufficient scope of inference to extrapolate the results across all Greater Sage-Grouse habitat in eastern Oregon and potentially into western Idaho and northern Nevada.
>
> The primary research purpose for BLM's closure would be to study whether livestock grazing has adverse, beneficial, or no impact on the availability of forbs and insects important to prelaying hens and Greater Sage-Grouse chicks. BLM intended the closed areas to serve as controls for studying grazing impacts on the same plant communities outside of the closed areas.[22]

BLM did not include any information about the "minimum number of sites and areas necessary" to perform research on sage-grouse habitat in the 2015 FEIS, the 2015 ARMPA and ROD, or the 2019 ARMPA and ROD. Nor did it cite to any studies requiring a minimum number of acres to perform research when it mentioned the concept in the 2019 ARMPA. The U.S. District Court

[20] *Id.* at 4-7 (AR_040174).

[21] *Id.* at 4-7-8 (AR_040174-75).

[22] *Id.* at 4-8 (AR_040175 (emphases added, reformatted)).

for the District of Idaho enjoined BLM from implementing the 2019 ARMPA in Oregon and other states. *W. Watersheds Project v. Schneider*, 417 F. Supp. 3d 1319, 1335 (D. Idaho 2019).[23]

In response to the injunction, BLM created a Supplemental EIS ("2020 FSEIS") "to review its previous NEPA analysis, clarify and augment it where necessary, and provide the public with additional opportunities to review and comment."[24] One of the alternatives that BLM considered but eliminated from detailed analysis was reducing the acreage of the 13 key RNAs unavailable to livestock grazing. In describing this alternative, BLM echoed the "minimum" language from its 2019 FEIS, stating:

> The BLM considered the remaining 15 key RNAs and acres identified in the 2015 ROD/ARMPA the *minimum size and placement needed* to provide a sufficient land base and mix of vegetation types to meet the research need and retain the statistical power and scope of inference that could be extrapolated over the planning area as a whole and into adjoining states.[25]

BLM did not analyze this alternative in detail because, among other reasons, "the reduced number and size of RNAs would be less than the minimum needed to meet research needs."[26] Again, BLM did not cite to any previous environmental assessment or study when describing the 2015 ARMPA and ROD's purported finding.

---

[23] ONDA and other plaintiffs filed a different lawsuit in this Court seeking to enjoin enforcement of the 2019 ARMPA. *Or. Nat. Desert Ass'n v. Bushue*, No. 19-1550-SI (D. Or. filed Sept. 27, 2019).

[24] 2020 FSEIS at ES-4 (AR_038406).

[25] *Id.* at 2-4 (AR_038428) (emphasis added).

[26] *Id.* at 2-5 (AR_038429). *See also id.* at 2-17 (AR_038441) (describing same in chart). The other reasons for rejecting the alternative included: "[T]he effects of the increased amount of fencing needed compared to the No-Action Alternative are similar to those effects analyzed under the Proposed Plan Amendment Alternative in the 2015 Proposed RMPA/Final EIS"; and "[T]here is no substantial difference in environmental and socioeconomic effects from those of the No-Action Alternative of the 2015 Proposed RMPA/Final EIS." *Id.* at 2-5.

In late 2021, BLM initiated a new planning process to amend the 2019 ARMPA.[27] During that planning process, the Court issued an Opinion and Order holding that BLM had unreasonably delayed implementation of the 2015 ARMPA. *See Or. Nat. Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813, 844 (D. Or. 2022). The Court directed BLM to "make unavailable to grazing the portions of the key RNAs specified in the 2015 ARMPA without further delay." *Id.* In 2023, the Court adopted a Stipulated Remedy that described the steps that BLM would be permitted to take to achieve the RNA closures. *Or. Nat. Desert Ass'n v. Bushue*, 672 F. Supp. 3d 1101, 1107-08 (D. Or. 2023), *appeal dismissed sub nom. Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 2023 WL 7548185 (9th Cir. Oct. 20, 2023). The 13 key RNAs were closed to grazing in 2022, 2023, and 2024, respectively.

**D. 2025 ARMPA**

The amendment process continued, and BLM created an EIS ("2024 FEIS"), with an 88-page report ("Appendix 17") analyzing the current conditions of all 15 key RNAs and the potential environmental impacts of six proposed alternatives on them.[28] BLM released a draft version of the EIS ("2024 DEIS") for public comment, including Appendix 17, and held a public protest period.[29] BLM received over 39,000 public comments, 6,000 individual comments, and input from cooperating federal, state, local, and tribal governments.[30] ONDA submitted public

[27] 86 Fed. Reg. 66,331-01 (Nov. 22, 2021). Although the 2019 ARMPA was enjoined, it is BLM's position that the 2019 plan is the existing approved plan because it was not vacated. *See* ECF 52 at 16 n.3.

[28] 2024 FEIS at 17-1-88 (AR_015177-268) (Appendix 17).

[29] *See* 2024 DEIS (AR_021325-29).

[30] *See* 2025 ROD and ARMPA at 1-29-30 (AR_000057-58).

comment on June 13, 2024.[31] BLM released the 2024 FEIS on November 8, 2024, and published an associated Federal Register Notice.[32] The agency received 60 unique protest letters.

In Appendix 17, BLM described for each key RNA the current state of vegetation and other resource values for which the key RNA was originally designated, sage-grouse presence in or near the key RNA, other resource values (like wildlife use and overlap with FLPMA Wilderness Study Areas ("WSAs")), and BLM's rationale for any proposed alternatives revising the 2015 ARMPA.[33] BLM considered site visits and monitoring results of each key RNA in these findings and rationales.[34]

Based on these findings, BLM determined that terrain rendered all or portions of certain key RNAs largely inaccessible to livestock even without closing them to grazing and the fence construction or active management that closing the areas to livestock would entail. Thus, those key RNAs were expected to remain largely undisturbed even if technically allocated as "available" for grazing.[35] For other key RNAs, areas allocated as unavailable to grazing in 2015 traversed terrain that, "based on further analysis and field inventory," would preclude fencing.[36] Still, for other key RNAs, shifting or reducing some closures avoided the need to fence

---

[31] AR_020301 (ONDA public comment).

[32] 89 Fed. Reg. 90,331 (Nov. 15, 2024).

[33] 2024 FEIS at 17-1-88 (AR_015177-268) (Appendix 17).

[34] *See generally id.*

[35] *See, e.g.*, *id.* at 17-12 (AR_015192-93) ("The key RNA portion of the pasture is largely inaccessible to livestock grazing due to topography, such as steep, rugged slopes that are sparely vegetated due to shallow soils and dry south-facing aspects . . . ."); *id.* at 17-18 (AR_015198) (describing "remote, rugged nature of the area [that] naturally limits livestock use").

[36] *See, e.g.*, *id.* at 17-26 (AR_015206).

within 1.2 miles of leks, in WSAs, or near sensitive cultural sites identified in post-2015 field inventories.[37] In effect, BLM again proposed that it re-open some acreage within the key RNAs to grazing. Under the 2024 DEIS, 18,259 acres would remain unavailable for grazing, as compared to the 21,957 acres closed in the 2015 ARMPA.

The 2024 DEIS also introduced a new definition of "key RNA." It defined key RNAs as areas that allow for "long term vegetation monitoring of *relatively unaltered* native plant communities important for" greater sage-grouse that "can provide baseline vegetation information on natural processes such as successional changes, and future vegetation shifts in the plant communities from changes in precipitation and temperature (climate change)."[38] The 2024 DEIS did not define "relatively unaltered." Nor did the 2024 FEIS.

BLM approved the 2025 ARMPA and ROD on January 15, 2025.[39] The 2025 ARMPA defined "relatively unaltered" as "exhibiting utilization levels of 20% or less of key indicator species, which is considered negligible to very light grazing."[40] The 2025 ARMPA defined "baseline reference areas"—another term undefined in the 2024 DEIS and FEIS—as areas:

> where ecological processes and current ecological condition are functioning within a normal range of variability and the plant community has adequate resistance to, and resiliency from, *most disturbances*. Ecological condition *considers historical*

---

[37] *Id.* at 17-28 (AR_015208) (modified boundary reduces amount of necessary fencing and none of boundary is within 1.2 miles of lek), 17-33 (AR_015213) (modified boundary avoids cultural sites located during field inventories), 17-43 (AR_015223) (modified boundary avoids conflict with WSA wilderness characteristics), 17-50 (AR_015230) (modified boundary reduces impacts to WSA wilderness characteristics). *See also id.* at 17-54-56 (AR_015234-36), 17-59-61 (AR_015239-41), 17-64-66 (AR_015244-46), 17-70-72 (AR_015250-52), 17-77-80 (AR_015257-60), 17-83-85 (AR_015263-65).

[38] 2024 DEIS at Glossary-4 (AR_021972) (emphasis added).

[39] 2025 ROD and ARMPA at 1-31 (AR_000059).

[40] *Id.* at 6-5 (AR_000255).

> *disturbance regimes, current authorized uses*, climatic variability, and existing vegetation. Preservation and protection of the natural attributes will predominate within the baseline reference areas.[41]

The 2025 ARMPA incorporates these definitions into the new Objective SD 4, which states: "Manage all or portions of key RNAs as baseline reference areas for the sagebrush plant communities they represent that are important to Greater Sage-grouse. Active or passive restoration actions are allowed within key RNAs to support maintenance or improvement of identified vegetation communities and to meet [sage-grouse] habitat objectives."[42]

The Court preliminarily enjoined BLM from authorizing livestock grazing in any of the portions of the 13 key RNAs that were made unavailable for grazing in the 2015 ARMPA. *Raby*, 780 F. Supp. 3d at 1110. As noted, Plaintiff moved for partial summary judgment, and Defendants cross-moved for summary judgment, on ONDA's FLPMA, NEPA, and APA claims.

## DISCUSSION

The Court's review is governed by the APA. Under 5 U.S.C. § 706(2)(A), a court may "hold unlawful and set aside agency action, findings, and conclusions" that are arbitrary and capricious. Agency action is arbitrary and capricious if the agency has

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Although the APA provides a standalone cause of action for those aggrieved by agency actions, *Washington v. U.S. Food & Drug Administration*, 108 F.4th 1163, 1173 (9th Cir. 2024),

---

[41] *Id.* at 6-1 (AR_000251) (emphases added).

[42] *Id.* at 2-31 (AR_000091).

the Court also uses the arbitrary and capricious standard to review actions taken under FLPMA and NEPA, *see Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1188 (9th Cir. 2019).

"Judicial review" under the arbitrary and capricious standard "is deferential." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.*; *see also Barton v. Off. of Navajo*, 125 F.4th 978, 982 (9th Cir. 2025) (quoting same with alterations). Yet, courts still "insist that an agency 'examine the relevant data and articulate a satisfactory explanation for its action.'" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *State Farm*, 463 U.S. at 43).

**A. FLPMA**

ONDA argues that BLM's decision to allocate the key RNAs as available to livestock grazing violates two mandates of FLMPA. The Court explains briefly those mandates below before discussing how BLM violated the first but not the second.

*First*, BLM is entrusted under FLPMA to oversee Wilderness Study Areas ("WSAs"), which are "roadless lands of 5,000 acres of more that possess wilderness characteristics" and "have been subjected to further examination and public comment in order to evaluate their suitability for designation as wilderness." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 59 (2004) (internal quotation omitted). BLM cannot manage WSAs in such a manner that "impair[s] the suitability of such areas for preservation as wilderness." 43 U.S.C. § 1782(c). This non-impairment standard requires BLM to undertake analysis of whether any new uses in a WSA will impair the wilderness characteristics (e.g., the area's size, its apparent naturalness, and outstanding opportunities for solitude or a primitive and unconfined type of recreation, *see* 16 U.S.C. § 1131(c)) for which the area is managed. Here, four of the key RNAs overlap, fully or in part, with WSAs. ONDA argues that BLM's decision to permit grazing within the WSAs without

performing an adequate wilderness characteristic impairment analysis violates § 1782(c)'s non-impairment requirement.

*Second*, FLPMA requires BLM to manage the public lands "in accordance with the land use plans . . . when they are available." 43 U.S.C. § 1732(a). When BLM adopts an RMP, all future resource management authorizations and actions must conform with that plan. *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 42 (9th Cir. 2025) (citing 43 C.F.R. § 1610.5-3(a)). This rule also "prevent[s] BLM from taking actions inconsistent with the provisions of" an RMP. *Norton*, 542 U.S. at 69. Any "such actions can be set aside as contrary to law" pursuant to the APA. *Id.* ONDA argues that BLM's designation of the key RNAs as available to grazing violates FLPMA's land use consistency requirement, because the "primary purpose" of RNAs is "research and education." *See* 43 C.F.R. § 8223.0-5(a). The reintroduction of grazing in these RNAs, ONDA argues, is managing RNAs "in a manner inconsistent with the purpose of" the research areas. *Id.* § 8223.1(b).

**1. Non-Impairment**

BLM argues that its designation of the WSAs as available to grazing falls within an exception to FLPMA's non-impairment requirement. Under the "legacied use" exception, FLPMA permits "the continuation of existing mining and grazing uses and mineral leasing" on WSAs "in the manner and degree in which the same was being conducted on October 21, 1976." 43 U.S.C. § 1782(c). As of that date, and prior to implementation of the 2015 ARMPA, the key RNAs containing WSAs were open to grazing. Thus, BLM argues, grazing is a "legacied use," and the agency was not required to perform an impairment analysis under § 1782(c) when it re-designated the WSAs as available to grazing in the 2025 ARMPA.

ONDA argues that grazing is not a "legacied use" because, by its terms, the exception applies only to continuing or uninterrupted uses. Here, the 2015 ARMPA closed the 13 key

RNAs to grazing and, following this Court's 2022 order in *Bushue*, grazing stopped. In support of its reading of the exception, ONDA cites BLM Manual 6330 ("Handbook").[43] The Handbook, however, seems to support BLM's interpretation. Although the Handbook states when describing the legacied use exception that "uses and facilities may *continue* in the same manner and degree as on [October 21, 1976],"[44] it also directs the agency to "[c]onsult section 1.6.D for activity-specific guidance on the application of all exceptions."[45] The "Grazing Management" portion of that section explains that the agency can "allow *new* grazing development under the legacied use exception" so long as there is "no increase in the AUMs [Animal Unit Months] existing prior to the new development as a result of any new permanent livestock management development."[46] Put another way, the BLM Handbook reflects the agency's position that new grazing falls within the exception as long as it is in the same "manner and degree" as existed on October 21, 1976.

The legacied use exception derives from FLPMA § 1782(c), however, and "agency interpretations of statutes . . . are *not* entitled to deference." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) (emphasis in original). "In interpreting statutes, 'the court relies on traditional rules of statutory interpretation." *Powers v. McDonough*, 163 F.4th 1162, 1191 (9th Cir. 2025) (quoting *POM Wonderful LLC v. Coca-Cola Co.*, 572 U.S. 102, 112 (2014)) (brackets omitted). By FLPMA's plain language, the exception applies to "*existing* . . .

---

[43] *See* ECF 41 at 35 (citing AR_051122). The Handbook is available at AR_051110-051165.

[44] Handbook at 1-12 (AR_051124) (emphasis added).

[45] *Id.* at 1-11 (AR_051123).

[46] *Id.* at 1-16-17 (AR_051128-29) (emphasis added); *see also id.* at 6-134 (AR_051131) ("While there will be no reduction in grazing use levels due to impacts to wilderness characteristics, legacied grazing use is not necessarily frozen at the October 21, 1976 . . . level, but may be subject to general BLM grazing management policy.").

grazing uses." 43 U.S.C. § 1782(c) (emphasis added). Existing means "having being at the present time."[47] As explained, grazing is not "existing" in the key RNAs because it actually ceased upon the Court's order in *Bushue*. Therefore, the legacied use exception does not apply, and BLM was required to consider whether reopening the WSAs to grazing would impair wilderness values.

BLM argues that it adequately considered whether new grazing would impair wilderness values and, in compliance with the non-impairment requirement, concluded that it would not. The four key RNAs that overlap with WSAs are Fish Creek Rim, Dry Creek Bench, Lake Ridge, and Toppin Creek Butte.[48] BLM made express findings with respect to the impact of grazing on wilderness characteristics for each of them.[49] BLM's wilderness characteristic findings, however, compare WSA wilderness characteristics to the WSAs' state at the time they were identified as having wilderness characteristics. As ONDA highlights, BLM's manual states that, where "wilderness characteristics have improved since 1976 for a particular WSA . . . it is the policy of BLM to not allow actions that would cause the regression of the WSA to its 1976 . . .

[47] *Existing*, Merriam-Webster (https://www.merriam-webster.com/thesaurus/existing). Last accessed Jul. 24, 2026.

[48] 2024 FEIS at 17-26 (AR_015206), 17-16 (015196), 17-44 (015224), 17-82 (015262).

[49] *See id.* at 17-28 (AR_015208) (Fish Creek; "Because the ecological condition had been good when grazing was allowed, the effect from this reallocation on wilderness characteristics is expected to be negligible."); 17-20 (AR_015200) (Dry Creek Bench; "There are no existing unnatural conditions on the landscape attributed to the livestock grazing that occurred prior to the key RNA being allocated as unavailable for livestock grazing, therefore no additional impacts to wilderness characteristics are anticipated from reallocating livestock grazing in the key RNA."); 17-43-45 (AR_015223-25) (Lake Ridge; discussing impact of grazing on wilderness characteristics under several alternatives); 17-84 (AR_018103) (Toppin Creek Butte; "The wilderness characteristic of naturalness, outstanding opportunities for solitude, and primitive and unconfined recreation would not be impaired under this alternative either short-term or long-term any more than it had been at the time that this unit was identified as one with wilderness characteristics.").

condition."[50] Here, BLM assumed that there would be no regression of the WSAs because grazing was authorized on them in 1976 without performing a meaningful baseline analysis.

Even if the WSAs would, in fact, maintain their wilderness characteristics and BLM's cursory regression analysis was harmless error, *see Zamorano v. Garland*, 2 F.4th 1213, 1228 (9th Cir. 2021), BLM's non-impairment findings also are conclusory. BLM does not discuss how the individual wilderness characteristics for which each of the WSAs were designated would be impacted by grazing. It does not, for example, ask whether the "solitude" or "naturalness" of the WSAs may be impacted. Its impairment analysis begins and ends with general statements about the effects of grazing on the "characteristics" as a whole. BLM states, for example, that "[b]ecause the ecological condition had been good when grazing was allowed" in the Fish Creek key RNA, "the effect from this reallocation on wilderness characteristics is expected to be negligible."[51] "This is a mere conclusion . . . not an analysis." *W. Watersheds Proj. v. Rosenkrance*, 736 F. Supp. 2d 1276, 1281 (D. Idaho 2010) (holding that BLM violated FLPMA non-impairment duty by failing adequately to compare impact of new land use on wilderness characteristics of WSA). Accordingly, the Court holds that BLM violated FLPMA by failing adequately to discuss the impacts of grazing on the wilderness characteristics of the WSAs within the key RNAs.

**2. Land Use Consistency**

In the land use consistency challenge context, the Court "'afford[s] deference to an administrative agency's interpretation of its own regulations,' including Resource Management Plans." *Mont. Wildlife Fed'n*, 127 F.4th at 42 (quoting *Or. Nat. Res. Council Fund v. Brong*, 492

[50] Manual at 1-9-10 (AR_051121-22).

[51] 2024 FEIS at 17-28 (AR_015208).

F.3d 1120, 1125 (9th Cir. 2007)) (alteration added). But "an agency's interpretation does not control where . . . it is plainly inconsistent with the regulation at issue." *Brong*, 492 F.3d at 1125; *see also Kisor v. Wilkie*, 588 U.S. 558, 575-76 (2019).

*Montana Wildlife Federation* is instructive for evaluating ONDA's land use consistency challenge. *See generally* 127 F.4th at 42-45. There, the Ninth Circuit reviewed whether a new BLM instruction memorandum ("IM") establishing procedures for oil and gas leasing violated FLMPA's land use consistency requirement. Under the governing RMP and the ROD adopting it, the agency pledged to prioritize leasing outside of sage-grouse habitat to "further limit future surface disturbance and encourage new development in areas that would not conflict with the greater sage-grouse," in order to "guide development to lower conflict areas and as such protect important habitat." *Id.* at 43 (brackets and emphases omitted). The IM, however, set forth a new "backlog requirement" that directed the agency to "prioritize leasing outside of sage-grouse habitat only where the BLM has a backlog of Expressions of Interest," and, to this end, permitted the agency to lease parcels within sage-grouse habitat management areas without first leasing parcels in non-habitat areas. *See id.* at 43-44 (cleaned up). Reasoning that the IM did "nothing to encourage or guide development to areas outside sage-grouse territory" and that leasing in accordance with the IM did not "avoid or minimize the impacts on sage-grouse habitat," the Ninth Circuit held that the agency "failed to draw a rational connection between the backlog requirement and the substantive, conservation-oriented goals of the" RMP. *Id.* at 44 (cleaned up).

Here, the key RNAs were originally designated as RNAs because they possessed a typical representation of a common plant, animal, or other resource values that were determined

to be of scientific or other special interest.[52] Each of the RNAs "were being grazed at the time they were designated as RNAs," and BLM did not determine in their designations that it was necessary to remove grazing to facilitate research.[53] When BLM closed the areas to grazing in the 2015 ARMPA, it articulated "[t]he primary research purpose" for doing so: "to study whether livestock grazing has adverse, beneficial, or no impact on the availability of forbs and insects important to prelaying hens and Greater Sage-Grouse chicks." *See Raby*, 780 F. Supp. 3d at 1101 (quoting 2018 FEIS).[54]

Unlike in *Montana Wildlife Federation*, BLM drew a rational connection between its grazing redesignations and the "substantive" research-oriented goals of the RNA, just as it did in the prior-governing 2015 ARMPA. BLM is empowered by statute and regulation to change an RMP's management direction through the amendment process based on new policy priorities or data. 43 U.S.C. § 1712(a); 43 C.F.R. § 1610.5-5. In Appendix 17, BLM described how each "key RNA would continue to provide research opportunities to study relatively unaltered plant community types important to sage-grouse."[55] Although it changed how the key RNAs would be managed to further their research goals by designating the key RNAs as available in whole or part to grazing, BLM did not contravene the purpose of the key RNAs by doing so.

---

[52] 2025 ROD and ARMPA at 1-14 (AR_000042); 2024 FEIS (AR_015177-268) (Appendix 17, listing values for which each RNA was designated).

[53] 2025 ROD and ARMPA at 1-14 (AR_000042).

[54] *See also* 2015 FEIS at 4-275 (AR_047487) (describing purpose of RNAs as "provid[ing] the BLM with areas for baseline vegetation monitoring without the influence of BLM-permitted activities"; noting that "[l]ivestock grazing *above moderate levels of utilization* could impact ACEC values" (emphasis added)).

[55] *See, e.g.*, 2024 FEIS at 17-18 (AR_015198) (Dry Creek Bench key RNA).

**B. NEPA**

ONDA argues that BLM's NEPA review of its 2025 ARMPA was deficient. NEPA is a "purely procedural" statute that "'prescribes the necessary process' for an agency's environmental review of a project." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 177 (2025) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). In reviewing agency action under NEPA, the Court must therefore "refrain from acting as a type of omnipotent scientist." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1126 (9th Cir. 2012). Indeed, NEPA "imposes no substantive environmental obligations or restrictions" on an agency and "does not require the agency to weigh environmental consequences in any particular way." *Seven Cnty.*, 605 U.S. at 173.

**1. Adequate Explanations**

ONDA first argues that BLM violated NEPA by failing to take a "hard look" at several environmental consequences of its reduction of the ungrazed key RNAs in the 2024 FEIS. To satisfy NEPA's hard look requirement, "an agency must provide a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 902 (9th Cir. 2025) (quotation omitted). The Court "employ[s] 'a rule of reason' analysis to determine whether the discussion of the environmental consequences included in the EIS is sufficiently thorough." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 734 (9th Cir. 2020) (quoting *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1071 (9th Cir. 2002)). "The rule of reason analysis is 'essentially the same as an abuse of discretion analysis.'" *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 980 (9th Cir. 2022) (quoting *Ctr. for Biological Diversity*, 982 F.3d at 734). "Thus, an 'agency will have acted arbitrarily and capriciously only when the record plainly demonstrates that [the agency] made a clear error in judgment in concluding that a project meets the requirements of

NEPA.'" *Id.* (quoting *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1052 (9th Cir. 2012) (alteration in *Native Ecosystems*)). A plaintiff raising a NEPA challenge accordingly faces an "exacting standard." *See Cascadia Wildlands*, 153 F.4th at 906.

**a. Science-Based Research and Conservation**

ONDA asserts that BLM failed adequately to explain the effect its decision would have on BLM's ability to conduct science-based, statistically powerful, and "coherent" research on sage-grouse habitat. BLM argues that NEPA imposes no statutory obligation to analyze the impacts of its decision on research or data-generation, citing *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766 (1983), in support. In that case, the Supreme Court concluded from the statute's language that "NEPA does not require the agency to assess every impact or effect of its proposed action, but only the impact or effect on the environment." *Id.* at 772. Because the psychological health of persons living in the vicinity of a nuclear reactor did not have a "reasonably close causal relationship [with] a change in the physical environment" resulting from granting a nuclear permit, the Court held that the Nuclear Regulatory Commission did not violate NEPA by failing to address it in an EIS. *See id.* at 768, 774-79. Similarly, in *Douglas County v. Babbitt*, 48 F.3d 1495 (9th Cir. 1995), the Ninth Circuit held that agencies need not issue an EIS before taking actions that preserve the physical environment, such as designating critical habitat under the ESA. *Id.* at 1505-06. The court there explained that "the purpose of preparing an EIS is to alert agencies and the public to potential adverse consequences to the land, sea or air," and that, therefore, "an EIS is unnecessary when the action at issue does not alter the natural, untouched physical environment at all." *Id.* at 1505.

The Court disagrees with BLM's statement that NEPA imposes *no* obligation to discuss the impact of BLM's proposed amendments on research—the research discussed throughout the 2015, 2019, and 2025 ARMPAs depends on the preservation of the physical landscape of the

key RNAs. In keeping with the rationale of *Metropolitan Edison Co.* and *Douglas County*, however, BLM has adequately explained the physical impact of its proposed amendments on the land available for research. In Appendix 17, the agency explained for each key RNA how its proposed ARMPA would impact the acreage available to perform research. Taking the Dry Creek Bench RNA, for example, BLM explained that the proposed alternative would "continue to provide research opportunities to study relatively unaltered plant community types important to sage-grouse without additional fencing" because the key RNA would remain "largely undisturbed," and, "[g]iven the topography and limited water sources for livestock use, there are areas that are unused by livestock, allowing for ungrazed comparison areas without the need of additional fencing or increased livestock grazing management practices to remove livestock from an unfenced exclusion area."[56] NEPA does not obligate the agency to further discuss research.

**b. Definitions in Objective SD 4**

ONDA next argues that BLM failed adequately to explain the environmental impact of its definitional changes to the 2015 ARMPA's Objective SD 4. The Court agrees. In the 2015 FEIS and ARMPA, Objective SD 4 directed BLM to manage key RNAs "as undisturbed baseline reference areas" with "minimum human disturbance."[57] The 2025 ARMPA substantially changed this definition, removing the requirement that baseline reference areas be "undisturbed," newly defining key RNAs as "relatively unaltered native plant communities" (which means up to 20% interference with such communities is tolerable), and inserting into the definition of key RNA that "[a]ctive or passive restoration actions" are appropriate.

[56] 2024 FEIS at 17-18-19 (AR_015198-99)

[57] 2015 FEIS at 2-18 (AR_046830) (emphasis added).

BLM did not evaluate the environmental consequences of changing its baseline definition—it did not discuss how sage-grouse habitat or the physical environment would be impacted by newly allowing "active restoration" within key RNAs previously designated as having "minimum human disturbance." Nor did BLM explain the physical consequences of its choice to change the definition of key RNA to permit "relatively unaltered native plant communities," when previously the areas were "undisturbed." Although BLM explains thoroughly its choice to open each of the key RNAs to grazing, the underlying definitional changes to what amounts to a "key RNA" will themselves have a substantive impact on the environment and, therefore, BLM has "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. BLM's failure to discuss its definitional changes was arbitrary and capricious in violation of NEPA.

**2. Public Comment**

ONDA next argues that BLM violated NEPA by failing to provide for meaningful public review of the new Objective SD 4 definitions discussed above ("relatively unaltered," "key RNAs," and "baseline reference area"). "[A]n agency is required to repeat the public comment process when [an environmental assessment] includes substantial changes relevant to environmental concerns." *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1067 (9th Cir. 2023). In *Earth Island*, the Ninth Circuit held that the Forest Service did not need to redo the public comment process when its second environmental assessment merely expanded upon mathematical figures enumerated in its first EA. *See id.* at 1067-69. As one example, the Forest Service stated in its first EA that "the project area's desired mean basal area was 147 square feet per acre." *Id.* at 1068. The second EA changed the desired mean basal area "from a singular number (147 square feet per acre) to a range that encompassed that number (70-152 square feet per acre)." *Id.* The Ninth Circuit held that this was a minor modification not requiring additional

public comment because it was "not based on consideration of new information or changed circumstances and did not differ sufficiently from the alternatives canvassed in the [first] EA." *Id.* (cleaned up).

BLM suggests that, as in *Earth Island*, the definitions in the 2025 ARMPA and ROD constitute minor modifications to the 2024 DEIS. But BLM's definition of "relatively unaltered" newly relies on a mathematical figure ("exhibiting utilization levels of 20% or less of key indicator species"[58]) that the public never had a meaningful opportunity to comment on. In *Earth Island*, by contrast, comments about the wisdom of the 147-square-feet-per-acre figure necessarily would inform the agency about the commenter's views about an appropriate range. And unlike in *Earth Island*, the public had no notice that BLM was even considering quantifying "relatively unaltered," nor did it have an idea of how the figure would be quantified. It also would not be reasonable for the public to predict that BLM would add quantifications to the term—as BLM admits, the term "baseline reference area" had been undefined since the 2015 ARMPA.[59] Thus, public comments solicited without the proposed changed definitions would not address the environmental impacts of BLM's definitional changes. BLM's failure to make the definition "available during the public comment period 'caused the agency not to be fully aware of the environmental consequences of the proposed action, thereby precluding informed decisionmaking and public participation.'" *Rose*, 921 F.3d at 1192 (quoting *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016)).

[58] 2025 ROD and ARPMA at 6-5 (AR_000255).

[59] *See id.* at 1-15 (AR_000043) ("Key RNAs were identified to provide baseline vegetation information, but baseline reference areas were undefined in 2015.").

BLM argues that its definitions are consistent with BLM practice and peer-reviewed studies. Those practices and studies, however, have never before been discussed in connection with the definitions of "relatively unaltered," "baseline reference area," or "key RNA." This is the very sort of "consideration of new information" that requires agencies to re-do the public comment process. *See Earth Island*, 87 F.4th at 1068. BLM violated NEPA by failing either to include the definitions in the 2024 DEIS or perform another round of public comment on a supplemental environmental assessment.

**3. Alternative**

Finally, ONDA argues that BLM violated NEPA by failing to develop and study an alternative in the 2024 FEIS that identified substitute RNAs to maintain the minimum number of sites and acres necessary to generate reliable scientific information. To determine whether an agency has appropriately considered alternatives in an EIS, the Court "employ[s] a rule of reason analysis to determine whether the agency considered an adequate range of alternatives to the proposed action." *Ariz. Mining Reform Coal. v. U.S. Forest Serv.*, 172 F.4th 641, 661 (9th Cir. 2026) (quoting *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 990 (9th Cir. 2025) (cleaned up)) (alteration added).[60] "[T]he agency's approach to analyzing the alternatives is entitled to substantial deference." *Id.* at 662; *see also id.* ("A reviewing court must be at its most deferential when considering an agency's predictive and scientific judgments in assessing alternatives." (cleaned up) (quoting *Seven Cnty.*, 605 U.S. at 181-82)). As such, "an

---

[60] In *Arizona Mining*, the Ninth Circuit set out a two-step approach to reviewing agencies' alternative analyses. *See* 172 F.4th at 661-62. The first step is to "determine 'whether or not the EIS's Purpose and Need Statement was reasonable.'" *Id.* at 661 (quoting *Ctr. for Biological Diversity*, 141 F.4th at 990). Here, as in *Arizona Mining*, the Court may skip to step two—the rule of reason analysis—because ONDA's argument pertains only to "the adequacy of the range of alternatives the FEIS considered." *See id.* at 662.

agency 'need not consider an infinite range of alternatives, only reasonable or feasible ones.'" *Ctr. for Biological Diversity*, 141 F.4th at 990 (quoting *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004)); *see also Seven Cnty.*, 605 U.S. at 188-89. "If an alternative is eliminated from detailed consideration, all the agency is required to do is to 'briefly discuss the reasons for [its] elimination.'" *Ariz. Mining*, 172 F.4th at 662 (quoting 40 C.F.R. § 1502.14(a)) (alteration in original).

BLM did not violate NEPA by failing to develop an alternative replacing the key RNAs to reach a "minimum" number of acres.[61] Appendix 17 explores six alternatives. Three alternatives re-designate some or all of the key RNAs as available to grazing, whereas the other three do not. "Under Alternative 1 all or portions of 13 key RNAs, approximately 21,922 acres total . . . would be allocated as unavailable for livestock grazing as described in the [2015 ARMPA]."[62] Similarly, Alternative 4 "would retain the 2015 decision that makes all or portions of the 13 key RNAs unavailable for livestock grazing."[63] Alternative 3, meanwhile, would make all acreage within the 13 key RNAs (46,484 acres total) unavailable for livestock grazing.[64] ONDA argues that BLM should have considered an alternative that identified acreage *outside* of

[61] BLM argues that replacing the key RNAs was an alternative that was eliminated from detailed consideration because it did not respond to the purpose and need for the plan amendments. In the 2025 ARMPA, however, BLM explains that "[u]ngrazed livestock controls was not identified as a need for amendment at the rangewide scale but is addressed as a state-specific circumstance for Oregon." AR_012928. The Court therefore rejects the argument that the alternative (needing ungrazed livestock controls) was eliminated from detailed consideration.

[62] 2024 FEIS at 17-2 (AR_015182).

[63] *Id.* at 17-5 (AR_015185).

[64] *Id.* at 17-6 (AR_015185-86) ("Under Alternatives 1 and 4 in 13 of the 15 key RNAs, 21,922 acres would be unavailable for livestock grazing, while under alternative 3, 46,484 acres would be unavailable for livestock grazing in the same areas . . . .").

the key RNAs to designate as unavailable for grazing to retain the "minimum" number of acres in the 2015 ARMPA. This alternative strikes the Court as though it may be arbitrary and capricious—it is the key RNA acreage that is relevant to sage-grouse study, not *any* 21,000 acres. In any event, ONDA's proposed alternative is not so qualitatively different than the three alternatives that BLM considered that would maintain or add acreage that BLM abused its discretion by failing to consider it. *See Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 551 (1978) ("Common sense also teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man."). "[U]nder the highly deferential scheme the Supreme Court set out in *Seven County*," BLM has considered reasonable alternatives. *See Ariz. Mining*, 172 F.4th at 662.

**C. APA**

ONDA argues that BLM arbitrarily and capriciously changed its position regarding the "minimum" number of acres necessary to research sage-grouse, as stated in the 2018 FEIS and the 2020 FSEIS. Even actions taken within an agency's statutory authority may be arbitrary and capricious, thereby violating the APA, if the agency fails to exhibit reasoned decision-making. *Moncrief v. U.S. Dep't of Int.*, 339 F. Supp. 3d 1, 6-7 (D.D.C. 2018) (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016), and *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017)). Although "[a]gencies are free to change their existing policies," they must "provide a reasoned explanation for the change." *Encino Motorcars*, 579 U.S. at 221. A policy change complies with the APA when: (1) the agency displays "awareness" that it is changing position; (2) the new policy is permissible under the statute; (3) the agency believes the new policy to be better; and (4) "there are good reasons" for the new policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009). If an agency's "new policy rests upon

factual findings that contradict those which underlay its prior policy," the agency must include "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.*

At the threshold, BLM argues that it did not change its position when it designated areas open to grazing in the 2025 ARMPA and ROD and, therefore, that the *Fox* change-in-position doctrine does not apply. Specifically, BLM asserts that the 2025 ARMPA continues the agency's practice of maintaining some ungrazed areas in the key RNAs to provide research opportunities. This states BLM's "position" at too high a level of abstraction. The cases that BLM cites in its favor demonstrate that courts determine whether the *Fox* doctrine applies by looking at the consistency between specific agency determinations or findings, not general policy directions. *See, e.g.*, *Or. Wild v. U.S. Forest Serv.*, 193 F. Supp. 3d 1156, 1165-66 (D. Or. 2016) (determining whether *Fox* applies to agency positions "on grazing's effect on bull trout habitat"); *Alaska v. Bernhardt*, 500 F. Supp. 3d 889, 923-24 (D. Alaska 2020) (*Fox* doctrine did not apply when agency built upon initial finding that there was a potential harm by enacting baiting practices to address potential harm). Properly framed, BLM's decision in the 2025 ARMPA to reduce the number of ungrazed acres in the key RNAs amounts to a change in position from the 2015 ARMPA. *Fox* applies.

ONDA concedes that the first three elements of the *Fox* test are met. The relevant question, therefore, is whether BLM articulated "good reasons" for the reduction in ungrazed acres. ONDA argues that BLM failed to show good reasons in the 2024 FEIS and 2025 ARMPA because BLM has never addressed its statements in the 2018 FEIS or the 2020 FSEIS about the "minimum" acreage necessary to perform research. Beyond that, BLM does not explain why the reduced acreage in the 2025 ARMPA will provide statistically valuable baselines for the type of

large-scale research that BLM referenced in those "minimum" statements. Thus, ONDA argues, there is an "[u]nexplained inconsistency" between the 2018 FEIS/2020 FSEIS and the 2025 ARMPA, rendering the latter arbitrary and capricious. *See Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

Upon further review of the administrative record,[65] the Court hesitates to bind BLM so rigidly to its prior statements regarding the "minimum" number of acres necessary to perform research. The statements appear in EISs for the *2019 ARMPA* and purport to describe the agency's *prior position* in the 2015 ARMPA.[66] The statements, however, do not cite to any page from the 2015 ARMPA, nor do they reference any study justifying a minimum number or any study that BLM stated in the 2015 ARMPA (or other document) that articulated a 21,922 acre "minimum."[67] The "minimum" statements do not themselves explain or reference "the type of

---

[65] The "findings and fact and conclusions of law made by a court in granting a preliminary injunction are not binding" on the merits. *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 631 n.5 (9th Cir. 2016) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

[66] *See* 2018 FEIS at 4-8 (AR_040175) ("The BLM determined in the 2015 ARMPA that the 13 RNAs identified for closure along with the 2 RNAs already closed to livestock grazing were likely the minimum number of sites and areas necessary to provide sufficient replication and support a coherent research plan that would provide data with the statistical power and sufficient scope of inference to extrapolate the results across all Greater Sage-Grouse habitat in eastern Oregon and potentially into western Idaho and northern Nevada."); 2020 FSEIS at 2-4 (AR_038428) ("The BLM considered the remaining 15 key RNAs and acres identified in the 2015 ROD/ARMPA the minimum size and placement needed to provide a sufficient land base and mix of vegetation types to meet the research need and retain the statistical power and scope of inference that could be extrapolated over the planning area as a whole and into adjoining states.").

[67] In the sentence preceding the "minimum" language in the 2018 FEIS, BLM cited to Berg, et al. (2016) for the general proposition that "[c]omparisons to areas without livestock grazing are important so that grazing treatments [including no grazing] can be compared to baseline conditions." *Id.* To the best of the Court's understanding, the Berg study did not make a

large-scale research that BLM sought to do with the key RNAs," *contra Raby*, 780 F. Supp. 3d at 1100, beyond articulating the agency's goal of collecting "data with the statistical power and sufficient scope of inference" to extrapolate the results over the key RNAs.[68] In the 2015 FEIS, the agency explained why closing the key RNAs to grazing would advance those goals: it "would provide areas where natural successional processes would proceed for long-term monitoring of the plant communities important for [sage-grouse] and research."[69] There is no research plan stated in the 2015 ARMPA beyond directing the agency to develop "[s]ite specific RNA activity plans" for each of the key RNAs within five years and "utilize these areas for baseline research for plant communities important for [sage-grouse]."[70] In the 2025 ROD and ARMPA, BLM explains that "there is no scientific consensus on the minimum size of an area allocated as unavailable to grazing that is necessary to study plant succession," because "plot size and exclosure sizes vary depending on the purpose of the study."[71] Because there is no particular study referenced by the "minimum" statements in the 2018 FEIS or 2020 FSEIS, the Court concludes that BLM has articulated "good reasons" to abandon its prior "minimum" number statements.

The Court also concludes that BLM has articulated good reasons for reducing the number of ungrazed acres from the 2015 ARMPA. In the 88-page Appendix 17, BLM explains how each

finding regarding a "minimum" number of acres necessary to make such comparisons. Such information, if it exists in the record, has not been drawn to the Court's attention by the parties.

[68] *See* 2018 FEIS at 4-8 (AR_040175); 2020 FSEIS at 2-4 (AR_038428).

[69] 2015 FEIS at 2-46 (AR_046858).

[70] *Id.*

[71] 2025 ROD and ARMPA at 1-16 (AR_000044).

of the key RNAs will still facilitate plant research despite reduction of ungrazed acres. Between the 2015 ARMPA and the 2025 ARMPA, BLM performed key RNA monitoring and considered site inventories and ground truthing in its proposed changes.[72] This data supplemented BLM's previous research in 2015. Although BLM, through the 2015 ARMPA, addressed similar

---

[72] As explained by BLM:

> These included "Conformance Review Worksheets" assessing the closure areas in BLM's Malheur District (AR_019850, AR_021144, AR_021276, AR_026578, AR_026618, AR_026782, AR_026789), the Environmental Assessment for 2015 key RNA closures in the Lakeview District (AR_[0]19[8]91), documentation regarding permittee compliance with 2015 key RNA closure boundaries under the 2023 Stipulated Remedy [including trespass notices, actual grazing use reports, photos, and other compliance inspection records], . . . (see, e.g., AR_018560-600, AR_018748, AR_020287-300, AR_021022-26, AR_021165-70, AR_026284-90, AR_026435-44, AR_026456-60, AR_0[2]6524- 47, AR_0[2]6558-272, AR_026624-30, AR_026627-36, AR_026714-15, AR_026746-51, AR_026796-97, AR_0[2]6863-66), updated monitoring and utilization data for areas containing key RNAs [including related photos and communications] (AR_026557, AR_026569-70, AR_026573-83, AR_026718-26745, AR_026752-26779, AR_026810-26838, AR_026844-62, AR_027147-52, AR_028639-43, AR_028742, AR_028750, AR_038957, AR_039187-96, AR_039267-331, AR_040480, AR_041458-64, AR_041909-36, AR_041899-2023, AR_042021-23, AR_042498-504), habitat suitability worksheets assessing the sage-grouse habitat in various key RNAs (AR_026804-09, AR_026841-43, AR_028751-[53]), draft activity plans for each key RNA (AR_000597-685), post-2015 references identifying research and reports on a wide variety of topics including greater sage-grouse, sage-grouse habitat, grazing, wildfire, and climate change (see AR_013304-49), public comments on the proposed RMPA and FEIS (see AR_015553-694 (summary of comments and responses)), updated information from the Oregon Department of Fish and Wildlife (AR_020038-41), and other coordination with the State (AR_023775).

ECF 52 at 24-25.

concerns (e.g., seeking to minimize fencing in key RNAs), BLM did not rely on "precisely the same record" to reach its different conclusions in the 2025 ARMPA. *See Kake*, 795 F.3d at 968.

BLM did not, however, articulate good reasons for changing the definition of "key RNA" or adding definitions of the terms "relatively unaltered," or "baseline reference area."[73] As explained above in connection with the NEPA public comment claim, changing these definitions fundamentally alters the nature of the "baselines" preserved in the ungrazed areas of the key RNAs, because it allows even those ungrazed areas to have up to 20% utilization. Several BLM documents emphasize the need for "ungrazed baselines."[74] Although BLM cited studies in support of its new definition of baseline (which need not be "ungrazed"),[75] BLM never acknowledges its previous descriptions of the baseline as ungrazed, nor do its studies in the 2025 ROD and ARMPA explain whether there is a difference between an ungrazed baseline and a grazed baseline. This is the kind of unexplained inconsistency that renders the agency's decision arbitrary and capricious. *See Kake*, 795 F.3d at 966.

---

[73] ONDA raises this issue in connection with its APA claim its reply-response brief. *See* ECF 53 at 15. The Court has discretion to consider issues raised for the first time on reply. *See Glenn K. Jackson Inc. v. Roe*, 273 F.3d 1192, 1202 (9th Cir. 2001). The Court exercises that discretion here because, based on the briefing schedule of the cross-motions for summary judgment, BLM had adequate opportunity to respond to this argument. *See* ECF 53 (ONDA response and reply, filed Jan. 26, 2026), ECF 54 (BLM reply, filed Feb. 23, 2026).

[74] *See, e.g.*, 2018 FEIS at 4-8 (AR_040175) (describing the Actionable Science Plan (Berg, et al. 2016)); 2020 FSEIS at 4-17 (AR_038491) ("Beck and Mitchell (2000) indicated there is a lack of ungrazed comparison areas for evaluating livestock impacts on seasonal needs of Greater Sage- Grouse. Hockett (2002) noted the lack of large representative tracts of ungrazed habitat makes it nearly impossible to determine and monitor the actual consequences of livestock grazing. . . . Closure of the 13 RNAs to serve as ungrazed baselines for research supports Sagebrush and Greater Sage-Grouse Science Need #2: Conduct a series of large-scale, replicated grazing studies that address how different livestock species, grazing systems, disturbance histories, and other environmental conditions affect Greater Sage-Grouse habitat (Berg et al. 2016, page 74).").

[75] *See* 2025 ROD and ARMPA at 1-15 (AR_000043).

**D. Remedy**

Having found the 2024 FEIS, 2025 ARMPA, and 2025 ROD violative of FLPMA, NEPA, and the APA, the Court turns now to the appropriate remedy. "Vacatur is the traditional remedy for erroneous administrative decisions." *Nat. Res. Def. Council v. EPA*, 38 F.4th 34, 51 (9th Cir. 2022). The Court need not vacate, however, and in fashioning an appropriate remedy it must (1) "weigh the seriousness of the agency's errors against the disruptive consequences of an interim change that itself may be changed"; (2) consider "the extent to which either vacating or leaving the decision in place would risk environmental harm"; and (3) examine "whether the agency would likely be able to offer better reasoning [and] . . . adopt the same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *Id.* at 51-52 (quoting *Nat'l Fam. Farm Coal. v. EPA*, 960 F.3d 1120, 1144 (9th Cir. 2020)).

BLM's new definitions in the 2025 ARMPA form the basis for the NEPA and APA violations. To remedy those, the agency will need to reopen the public comment period and offer a better reasoned explanation for its changes. The agency also will need to better explain its non-impairment findings in a supplemental environmental assessment to remedy the FLPMA violation. Particularly with respect to the definitions, these errors may be fundamental.

The disruptive consequences of vacatur, however, dwarf the Court's concerns regarding the seriousness of BLM's errors. Vacatur here would reignite the Court's order in *Bushue*, requiring BLM to immediately implement the 2015 ARMPA. Ordering BLM to install fencing that, according to the 2025 ARMPA, is unnecessary and may introduce new environmental problems, seems to the Court to invite the "disruptive consequences of an interim change that itself may be changed." *Nat'l Fam. Farm Coal.*, 960 F.3d at 1144. If BLM promptly addresses the procedural deficiencies identified in this Opinion and Order, the agency would presumably

remove the fencing required by the *Bushue* Order and 2015 ARMPA. This flip-flopping will itself create the potential of environmental disruption in the key RNAs and impairment of the wilderness characteristics in the WSAs. Nor does equity call for Sisyphean construction. Remand, rather than vacatur, will best ensure that BLM's resources are dedicated to prompt implementation of this Opinion and Order and protection of the sage-grouse.

ONDA also requests a permanent injunction ordering BLM to implement the 2015 closures no later than the turnout of grazing in 2027 on each pasture containing a key RNA. Based on the above ruling, the Court denies this request. A narrower injunction, however, is warranted.

To obtain a permanent injunction, ONDA must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). ONDA has an interest in the conservation in sagebrush and therefore will suffer an irreparable injury if BLM was allowed to reintroduce grazing in the key RNAs. Monetary damages would not compensate for the harm to ONDA because "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

Because the government is a party, the balance of the hardships and public interest factors merge. *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). When the alleged action by the government violates federal law, the public interest factor generally weighs in favor of the plaintiff. *See Valle*

*del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013); *see also Inland Empire-Immigrant Youth Collective v. Nielsen*, 2018 WL 1061408, at *21 (C.D. Cal. Feb. 26, 2018) ("In addition, the Court again notes the public interest that exists in ensuring that the government complies with its obligations under the law and follows its own procedures." (quotation marks omitted)). And, because of the risk of permanent injury, the balance of hardships favors the issuance of an injunction to protect the environment. *Amoco*, 480 U.S. at 545. Combining those principles with the disruptive consequences of vacatur discussed above, the Court finds a narrow injunction appropriate that maintains the status quo while BLM remedies the procedural defects identified in this Opinion and Order.

Thus, BLM must implement the portions of the Stipulated Remedy from *Bushue* (No. 19-cv-01550-SI, ECF 177-1) that maintain the status quo. Specifically, BLM is ORDERED to:

(i) make best efforts to prevent livestock from grazing in the 2015 closure areas by entering into agreements with affected permittees to employ management strategies to that effect (*see id.* ¶ 2);

(ii) conduct periodic compliance checks of all key RNAs that have not yet been permanently closed (*see id.* ¶ 4); and

(iii) follow BLM's administrative process for addressing any unauthorized use and verify that all livestock have been removed from the key RNAs (*see id.* ¶ 2(a); *id.* ¶ 4(b)-(d)).

## CONCLUSION

The Court GRANTS IN PART Oregon Natural Desert Association's Motion for Partial Summary Judgment (ECF 41) and Defendants' cross-motion (ECF 51). The 2024 EIS, 2025 ARMPA, and 2025 ROD, as promulgated, violate FLPMA, NEPA, and the APA, and are hereby remanded to the Bureau of Land Management for further environmental assessment and

consideration. The Court further ORDERS the Bureau of Land Management to adhere to the permanent injunction described herein.

**IT IS SO ORDERED**.

DATED this 8th day of September, 2026.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge